## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | **)** | |
| | **)** | |
| v. | **)** | 23CR239-CKK |
| | **)** | |
| HEATHER MORGAN. | **)** | ***REDACTED*** |
| | **)** | |

### HEATHER MORGAN'S SENTENCING MEMORANDUM

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

LEGAL FRAMEWORK............................................................................................. 2

BACKGROUND........................................................................................................ 3

    A. Ms. Morgan's Childhood........................................................................ 3

    B. Ms. Morgan's College and Early Post-College Years............................. 7

    C. Ms. Morgan's Professional Endeavors and ██████████................... 8

    C.  Ms. Morgan's Relationship with Mr. Lichtenstein.............................14

    D. The Offense Conduct............................................................................. 19

    E. Ms. Morgan's Arrest and Post-Arrest Incarceration............................20

    F. The Consequences of Ms. Morgan's Offense.......................................23

    H. ████████████████████████████.............................. 28

DISCUSSION.......................................................................................................... 29

I. THE SENTENCING GUIDELINES.....................................................................29

    A. The Correct Guideline Calculation ...................................................... 30

    B. The Obstruction Enhancement Does Not Apply....................................30

    C. The Zero-Point Offender Reduction Applies ...................................... 31

II. THE SECTION 3553(a) FACTORS.....................................................................32

    A. Ms. Morgan's History and Characteristics Support a Sentence of time Served.................32

    B. A Sentence of Time Served is Sufficient When Considering Ms. Morgan's Role in the Offense, the Need to Avoid Unwarranted Sentencing Disparities, and the Need for General Deterrence................................................................................... 34

    C. A Sentence Greater Than Time Served is Unnecessary for Specific Deterrence.............. 40

    D. A Time Served Sentence is Sufficient to Achieve Just Punishment.................41

    ████████████████████████████████████████.............43

III. RESTITUTION AND FORFEITURE................................................................ 45

CONCLUSION........................................................................................................ 46

Heather Morgan, through counsel, hereby respectfully submits her Sentencing Memorandum. We respectfully submit that a sentence of time served in this case will comport with 18 U.S.C. § 3553's requirement of a "sufficient, but not greater than necessary" sentence.

## INTRODUCTION

Heather Morgan acknowledges that she committed a serious offense. She is deeply remorseful and makes no excuses for her conduct. Ms. Morgan understands that it is this Court's responsibility to impose a just sentence. We respectfully submit that a sentence of time served is appropriate under the unique facts and circumstances of this case.

In determining the sentence, we ask this Court to take into consideration the fact that Ms. Morgan did not plan or seek out the offense in this case. She learned about the hack of Bitfinex more than three years after it occurred, and "was in some ways thrust into the middle of a serious criminal scheme without her initial consent, and undoubtedly felt compelled to support it out of a sense of loyalty to her husband and desire to preserve their life together." ECF 143–Gov't Sent. Mem., at 18. She played a minor role in the offense. Still, her conduct in this case was out of step with the way she has lived her life before and since the offense—a life that has been characterized by hard work, overcoming challenges, and helping others.

Ms. Morgan's offense ended close to three years ago. Since then, she has dealt with significant consequences resulting from her offense, including the complete destruction of her reputation. Nevertheless, the decisions she has made in this case reflect her true character. Ms. Morgan promptly accepted responsibility for her criminal conduct, foregoing a preliminary hearing and indictment in this case, ████████████████████████████████████ ████████████████████████████████████████████

██████ Ms. Morgan was initially subject to difficult conditions of pretrial incarceration. Since her release, she has complied fully with the restrictive terms of pretrial release for nearly 33 months, ████████████████████████████████████ ████████████████████████████████████ ████████████████. Ms. Morgan has also been productive, maintaining employment during her pretrial release. Ms. Morgan has also matured and has worked to better herself. Under the unique circumstances of this case, a further term of incarceration would be greater than necessary to achieve the goals of sentencing. There is no need for specific deterrence in this case and, at this point, sending Ms. Morgan to prison would work a net detriment to all of the other goals of sentencing.

Ms. Morgan has proven herself worthy of a second chance, and we respectfully ask this Court to give her that chance by imposing a sentence of time served.

## LEGAL FRAMEWORK

Federal sentencing is governed by 18 U.S.C. § 3553(a), which requires the sentencing court to consider a multitude of factors in determining the appropriate sentence, including but not limited to the defendant's background and characteristics, the need for deterrence, and the need for rehabilitation. In considering these factors, section 3553(a) directs the sentencing court to "impose a sentence sufficient but not greater than necessary" to comply with the purposes of sentencing as set forth in the Sentencing Reform Act (emphasis added).

The federal sentencing guidelines are purely advisory, and a district court may not presume a sentence within the guidelines to be reasonable. *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also United States v. Terrell*, 696 F.3d 1257, 1261 (D.C. Cir. 2012) ("A sentencing

2

judge cannot simply presume that a Guidelines sentence is the correct sentence.") (internal quotations omitted). Instead, the Court must consider all Section 3553(a) factors.

The applicable law for individual sentencing factors are discussed in greater detail below.

## BACKGROUND

### A. Ms. Morgan's Childhood.

Ms. Morgan was born in ██████████████ Presentence Report ("PSR") ¶ 91. She is the only child of ████████████, Ex. A–Letter of ██████████, at 1. Throughout Ms. Morgan's childhood, her father worked as a biologist for the federal government. Ex. B–Letter of ██████████, at 1. Because of this job, during the early years of Ms. Morgan's life, the family lived in remote and often impoverished areas of Oregon and California. Ex. A, at 1; Ex. C–Letter of ██████████, at 1.

When Ms. Morgan was four years old, the family settled in ██████████, where ██████████ had grown up, and ████████████████████. Ex. A, at 1. At the time, ████████████████████ with few children. As a result, Ms. Morgan had very limited contact with children her own age. Ex. C, at 1. One notable exception to this was family friend ██████████, who was six years younger than Heather. ██████████ describes in her letter how, during their childhood, Heather looked after her and supported her growing up, knowing that her family had less than Ms. Morgan's. Ex. D–Letter of ██████████, at 1.

Because her father was away working and only came home during weekends, PSR ¶ 91, and her mother and grandmother worked full time, Ms. Morgan spent most of her time with her paternal grandfather. Ex. C, at 1. He taught her to read, and instilled an interest in world events and history by reading the newspaper with Ms. Morgan. *Id.* From an early age, Ms. Morgan was also taught to work hard, and "grew up doing inside and outside chores, some of them to earn

money." Ex. A, at 1-2; *see also* Ex. C, at 1; Ex. E–Letter of ██████████, at 1-2.  And while Ms. Morgan "credits [the experience] as part of her strong work ethic," Ex. A, at 2, the expectation to constantly be productive and organized could at times be overwhelming.  Ex. F–Report of ██████████, at 3.

Growing up in an isolated environment, Ms. Morgan "created her own world and seemed very content in it."  Ex. C, at 1 (noting that Ms. Morgan "always liked to learn"). Hearing about ██████ experiences in the military, Ms. Morgan developed an interest in foreign languages and cultures. Ex. B, at 2-3.  This would become a life-long interest, and to date, Ms. Morgan has traveled to 38 countries.  From an early age, she became an avid reader and enjoyed learning independently, as well as working on art projects and other creative endeavors. Ex. A, at 1;  Ex. B, at 2;  Ex. C, at 3.

Ms. Morgan showed intellectual promise from a young age.  Ex. A, at 1;  Ex. C, at 1. When Ms. Morgan began attending elementary school, she performed well academically, but had trouble adjusting to the new environment because of her limited experience socializing with other children.  *See* Ex. B, at 2-3;  *see also* Ex. A, at 2;  Ex. C, at 1-2.  Ms. Morgan suffered from a severe speech impediment and was required to attend speech therapy, and this "gave kids another reason to make fun of her." Ex. A, at 2;  Ex. F, at 4;  PSR ¶¶  91, 127. In the fourth grade, Ms. Morgan was subjected to repeated instances of sexual harassment by another student that the school failed to address, and Ms. Morgan's parents transferred her to a different elementary school.  Ex. A, at 2;  Ex. C, at 1.  Still, Ms. Morgan continued to struggle to integrate socially at the new school.  ██████████ recalls that "[h]er grammar school was very small with under 20 children total in her grade which only magnified any degrading personal comments… This began

an era of isolation and social awkwardness for Heather which did not change until high school." Ex. E, at 2.

In 2004, Ms. Morgan began her middle school years, ██████████████████████ ████████ and his health began to deteriorate. *See, e.g.*, Ex. C, at 2. Ms. Morgan spent much of her free time with him, assisting with care until he passed away in 2003. Ex. A, at 2. This was a difficult loss for Ms. Morgan. Still coping with the loss some years later, Ms. Morgan created a likeness of ████████████ in her art class. Ex. C, at 2. Ex. A, at 2.

In 2004, Ms. Morgan began attending Pleasant Valley High School in Chico, California, ███████████████████████████. *See* Ex. E, at 2. At Pleasant Valley, Ms. Morgan "had the opportunity to excel . . . She took college track classes in high school and by her sophomore year began taking some classes at the local college which counted towards her high school graduation credits." Ex. B, at 3; *see* Ex., A at 2. She pursued her interest in foreign languages and cultures, studying Arabic and Japanese, and participating in an exchange program that took her to Japan. PSR ¶ 93; Ex. A, at 2; Ex. C, at 2. Ms. Morgan graduated 11th in her high school class of 429 students. PSR ¶ 124. Throughout school, Ms. Morgan received various awards including the AP Scholar Award, as well as an Honorable Mention for outstanding writing at the Tehama County Literary Festival Writing and Illustration Contest. *Id*. Upon graduating, Ms. Morgan earned two scholarships that more than fully covered her college tuition costs. PSR ¶ 124; Ex. A, at 3.

Yet, while she thrived academically, Ms. Morgan continued to struggle socially. ████ ██████, a close friend of Ms. Morgan's since middle school, writes: "I sometimes thought I was 'too cool' to actually hang out with her… She would wear crocs and bright colors because that's what she liked. She liked to talk but she also talked with a lisp. So some people would

make fun of her." Ex. G, at 1. ▨▨▨▨▨▨ elaborates, writing, "She would often change her clothes and hair in an attempt to blend in more, even trying fake tans and bleaching her hair blonde with the help of my mother. Looking back, it's clear that Heather's intelligence and academic achievements made her stand out, which unfortunately led to her being singled out by peers." Ex. D, at 1. ▨▨▨▨▨▨ who evaluated Ms. Morgan over the course of approximately six hours, describes how these experiences affected Ms. Morgan, leading to ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ Ex. F, at 5.

Ms. Morgan often bonded with "nerds" and classmates who came from different countries and cultural backgrounds, and her own experience with social rejection motivated her to stand up for other students. Ex. B, at 4. ▨▨▨▨▨▨ writes in her letter that "Heather demonstrated a compassionate and supportive nature. She would always reach out to those who felt like outsiders, befriending them and making them feel included… Despite being picked on herself, Heather would always stand up for her friends." Ex. D, at 2; *see also* Ex. G, at 1. She often confided in her parents about the school's culture and how it clashed with her own values. Ex. B, at 4. Ms. Morgan also did not hesitate to step up and help students who were struggling academically–even those who excluded her socially. "Some of her peers kept her out of study groups and would only include her if they needed something, but she . . . was still willing to help when someone needed it." Ex. G, at 1.





**B. Ms. Morgan's College and Early Post-College Years.**

In September 2008, Ms. Morgan enrolled in UC Davis. In her time as an undergraduate, she continued to excel academically, pursuing a double major in international relations and economics. Ms. Morgan graduated in only three years with a GPA of 3.618. PSR ¶ 128.

In college, Ms. Morgan found community and pursued her extracurricular interests in foreign languages and cultures. She studied Japanese, joined the Japanese club, and made friends with many South Korean students. Ex. H–Letter of ████████, at 1. Ms. Morgan also completed a semester abroad in Turkey and a summer semester abroad in South Korea. PSR ¶ 124.

Ms. Morgan was conscientious about the costs of college, and took steps to ensure that she did not incur debt. Ex. I–Letter of ████████, at 1. To minimize costs, Ms. Morgan lived off campus, where housing was cheaper. She also worked several part-time jobs, including as a liaison to international students and professors, and cleaning house for an elderly couple. *See* Ex. B, at 3.

Towards the end of her time at UC Davis, Ms. Morgan was in a relationship with an international student from Hong Kong. Ex. A, at 3. They had plans to move to Hong Kong, and Ms. Morgan had already applied for a work Visa. Although the relationship ended prior to the move, Ms. Morgan nevertheless moved to Hong Kong by herself in August of 2011. Ex. A, at 3; Ex. G, at 2. There, she worked for the Hong Kong University of Science & Technology language center until February of 2012. In the fall of 2012, Ms. Morgan enrolled in the American University of Cairo graduate school to pursue a Masters in economics of international

development. PSR ¶ 123.   Unfortunately, while Ms. Morgan was in Egypt, she developed pneumonia and severe respiratory problems, and was forced to withdraw from her Master's program due to her illness and political unrest in Cairo at the time.  PSR ¶ 103;  Ex. A, at 3. This was a difficult decision for Ms. Morgan because she enjoyed her graduate studies, and formed close bonds with fellow students and expats, including members of the LGBTQ community.  Ex. J–Letter of ▓▓▓▓▓ at 1 (writing that the LGBTQ community faced repression and human rights violation, but "Heather opened her home to LGBTQ+ persons to offer them a safe place to socialize, and more generally she gave them moral support and acceptance.").

**C. Ms. Morgan's Professional Endeavors** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

When Ms. Morgan returned to California in early 2013, she moved to the San Francisco Bay Area, seeking a career in the tech industry.  Initially, Ms. Morgan lived with friends while finding her footing professionally. *See* Ex. A, at 3;  *see also* Ex. D, at 2;. During this time, Ms. Morgan briefly worked at a startup called ▓▓▓▓▓.   *See* Ex. G, at 3 (recounting how Ms. Morgan, with no money, job, or housing, was still driven and working hard); *see also* Ex. I, at 1.

In the spring of 2013, Ms. Morgan left ▓▓▓▓▓ and began working for a mobile gaming startup.   *See* Ex. G, at 3; *see also* Ex. H, at 1.  This job offered Ms. Morgan an opportunity to develop her networking and marketing skills and to gain experience managing investor relationships.   However, there were also significant problems.   As Ms. Morgan described to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. F, at 5.  The founder of this startup paid her in part by providing lodging in the apartment where he lived. *See* Ex. H, at 2; *see also* Ex. G, at 3. After Ms. Morgan moved in and began the job, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓.  In the end, he also failed to pay her money that she was still owed.  ▓▓▓▓



Starting in spring of 2013, Ms. Morgan participated in 500 Startups, an exclusive venture capital tech accelerator. There, Ms. Morgan met Ilya Lichtenstein, whom she and others refer to as "Dutch." *See* Ex. A, at 4. During the same program, she also met an older Brazilian man named ██████████████ who had founded a startup called ████████ *Id.* ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████ They married at a courthouse, and Ms. Morgan did not notify her family and friends. *Id;* Ex. F, at 5-6.

Those close to Ms. Morgan were shocked when they learned about the marriage. Many were deeply concerned about Ms. Morgan's decision. ████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

9



Upon her return to the United States, Ms. Morgan moved to Berkeley, California, staying with friends until she obtained regular work.  *See* Ex. G, at 3.  Those close to Ms. Morgan noticed the emotional toll that her time in Brazil took on her.  ███████████ writes, "I have seen Heather come back from difficult situations but in this case she was more defeated than I had ever seen her before.  It was clear that the whole experience took a toll on her and her ability to trust people."  Ex. G, at 3;  *see also* Ex. B, at 1-2 ("[s]he was traumatized by both ███████



Despite this difficult experience, Ms. Morgan turned her focus to re-establishing her career. Ex. D, at 2; Ex. L–Letter of ██████, at 1. In the fall of 2013, Ms. Morgan began working as a freelance consultant, helping Silicon Valley startups optimize cold emails.[1] *See* Ex. F, at 6. By the summer of 2014, Ms. Morgan gained significant experience creating and optimizing cold email campaigns through her freelance consulting work. With the encouragement of Mr. Lichtenstein, she decided to form her own business. She started SalesFolk LLC in June of 2014. *See* Ex. A, at 4; *see also* Ex. B, at 3; PSR ¶ 132. ██████ writes that "SalesFolk was born out of Heather's unwavering determination and work ethic. She dedicated herself wholeheartedly to her company, always putting her clients first. I observed firsthand how Heather never took a day off and was always available to support her clients, even at odd hours." Ex. D, at 2. ██████ writes: "I remember Heather working very hard to ramp up her business. When I would go to San Francisco to meet up with her for lunch or dinner, she would often be working on something when I got there and go right back to working on something when she came back home." Ex. G, at 4; *see* Ex. K–Letter of ██████, at 1 ("I would often find Heather at the weekend working, as she built up her business from the ground up."); *see also* Ex. M–Letter of ██████, at 1. Ms. Morgan's business gave her a sense of purpose, and helped her to move in a positive direction.

Clients were drawn to Ms. Morgan's creativity and commitment to their business's success. ██████o, a medical device and technology entrepreneur who was a SalesFolk client describes Ms. Morgan as "a smart and thoughtful collaborator [with] an innate ability to connect

---

[1] Businesses send cold emails to prospective customers in order to generate new revenue. Cold email campaigns are a sequence of emails designed to reach a highly specific audience of buyers.

with our customers by discussing and describing their psychology and emotions… " Ex. N–Letter of ██████, at 1. ████████ who hired Ms. Morgan to help with growth marketing and business development describes Ms. Morgan as having been "instrumental in assisting me with my startup, providing innovative ideas and solutions that have significantly impacted our progress . . . For instance, she developed a unique referral points system for my startup, which greatly increased our client base and was a testament to her creativity and commitment." Ex. O–Letter of ████████, at 1; *see also* Ex. M at 1 ("As a businesswoman, she was intelligent, focused, driven, organized, and creative, as well as scientifically minded.").

    In addition to building a team of dozens of copywriters, Ms. Morgan developed a cold email sales and marketing course that helped hundreds of businesses and sold over 5000 licenses, as well as popular educational content for salespeople.  She published articles on cold email marketing, enterprise sales, entrepreneurship, and related subjects.[2]  Ms. Morgan also spoke at conferences and helped train companies throughout the world.  *See* Ex. B, at 3;  Ex. H at 2.  All of these efforts contributed to her reputation as a "well-known expert in cold outreach email campaigns, [where] many of the fastest-growing startups were using her services to personalize emails to customers." Ex. N, at 1; *see also* Ex. P–Letter of ████████, at 1;  Ex. B, at 3.

---

[2]     *See, e.g.*, Heather R. Morgan, *The Most Persuasive Sales Emails Always Follow These Strategic Copywriting Tips*, Forbes (Nov. 14, 2017, 5:00 am), https://www.forbes.com/sites/heathermorgan/2017/11/14/the-most-persuasive-sales-emails-always-follow-these-strategic-copywriting-tips/; Heather R. Morgan, *4 Popular Myths That Are Actually Ruining Your Sales Email Strategy*, Forbes (Mar. 13, 2018, 5:00 am), https://www.forbes.com/sites/heathermorgan/2018/03/13/4-popular-myths-that-are-actually-ruining-your-sales-email-strategy/; Heather R. Morgan, *6 Tips for Sending Better Follow-up Emails,* Inc. (Nov. 22, 2016), https://www.inc.com/heather-r-morgan/6-tips-to-help-you-follow-up-with-your-sales-prospects.html; Heather R. Morgan, *7 Things That Influence Every Sales Email Strategy,* Inc. (Nov. 8, 2016), https://www.inc.com/heather-r-morgan/7-things-that-influence-every-sales-email-strategy.html.

Yet, while SalesFolk experienced significant growth and success with hundreds of business-to-business customers, Ms. Morgan maintained a modest lifestyle. She paid herself about $4,000 dollars a month, re-investing the rest of the revenue back into her company. ✕✕✕✕ notes Ms. Morgan was "someone who was not sitting on millions of dollars, but rather a bootstrapped entrepreneur working hard to make her business succeed." Ex. N, at 1. He recalls "visiting her apartment with a few other colleagues; it was modest and reflected the typical lifestyle of a hardworking startup entrepreneur. Heather lived frugally and creatively found ways to keep costs low during the conference for her and her team." *Id.*; *see also* Ex. K, at 2 ("throughout our decade long friendship I never recall Heather wanting to go to fancy shops or needing to live a certain lifestyle.").

Ms. Morgan's family and friends noticed the strong sense of purpose and direction that SalesFolk gave Ms. Morgan. ✕✕✕✕✕, a friend who frequently spent time with Ms. Morgan during this period, recalls that she was "highly motivated, finally putting her energy towards her own benefit, rather than working for someone else." Ex. L, at 1. "Day-to-day, she seemed to be working non-stop for her clients, or training new hires… Even though her field was marketing, she learned to adapt quickly in male-dominated spaces." Ex. M, at 1; *see also* Ex. D, at 2. As she worked to achieve her own goals, she consistently helped others do so as well. ✕✕✕✕✕ writes that "Heather's generosity extended beyond our business. She was known for assisting other startups in securing investors and offering her expertise freely. This selfless attitude was a testament to her character and her genuine care for others." Ex. N, at 1; *see also* Ex. H, at 1 (discussing the ways Ms. Morgan helped her in her job search, and noting that "Heather has always been a person to help someone no matter what."); *see also* Ex. Q–Letter of ✕✕✕✕.

13

at 1 (describing how Ms. Morgan helped him after college);  Ex. G, at 5-6 (describing Ms. Morgan assistance in his search for a job).

**C. Ms. Morgan's Relationship with Mr. Lichtenstein.**

Ms. Morgan and Mr. Lichtenstein began dating in 2014.  As they spent more time together, traveling to Asia together in February 2014, their relationship grew closer.  By this time, Mr. Lichtenstein had shown genuine concern for Ms. Morgan's well-being during her time in Brazil, remained emotionally supportive during the aftermath of that experience, and also encouraged and helped Ms. Morgan professionally.  ✕✕✕✕✕✕ writes that "Ilya always believed in Heather early on, in both her talents and potential, in ways very few others have." Ex. A, at 4; *see also* Ex. G, at 4.

In the fall of 2014, Ms. Morgan and Mr. Lichtenstein moved in together in San Francisco. They began to share living expenses, and as their personal relationship developed, Ms. Morgan and Mr. Lichtenstein began supporting each other's professional endeavors.  Mr. Lichtenstein advised Ms. Morgan on aspects of SalesFolk, including ideas for business development and software products, as well as advice on hiring, accounting, and other HR matters. *See, e.g.*, Ex. A, at 4; PSR ¶ 132.  Later, Ms. Morgan would also advise and assist Mr. Lichtenstein with his businesses. *See, e.g.*, PSR ¶ 131 (noting that Mr. Lichtenstein asked Ms. Morgan to be the CEO of one of his companies in 2019); Ex. M, at 2.  Over time, Ms. Morgan and Mr. Lichtenstein increasingly shared finances as well. *See* Ex. A, at 5.

In 2016, following a bitter disagreement between Mr. Lichtenstein and the co-founder of his startup MixRank, Mr. Lichtenstein left the company. *Id.*  This was a painful decision, given that he had invested over five years into establishing and building the company. The company had received investment from the likes of Mark Cuban, the prestigious tech accelerator

Y-Combinator, and was also on the Inc 5000 list for America's fastest growing companies in 2017.[3]  This experience took a mental and emotional toll on Mr. Lichtenstein.  Ex. A, at 5.  He began to isolate himself and to spend a lot of time at his computer.  *Id.* ██████████████████ ███████████████████████████████████████████  Ex. A, at 4-5.  Nearly four years later, Ms. Morgan learned that it was also during this period that Mr. Lichtenstein carried out the Bitfinex hack.  *See* ECF 100–Statement of Offense.

In 2017, Mr. Lichtenstein told Ms. Morgan that he needed to get away from Silicon Valley, which he felt was toxic, and proposed to move to New York.  Ms. Morgan, herself feeling exhausted by Silicon Valley culture and concerned for Mr. Lichtenstein's mental health, agreed to move.  Ex. F, at 6.  Unfortunately, this did not resolve the stressful circumstances the couple faced. In 2017, ██████████████████████████████████████.  Ex. F, at 9.  Then, in 2018, Ms. Morgan faced a series of personal and professional challenges that contributed to an overwhelming sense of "burnout."  *Id*; Ex. B, at 3; Ex. M, at 2.  In that year, ███████████████████████████████████████.[4]  Ex. F, at 9;  Ex. B, at 3.  Ms. Morgan was also experiencing frustrations with her efforts to scale SalesFolk.  Ex. L, at 3; *see also* Ex. B, at 3.  These personal stressors were compounded ██████████Ms. Morgan herself was dealing with at the time. PSR ¶ 108.  Ms. Morgan recounted to ██████ that, during this period, "[i]t felt like everything was collapsing."  Ex. F, at 9.

Ms. Morgan's family members grew increasingly concerned about her ██████████ ████████████████████████████████████████████ ████████████████████████████ Ex. B, at 2.  ██████████



---

[3]        https://www.inc.com/profile/mixrank.

[4]     ██████████████████████████████████████████████████ █████████████████████████



PSR ¶¶ 116, 117, 118; Ex. L, at 2.

"[Heather] tells me now that there were times when she almost left him because she felt so alone, as he grew more and more withdrawn . . . He would often lock himself in their office for hours at a time, sometimes for most of the day, completely unavailable to her." Ex. A, at 5.

As she had done throughout her life, Ms. Morgan sought solace in her creative endeavors. Ex. B, at 3-4. It was during this period that she began writing rap songs and making videos as the alter ego "Razzlekhan." As she described to

> I wanted to create a persona that embodied awkward confidence and explored societal issues. The universal truth is that your best self is your real self. Part of the way to do that was to be absurd and a hyperbole of myself. If you can be the person people can laugh at, then they will have permission to explore themselves. When you are ridiculous, you give others permission to try something different, not to be flawless, and to embrace imperfection. Razzlekhan [alter ego] was an exercise in my own humility.
>
> I used to care about things like Forbes 30 under 30, but reflecting on this made me realize that I don't want to be like that. I had to do something stupid to realize it. Being the ironic version of that meant doing something that was a stupid spectacle. I have always liked music but never thought I had a good voice, especially with a speech impediment and people making fun of me for it for my whole life; rapping was a way to conquer it.

Ex. F, at 9-10. *See also* Ex. D, at 3 ("Razzlekhan became a persona through which Heather could freely express herself and cope with the stress and pressures she faced."). Ms. Morgan's "intentional adoption of this alter ego as a coping tactic helped Mrs. Morgan manage her anxiety and find relief from everyday stresses" during a difficult period in her life. Ex. F, at 10. Years later, however, it would make Ms. Morgan a target for ridicule on social media and in the press. *See* Ex. T, *infra*.

Those who know Ms. Morgan well have made clear that Razzlekhan is a caricature, wholly distinct from the Heather Morgan they know. writes that

16

> I will be candid that I never really understood the Razzlekhan persona that has recently characterized Heather in the press – it was entirely distinct from my friend Heather. This is in large part because my understanding all along was that Razzlekhan was an artistic foil, a meta commentary on art and has absolutely nothing to do with the person I first met in Yosemite or the good friend I know today. I equate it to the way I presume professional wrestlers don't behave the same way at home. Even before the press coverage, Razzlekhan felt like a kind of fearless art project to probe the world since it was so distinct from the person I knew. Heather is kind, humble and deeply caring, funny and playful. The depiction in the press is a world apart from the person I know. She was also never flashy at all about her possessions as a friend, throughout our decade long friendship I never recall Heather wanting to go to fancy shops or needing to live a certain lifestyle. In fact, Heather was often most happy when we ate good chinese food from a local restaurant or she was getting something at a good discount.

Ex. K, at 2; *see also* Ex. M, at 2 ("Razzlekhan is a creative alter ego for Heather. The character allowed her to express parts of herself outside of her identity as an entrepreneur . . . Outside of playing Razzlekhan, Heather was Heather, another woman who is paving her own way in life.);

Ex. L, at 2 ("I think Razzlekhan is a lot about tech stereotypes, making fun of silicon valley, how much of an exclusive community it is, and other problems with that culture. As with any art, it is an exaggeration to get the point across. I believe that Heather is a talented artist, and that when her case became public, the line between Heather the person and her art got blurred."); Ex. B, at 3-4 ("She enjoyed unleashing her creativity to create and script [various] characters and then portraying them. But those characters aren't ██████!"); Ex. █ at 3 (noting that creating and playing characters was Ms. Morgan's "creative outlet to let off steam"); Ex. I, at 1 (noting that media reports have been an "inaccurate caricature").

While Ms. Morgan found a creative outlet in Razzlekhan, ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



Yet, Ms. Morgan remained committed to Mr. Lichtenstein. ▨▨▨▨▨ writes that

> Despite the strain caused by Dutch's work habits ▨▨▨▨▨, Heather cared deeply for him. She tried to support him through his challenges, showing compassion and understanding even when I suggested it might be time to move on from the relationship. It was evident to me that despite their problems, Heather and Dutch shared a genuine connection and cared deeply for each other.

*Id*. ▨▨▨▨▨ explains that "Heather has always been looking for a partner that shared her interests in life and that she could depend on." Ex. B, at 2. Even after learning about the hack, "[s]he did not consider abandoning him since he had not betrayed her the way her prior love interests had." *Id*; Ex. D, at 2 ("She saw Dutch as her protector during a time of great vulnerability, which likely influenced her initial perceptions of him despite his unconventional behavior."). Over time, Ms. Morgan's friends and family members gradually saw encouraging changes in his actions and his attitude. *See, e.g*., Ex. A, at 4 ("Heather fostered empathy in Ilya, and he greatly changed since I first met him."). ▨▨▨▨ concludes that, in contrast to her prior marriage, Ms. Morgan was willing to accept significant problems in her relationship because it was "founded on mutual respect and trust, whereby they also championed each other's unique qualities. Their foundation ▨▨▨▨▨▨▨▨▨, and reinforced Mrs. Morgan's unwavering commitment to Mr. Lichtenstein after he had informed her of his offense conduct." Ex. F, at 13-14.

Because Ms. Morgan ▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨. PSR ¶ 96. Then, in January of 2019, Ms. Morgan and

Mr. Lichtenstein were married in a private ceremony.  PSR ¶ 95.  As discussed in more detail below, Ms. Morgan learned about the hack of Bitfinex the following year, she made the decision to risk her own freedom in order to help her husband.

### D.  The Offense Conduct.

In the beginning of 2020, Mr. Lichtenstein informed Ms. Morgan that he hacked Bitfinex over three years prior, in 2016.  He sought her help in concealing the proceeds of the hack.  As reflected in the Statement of Offense, Ms. Morgan agreed to help her husband conceal the stolen funds.  Statement of Offense, ECF 100.  Mr. Lichtenstein instructed Ms. Morgan not to do any internet research on the hack, and began giving her instructions regarding the steps she needed to take in order to launder the funds.  During the two years that followed, Ms. Morgan acted on his instructions, taking various steps to launder the proceeds of the hack "with the intent to protect her husband . . . from being arrested and prosecuted for it."  ECF 143–Gov't Sent. Mem., at 12.

As the government recognizes, Ms. Morgan "was in some ways thrust into the middle of a serious criminal scheme without her initial consent, and undoubtedly felt compelled to support it out of a sense of loyalty to her husband and desire to preserve their life together."  Gov't Sent. Mem., at 18.  There is no dispute that Ms. Morgan played a minor role in the offense.  PSR ¶¶ 60, 75.  Ms. Morgan participated in laundering a small fraction of the hack proceeds.  As noted by the government, Ms. Morgan "herself spent a small fraction of the criminal profits."  Gov't Sent. Mem., at 17; *see also* Ex. G, at 4 (noting that he did not observe Mr. Lichtenstein and Ms. Morgan spending extravagantly when he visited them in New York).

Ms. Morgan clearly recognizes that her conduct was serious, and regardless of the circumstances, there is no excuse for her involvement in the offense.  As she writes in her letter to the Court,

I compromised my morals and became part of a serious crime. I love and respect my husband, but this is no excuse for my actions, which were clearly illegal. I made it more difficult for law enforcement to detect his crime, preventing Bitfinex from recovering their rightful assets sooner, and I am deeply sorry for that. I also apologize that our actions required the government to spend its resources and taxpayer money to uncover our laundering efforts, which could have otherwise been spent on more valuable things to society. I recognize that my conduct is worthy of punishment and my decisions have serious consequences.

Ex. R, at 1.

Since her arrest, Ms. Morgan has reflected on her decision to become involved in the offense:

In 2020, I learned that my husband Ilya Lichtenstein committed a serious crime in 2016. When he told me what he had done, I was in complete shock. I made the poor decision to get involved in Ilya's crime. Our relationship was far from perfect, but I deeply love and care about my husband, and the truth is, I did not want him to go to prison because we were planning to start a family together. He was there for me in so many ways others had not been in my life, and our relationship was the biggest part of my decision. I also felt like I was already involved because I had been accepting cryptocurrency from him and worked on businesses with him for years without knowing where the cryptocurrency came from. I felt like I was already in the offense whether I liked it or not. This is not an excuse, but I hope it gives you a sense of my thought process at that time.

*Id*; *see also* Ex. A, at 3.  Ex. F, at 15. She explains that *see also* Ex. B, at 2 ("She is a loyal person and I believe it was her bond with Ilya that pulled her into the mess that Ilya started with his cryptocurrency hacking."); Ex. E, at 5.

**E. Ms. Morgan's Arrest and Post-Arrest Incarceration.**

Ms. Morgan was arrested on February 8, 2022. By this time, Ms. Morgan and her husband had been aware of the government's investigation for several months, had hired counsel,

████████████████████. Ms. Morgan and her counsel understood that the government was months from making a decision regarding how it would proceed with the case, and believed that Ms. Morgan and her husband would be permitted to self-surrender in the event of criminal charges being brought against them.  Transcript of February 8, 2022 Detention Hearing in the Southern District of New York, 1:22-mj-00022-RMM, ECF 29-3, at 19[5]; Ex. B, at 1.  As part of her counsel's dialogue with the government, defense counsel informed the government that Ms. Morgan was set to have surgery █████████████████████████████████ ███████ and understood the dialogue would continue following Ms. Morgan's surgery. 1:22-mj-00022-RMM, ECF 29-3, at 19.   Instead, just five days after Ms. Morgan's surgery, the government arrested Ms. Morgan and her husband without notice.  At the time, Ms. Morgan was still in the process of recovering.  *Id.* at 18;  PSR ¶ 99.  As her prior counsel wrote to at the time in response to the government's appeal of the initial decision to release her, "she has surgical wounds that are still healing and are at a heightened risk of infection in a custodial environment, she has limited mobility in her right arm, and she is supposed to have a follow-up appointment with her surgeon next week to confirm that there are no complications from her recent surgery. She is currently experiencing pain from those incisions, which makes it all the more vital for her to have the follow up visit."  1:22-mj-00022-RMM, Def. Opp'n to Review of Bail Conditions, ECF 21, at 4-5.

Ms. Morgan was initially held at MDC Brooklyn for a period of three days in solitary confinement.  She was ordered released at the conclusion of her initial detention hearing in the Southern District of New York on February 8, 2022.  The government appealed this decision, PSR ¶ 19, and Ms. Morgan was subsequently transferred to the Alexandria Detention Center in

---

[5]     Page numbered referenced are from the ECF-generated header in the filed version of the document.

Alexandria, Virginia.   On February 14, Judge Howell granted Ms. Morgan pretrial release pending trial, but required that she post ✖✖✖✖✖✖✖ as a security.   PSR ¶ 18.   Ms. Morgan's attorneys proceeded expeditiously to post the required security, but this took several weeks.   PSR ¶ 20 (noting bond was posted on Feb. 25, 2022).   In the meantime, Ms. Morgan contracted COVID, and was quarantined.   This entailed being held in solitary confinement for the entirety of her incarceration there, where she was moved from booking, to a solitary cell in the medical unit.   Many of the days, Ms. Morgan was not let out to shower or make phone calls. During this time she also suffered from a severe asthma attack when pepper spray penetrated the door of Ms. Morgan's cell, and the guards were unable to locate her prescribed inhaler.   After putting Ms. Morgan on a nebulizer machine, medical staff told Ms. Morgan that her oxygen levels were still too low and had to give her another round of treatment.   ✖✖✖✖✖ writes, "due to bureaucratic issues caused by differences between jurisdictions and complications from the pandemic, it took over 3 weeks for Heather to be released."   Ex. A, at 6.   ✖✖✖✖✖ recalls that, after her release, Ms. Morgan was "emaciated; still in pain from the pre-arrest surgery; had failed to receive adequate post operative care; and was still getting over COVID that she contracted while in custody."   Ex. B, at 1.   Ex. A, at 6 ("she was so under-weight the doctor told me to feed her peanut butter in addition to everything else to put weight back on.").

Since her release from pretrial custody, Ms. Morgan will have spent 33 months on home incarceration with location monitoring by the time of sentencing, along with other significant restrictions on her freedom.

As we discuss next, many more consequences have followed in the nearly three years since Ms. Morgan's arrest.

**F.  The Consequences of Ms. Morgan's Offense.**

Even prior to Ms. Morgan's arrest, Ms. Morgan's involvement in this offense was a significant cause of distress for her.  As the government acknowledges, "it appears highly unlikely that the defendant would have sought out or otherwise become involved in criminal activity had it not been for her husband's actions."  Gov't Sent. Mem., at 18.  ████████ relates that "[a]fter the plea, she shared with me how she'd felt trapped once she'd learned Ilya had hacked the crypto exchange and involved her without her knowing, so she felt she would be implicated, too. She told me that before the arrest, she had felt paranoid, afraid and unsure what to do." Ex. A, at 3. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

Then, in 2022, the charges in this case led to a firestorm of media coverage.  Ms. Morgan's ████████████ writes how reporters descended on ████████████ ████ and "went door to door questioning my neighbors."  Ex. C, at 3; *see also* Ex. A, at 6-7

(describing how the press set up outside of Ms. Morgan's apartment and came up to knock on the door). Although Ms. Morgan did not participate in the Bitfinex hack, or even know about it until almost four years after it occurred, much of the media attention has fixated on her. *See, e.g.*, Ex. T–Samantha Hissong, *Accused Bitcoin Mega Crook Made Rap Videos. And Dear God, Are They Cringey,* ROLLING STONE, (Feb. 8, 2022), *https://www.rollingstone.com/culture/culture-news/crypto-laundering-scheme-doj-1296783/*; Ex. U–Justin Valejo, *Alleged bitcoin hacker Heather Morgan was also a wannabe TikTok business influencer called 'Razzlekhan'*, THE INDEPENDENT, (Feb. 9, 2022, 9:08 pm), https://www.independent.co.uk/news/world/americas/razzlekhan-heather-morgan-bitcoin-tiktok-b2011340.html; Ex. V–*Justin Rohrlich, Hipster Rapper and Alleged Bitcoin Hacker Remade Herself in NYC*, THE DAILY BEAST (Feb. 9, 2022, 9:07 pm), https://www.thedailybeast.com/how-hipster-rapper-and-alleged-bitcoin-hacker-heather-rhiannon-morgan-remade-herself-in-nyc/.

Notably, even after Ms. Morgan's public guilty plea made clear that she did not hack Bitfinex and did not know of the hack until years later, news sources have continued to claim that she was the "Bitfinex hacker." *See, e.g.,* Ex. W–Tom Mitchelhill, *Feds want Bitfinex hacker 'Razzlekhan' jailed for 18 months*, COINTELEGRAPH, https://cointelegraph.com/news/feds-ask-18-months-jail-bitfinex-hacker-heather-morgan-razzlekhan; Ex. X–Protos Staff, *Bitfinex Hacker Razzlekhan was Job Hunting at Bitcoin 2024*, PROTOS (July 29, 2024, 6:04 pm) ) (falsely claiming that "In 2016, Heather Morgan, a.k.a 'Razzlekhan' hacked Bitfinex and stole over 120,000 bitcoin."), https://protos.com/bitfinex-hacker-razzlekhan-was-job-hunting-at-bitcoin-2024/; Ex. Y–Unknown Author, *The hacker of Bitfinex was present at the Bitcoin Conference 2024 in*

*Nashville,* THE CRYPTONOMIST   (July 30, 2024) (falsely claiming that "**Heather Morgan**, alias **"Razzlekhan", had stolen 120,000 BTC from Bitfinex in 2016, worth 4.5 billion dollars** at the time of the arrest.") (emphasis in original), https://en.cryptonomist.ch/2024/07/30/the-hacker-of-bitfinex-was-present-at-the-bitcoin-conference-2024-in-nashville/

The sensationalized media coverage has also fueled abusive comments on social media by members of the public. ▨▨▨▨▨, who helped Heather manage her social media accounts, recalls being shocked at what she saw after the news of the arrest:

> I looked closer at the comments and saw the most horrendous things. People were messaging her, saying that they hoped she rots in prison, that she should harm herself, and all kinds of other horrible things . . . I was worried for her safety as well. The comments were vicious and violent, and I feared she might be recognized and attacked on the streets of NYC. It was a deeply distressing time for both Heather and those close to her.

Ex. D, at 4.   Although ▨▨▨▨▨ deleted many of the comments at the time, Heather has continued to receive these types of messages throughout the pendency of this case.    Ex. Z–Examples of Abusive Messages Directed at Ms. Morgan. Predictably, these comments and the media coverage have been a significant source of anguish for Ms. Morgan. ▨▨▨▨▨



▨▨▨▨▨▨▨▨ *see also* Ex. M, at 3 ("[T]he media coverage on her became harsher because of Razzklekhan. The media didn't see her as a person and Razzklekhan made it too easy for them to sensationalize. . . . from outside looking in, it seemed like the media tore her apart.").

While she recognizes that she deserves criticism for her criminal conduct, Ms. Morgan has struggled with the fact that her hard-earned accomplishments have been written off as illegitimate. Ex. F, at 11; Ex. A, at 4 ("It deeply upset Heather that the business she worked so hard for was being treated as a fraud after her arrest."). The media has in many cases presented a grotesque caricature of Ms. Morgan, starkly at odds with who she really is. *See, e.g.*, Ex. S–Letter of ▓▓▓▓▓, at 1 (noting that Ms. Morgan is "a very smart, creative, and talented person as well, which is reflected in her business acumen."); Ex. K, at 1 ("She was unlike other people I met in silicon valley who felt the need to share what they are doing, or are overly focused [on] what accolades they have. Heather was very accomplished, but also was someone I rarely saw posture."); Ex. P, at 2 ("I believe Heather to be a person of exceptional talent, kindness, and integrity.").

Ms. Morgan has lost multiple employment opportunities as a result of this conviction and the media attention it has garnered. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ In one such instance, Ms. Morgan was hired as Head of Business Development for a prominent blockchain and Artificial Intelligence company. The company's CEO went from publicly celebrating that Ms. Morgan was one of the best hires he had ever made, to deciding he had to fire her because of a New York Post article, which erroneously claimed she was the Bitfinex Hacker. Other employment opportunities were also terminated in a similar fashion, stating fear of bad press or government retaliation.

**G. Ms. Morgan's Full Acceptance of Responsibility and Post-Offense Rehabilitation.**

As the government has noted in its sentencing memo, Ms. Morgan has accepted full responsibility very early in this case.  Gov't Sent. Mem., at 18.  Ms. Morgan is genuinely remorseful for her conduct, and has given significant thought to what led to her poor decisions. *See eg.,* Ex. A, at 7.  She is fully aware of the harm her actions have caused, recognizes that she must work to ensure that she never makes such a mistake in the future, and has thought about concrete steps to ensure that she never does so.  Ex. B, at 2;  Ex. A, at 7.  Over the course of 32 months since her arrest, Ms. Morgan has demonstrated her ability and commitment to abide by the law through her full compliance with the stringent conditions of release imposed by the Court.  She has not incurred a single alleged violation—not even a technical one—while on home confinement and home detention. ████████████████████████████ ████████████████████ Ms. Morgan also recognizes that she must continue to work to address the underlying issues that contributed to her poor decision-making in this case. *See* Ex. R, at 1.  She has been proactive in this goal by continuing to attend therapy on a regular basis.

Finally, she lives in significant uncertainty regarding her future, she has not seen her husband in person for nearly three years, and has been subjected to humiliating public attention and threats.  Yet, Ms. Morgan has remained motivated and productive.  In the period since her arrest, Ms. Morgan has continued to work.  ECF 143, at 17.  She has maintained a loving and supportive relationship with her husband.  Ex. A, at 7;  Ex. H, at 2.  Remarkably, she has also been a caring friend and source of support to others.  Ex. D, at 1 (describing how Ms. Morgan encouraged her to apply to ██████ and helped her find a job once she graduated);  Ex. K, at 2 ("She has stayed positive and supportive of others around her during this period.");  Ex. M,

at 3 (stating that Ms. Morgan "continued to remain a friend who offers me help because I was starting my own firm even though she's dealing with so much."); *see also* Ex. H, at 2; Ex. O, at 2.





**DISCUSSION**

When considering all of the applicable 3553(a) factors, including Ms. Morgan's personal history and character, her lack of any prior criminal history, the circumstances of her involvement and minor role in the offense, and the significant collateral consequences that have followed from her offense conduct, we respectfully submit that a sentence of time served is sufficient under the facts of this case.

## I.    THE SENTENCING GUIDELINES.

The plea agreement correctly sets forth the sentencing guidelines calculation in this case, with the exception of the application of the two-level obstruction enhancement pursuant to

USSG § 3C1.1;  PSR ¶¶ 64, 76.  In the end, although it arrives at the same offense level through a different route, the parties and the Probation Department agree that the final offense level is 24.

### A.  The Correct Guideline Calculation.

For the reasons set forth in Ms. Morgan's objections to the PSR, PSR, at 44-46, and detailed in the government's sentencing memorandum, the agreed-to guideline calculation is correct (prior to accounting for the Zero-Point offender reduction).  The calculation set forth in the plea agreement is the result of extensive negotiations and discussions between the parties, based on a detailed consideration of the facts.  The government's sentencing memorandum correctly sets forth the basis for this calculation.  Gov't Sent. Mem., at 9-12.

### B.  The Obstruction Enhancement Does Not Apply.

In support of the obstruction enhancement, the PSR cites two out-of-circuit cases that are inapposite.  In *United States v. Owens*, 308 F.3d 791, 794 (7th Cir. 2002), the enhancement was applied based on the defendant's fabricated story to law enforcement regarding his innocence—a story the defendant unsuccessfully maintained through his jury trial.  *Id*.  Similarly, in *United States v. Nobles*, the defendant testified falsely at a pretrial suppression hearing. 69 F.3d 172, 191 (7th Cir. 1995).  ████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████



**C.  The Zero-Point Offender Reduction Applies.**

██████████████████████████████████████ the offense level is 24.  This differs from the offense level calculated in the Plea Agreement because the Zero-Point Offender provision was enacted after the entry of the Agreement.  The government concurs with this position.  Gov't Sent. Mem. at 10 (citing *United States v. Gary*, 291 F.3d 30, 36 (D.C. Cir. 2002); 18 U.S.C. § 3553(a)(4)(A)).

Nevertheless, for the reasons discussed below, a sentence within the guidelines, ██ ██████████████████████, is an excessive sentence under the unique combination of factors this case.

## II.    THE SECTION 3553(a) FACTORS.

### A. Ms. Morgan's History and Characteristics Support a Sentence of time Served.

Ms. Morgan's history and characteristics overwhelmingly support a downward variance in this case, and a sentence of time served would be "sufficient, but not greater than necessary" under Section 3553(a).

*History of Hard Work and Consistent Employment*.  Throughout her life, Ms. Morgan has worked hard to achieve her goals.  The letters submitted to the Court show Ms. Morgan's extraordinary level of drive and determination, even in the face of significant challenges and setbacks. An individual's education, skills, and history of hard work are factors that are relevant at sentencing.  *United States v. Bras*, 483 F.3d 103, 113 (D.C. Cir. 2007) (citing with approval district court's consideration of the defendant's education and history of employment, among other factors); *United States v. Tomko*, 562 F.3d 558, 570-72 (3rd Cir. 2009) (citing, *inter alia*, the defendant's record of employment in support of sentence of probation); *United States v. Harry*, 816 F.3d 1268, 1284 (10th Cir. 2016) (stating that factors such as defendant's education and skills supported downward variance).

*Strong family ties and community support*.  Ms. Morgan has a close and loving relationship with her family.  Despite the significant negative media attention this case has garnered, she also continues to have strong support from members of the community.  This support is not only a reflection on Ms. Morgan's character, but also gives Ms. Morgan a powerful incentive to work towards redemption  S*ee, e.g., United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance); *United States v. Cernik*, 07-20215,

2008 WL 2940854, at *6, 10 (E.D. Mich. July 25, 2008) (noting that "defendant has a solid support structure in his family" in imposing a sentence of probation sentence where guidelines range was 46-57 months).



**Good works and acts of kindness**.    Throughout her life, Ms. Morgan has shown a willingness to step up and help others, without expecting anything in return.    Even during very difficult periods in her life, Ms. Morgan has continued to be a source of support and help to the people in her life, and the community more generally.    This is an aspect of Ms. Morgan's character that is thoroughly documented in the letters before the Court, and it is a factor that strongly supports leniency at sentencing.

Under § 3553(a)(1) and § 3661, the Court has broad discretion to take account of such good works, whether exceptional or non-exceptional, and whether personal or public in nature. *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008) (upholding downward variance from advisory range of 63-78 months to three months of incarceration followed by 24 months of supervised release, in part based on defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others."); *see also United States v. Serafini*, 233

F.3d 758 (3d Cir. 2000) (upholding a downward departure to an individual who encouraged a young man to attend college and loaned him money); *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (upholding a downward departure for defendant's good works that were personal in nature).

***Genuine remorse and acceptance of responsibility***.  she was also the driving force behind Mr. Lichtenstein's decision to cooperate. The letters written to the Court detail Ms. Morgan's genuine remorse for her involvement in the offense, and the fact that she has not sought to make any excuses or to minimize her conduct. These factors strongly support a downward variance to a sentence of time served in this case.

### B. A Sentence of Time Served is Sufficient When Considering Ms. Morgan's Role in the Offense, the Need to Avoid Unwarranted Sentencing Disparities, and the Need for General Deterrence.

Ms. Morgan did not plan or orchestrate the offense. Instead, when confronted with the choice, she "felt compelled to support it out of a sense of loyalty to her husband and desire to preserve their life together." Gov't Sent. Mem., at 18. To be sure, this does not excuse her conduct, and Ms. Morgan recognizes this fact. Nevertheless, imposing a fair sentence requires a close consideration of the motive for the defendant's actions. *See, e.g., Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) ("The defendant's motive for committing the offense is one important factor [in determining the sentence]").

Indeed, because spouses are often uniquely vulnerable to becoming involved in the crimes of their partner out of loyalty, they often do not get charged at all. For example, in *United States v. Cooper*, 85 F. Supp. 2d 1, 5 (D.D.C. 2000), the defendant pleaded guilty to committing

robberies and three murders.  The defendant's wife and mother were participants in Cooper's crimes.  Yet, they were never charged.  Bill Miller, *Cooper Sentenced to Life For Starbucks Slayings*, WASHINGTON POST (April 25, 2000, 8:00 pm), https://www.washingtonpost.com/archive/local/2000/04/26/cooper-sentenced-to-life-for-starbucks-slayings/35324138-0b31-4da1-a0de-57374cdd0fda/ ("As part of the plea bargain, prosecutors agreed not to pursue criminal charges against Cooper's wife, Melissa, or his mother, Gwendolyn. They said his wife had purchased a handgun he used in a robbery and that his mother sometimes wrote him checks from her own account in exchange for the cash proceeds of his robberies."); *see also United States v. Parker*, 834 F.2d 408, 412 (4th Cir. 1987)  (defendant's wife, who was not charged, assisted her husband in a murder and in subsequent efforts to conceal the crime); *United States v. Short,* 4 F.3d 475, 478 (7th Cir.1993) (in a conspiracy involving (1) knowing and unlawful possession of, with the intent to sell, motor vehicles bearing altered Vehicle Identification Numbers (VINs) and (2) conspiring to remove, obliterate, tamper with, and alter the VIN, defendant's wife, who played a minor role by preparing the fraudulent title, registration, and transfer documents, was not charged); *United States v. Miller*, 588 F.3d 897, 905 (5th Cir. 2009) (reflecting that defendant's wife who was involved in joint criminal activity with her husband in connection with his medical clinic, was "not charged with any crime); *United States v. Nardozzi,* No. 1:18-cr-10017 (D. Mass.) (in a case where a state senator and his accountant were charged in a bribery scheme, his wife (who was involved in the scheme, according to the accountant's sentencing memo) was never charged).  We respectfully submit that a sentence of any additional term of incarceration would create an unwarranted sentencing disparity with the foregoing cases and countless others where a spouse who plays a minor role is never charged.

A sentence of time served is necessary here because courts have imposed non-incarceration sentences in cases where individuals devised and carried out far more serious crimes, over a significant period of time.

For example, in *United States v. Nishad Singh*, the defendant admitted to joining a conspiracy orchestrated by Sam Bankman-Fried to defraud investors in the FTX cryptocurrency exchange. *United States v. Bankman-Fried, et al*, 1:22CR673-LAK (S.D.N.Y. 2024). Singh became Head of Engineering at FTX, and managed approximately 20 employees. ECF 526 (Gov't Sent Mem. as to Singh). Although Singh did not initially know about the fraud, which the government described as "one of the largest financial frauds ever," he knowingly and willfully contributed to the fraud once it became apparent to him. *Id.* at 2-6. Singh stayed involved in the fraud after learning about it, and "completed the purchase of a home in the San Juan Islands for approximately $3.7 million, despite knowing that the money being withdrawn from FTX was necessarily customers' money." *Id.* at 4. Furthermore, Singh also admitted to participating in inflating the revenues of FTX and misrepresenting them to clients, as well as a conspiracy to violate campaign finance violations and money laundering. *Id.* at 7. Since faced a guidelines level of 43 and an advisory sentence of life that was capped at 900 months, driven by a loss amount of over $10 billion. *Id.* at 11. ████████████████████████████ ████████████████████████ On October 30, 2024, Singh was sentenced to time served. ECF 531 (Judgment as to Singh).

A sentence in excess of time served in this case would create an unwarranted sentencing disparity with the sentence imposed in Singh. Here, like Singh, Ms. Morgan was not initially aware of the offense. ████████████████████████████████████ ████████████████████████████████████

██████ But the similarities end there. Unlike Singh, Ms. Morgan did not commit multiple crimes, and did not live lavishly off of the proceeds of those crimes. Ms. Morgan was motivated to protect her husband, whereas Singh had no similar motive. ████████████████ ████████████████████████████████████████ A sentence of time served is certainly appropriate in this case when compared to the facts and circumstances in Singh's case.

In *United States v. Kagel*, the defendant conspired with others to carry out a Ponzi scheme that continued over the course of nearly five years. 2:24CR24-GMN (D. NV. 2024). The defendant, acting with co-conspirators, "fraudulently promoted and solicited investments and obtained at least approximately $15,000,0000 in victim-investor funds for various cryptocurrency trading programs." ECF 22 (Kagel Plea Agreement), at 3. Kagel agreed that he and his co-conspirators were "operating an illegal Ponzi scheme to defraud victim-investors and take and use the funds for their own personal benefit." *Id*. As part of his role in the offense, Kagel personally spoke with and made fraudulent representations to multiple investors. *Id*. at 3. Although he faced a guidelines range of 108 to 135 months, which was capped by a statutory maximum of five years, (ECF 31–Gov't Sent. Mem. as to Kagel, at 1-2), Kagel was sentenced to five years probation. ECF 4o (Judgment as to Kagel). Although Kagel's sentence was driven to a large extent by his age (86), there are a multitude of over factors not present in Kagel, including ███████████████████████████, that even more strongly support a sentence of time served.

Similarly, in *United States v. Arthur Hayes*, et al, the defendant was the CEO and 30% owner of Bitmex, "one of the largest cryptocurrency derivatives platforms in the world."

1:24CR500-JGK, ECF 334 (Gov't Sent. Mem. as to Hayes), at 1.  According to the government, Hayes

> designed [Bitmex] to operate in violation of the Bank Secrecy Act ("BSA"), the U.S. law designed to prevent money laundering and to assist the tracking of proceeds of criminal activity. Hayes profited greatly from BitMEX, personally earning over one hundred million dollars, while willfully and continuously operating the Company in violation of the BSA, by failing to implement an anti-money laundering ("AML") program. . . . The defendant prominently advertised BitMEX's lack of KYC and AML, through its website, blogposts that he authored, and in the media. The lack of KYC and AML drew precisely the bad actors which the BSA intends to deter, but when the defendant learned about suspicious transactions on BitMEX's platform, he caused the Company to fail to file suspicious activity reports ("SARs") with the Department of Treasury.

*Id*. According to the government, Hayes knew, inter alia, that (1) Bitmex was a tool for criminal activity, and (2) repeatedly lied about Bitmex's operations.  *Id*. at 4, 6.  The government sought a sentence greater then 12 months, but Hayes was sentenced to two years probation with home detention and electronic monitoring.  ECF 344 (Judgment as to Hayes).  His co-founders, Ben Delo and Sam Reed, who also participated in the offense, were sentenced to 30 months probation and 18 months probation, respectively.  ECF 360 (Judgment as to Delo); ECF 383 (Judgment as to Reed).  Ms. Morgan's conduct stands in stark contrast to that of these executives, who engaged in a scheme in which they knowingly and intentionally evaded US law and allowed their company to be used as a platform for money laundering, all while earning massive profits, over a period of five years.

A sentence greater than time served would also create an unwarranted sentencing disparity with sentences imposed for far more serious conduct.  *See Gall,* 552 U.S. at 55 (recognizing that unwarranted sentencing disparities include unwarranted sentencing *similarities* between defendants with different backgrounds and degrees of culpability).  For example, in *United States v. Zhong*, the defendant stole more than 50,000 Bitcoin.  *United States v. Zhong*, 1:22CR606-PGG (S.D.N.Y. 2023).  He faced a stipulated sentencing range of 27-33 months in

prison.  ECF 32 (Gov't Sent Mem. as to Zhong).  The government recommended a sentence of 24 months.  *Id*. The court imposed a sentence of a year and a day of imprisonment.  ECF 35 (Zhong Judgment).  At its height, the value of the stolen Bitcoin was $3.4B.  ECF 32 (Gov't Sent Mem. as to Zhong), at 20.  Unlike Ms. Morgan, Zhong himself planned and perpetrated the theft of the Bitcoin, which he stole from the Silk Road, a dark web black market that he had used to purchase drugs.  *Id*. at 23.  Also unlike Ms. Morgan, Zhong "dissipated approximately $16 million of crime proceeds, spending lavishly on real estate investments, luxury products, travel, hotels, nightclubs, and other expenses  *Id*. at  2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮    And unlike Mr. Zhong, Ms. Morgan did not devise and carry out the scheme to commit the actual fraud.  For all of these reasons, if a sentence of 12 months and a day is sufficient for Zhong, a significantly more lenient sentence is appropriate for Ms. Morgan.

Finally, the Court should also consider *United States v. Changpeng Zhao*. 2:23cr179-RAJ.  Zhao was the CEO of Binance, the world's largest cryptocurrency exchange. ECF 78 (Gov't Sent. Mem. as to Zhao), at 1.  According to the government's sentencing memorandum as to Zhao,

> Zhao chose not to register the company with U.S. regulators; he chose not to comply with fundamental U.S. anti-money-laundering (AML) requirements; he chose not to implement and maintain an effective know-your-customer (KYC)

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

system, which prevented effective transaction monitoring and allowed suspicious and criminal users to transact through Binance; and even when Binance employees detected suspicious transactions, Zhao's choices meant those transactions were not reported to U.S. authorities. And when it became clear that Binance had a critical mass of lucrative U.S. customers, Zhao directed Binance employees in a sophisticated scheme to disguise their customers' locations in an effort to deceive regulators about Binance's client base. Critically, Zhao knew that his decision not to implement an effective AML program would result in Binance facilitating transactions between U.S. users and users in Iran and other sanctioned countries and regions in violation of U.S. law.

*Id.* at 2.

Zhao took responsibility for his offense, and personally paid $50 million in restitution, which the government noted represented "a small fraction of his wealth," in addition to $4.3 billion dollars his company paid. Gov't Sent. Mem. as to Zhao, at 16-17. Zhao pleaded guilty to one count of willful failure to maintain an effective AML program, in violation of 31 U.S.C. §§ 5318(h), 5322(b), 5322(e), and 31 C.F.R. § 1022.210(a). The government sought a sentence of 36 months, but Zhao was ultimately sentenced to four months. ECF 90 (Zhao Judgment). Unlike Ms. Morgan, Mr. Zhao carefully planned, directed, and executed a strategy to violate the law with respect to billions of dollars in transactions. He was not driven by loyalty to a spouse or family member—instead, his actions were motivated by profit. Given these differences, a sentence greater than time served in this case would work as an injustice and create an unwarranted sentencing disparity.

*A fortiori*, if the sentences in the foregoing cases also show that a sentence of time served in this case comports with the need to achieve general deterrence, particularly when factoring in the nature of Ms. Morgan's pretrial confinement, her lengthy period of release on restrictive conditions, and the significant collateral consequences of the offense.

### C. A Sentence Greater Than Time Served is Unnecessary for Specific Deterrence.

Ms. Morgan poses an exceedingly low risk of recidivism.  Prior to the instant offense, she had no criminal history.  The government concurs that Ms. Morgan's "recidivism risk is low," citing Ms. Morgan's early acceptance of responsibility and other aspects of her history and characteristics.  Gov't Sent. Mem., at 18.  Therefore, a sentence of imprisonment is not necessary to achieve specific deterrence.

### D.  A Time Served Sentence is Sufficient to Achieve Just Punishment.

Ms. Morgan has been subject to significant consequences for her involvement in the offense.  First, the nature and conditions of Ms. Morgan's pretrial incarceration in this case constitute substantial punishment.  Ms. Morgan had just had surgery and was recovering at the time of her arrest, and spent three weeks in pretrial custody in what amounts to solitary confinement without adequate medical care.  She was exposed to pepper spray and later contracted COVID while in Alexandria Detention Center.  All of this had a significant impact on Ms. Morgan's health, and exposed her to psychological anguish as well.  It is important to account for the punitive nature of Ms. Morgan's pretrial confinement, which is a valid sentencing consideration under § 3553(a).  *See, e.g., United States v. Pressley,* 345 F.3d 1205, 1219 (11th Cir. 2003) (remanding to district court with instruction to determine whether to depart on the ground of harshness of pretrial confinement).

Further, Ms. Morgan has been subject to restrictive conditions of pretrial confinement for nearly three years, and she will continue to be subject to conditions while on supervised release. The sentencing court in *Gall*, whose decision was extensively quoted and upheld by the Supreme

Court, recognized that a probationary sentence is "substantial restriction of freedom.'" *Gall*, 552 U.S. at 44. The district court in *Gall* explained that Mr. Gall's freedom would be severely limited in a number of ways and would be backed up by harsh consequences in the event of a violation of the conditions imposed. *Id.*; *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, (1987)); *see also United States v. Romualdi,* 101 F.3d 971(3d Cir.1996) ("it may be proper to depart because of the ... home detention [a defendant] had already served."); *United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) (where defendant convicted of bankruptcy fraud and on probation for prior state conviction for fraud and where guidelines range 27-33 months,  sentence of probation seven months of which was to be served under house arrest, and $5,000 fine, and restitution of $100,000 not abuse of discretion in part because proper for judge to consider that "by the time of the 2008 re-sentencing, the offenses had been committed nine years previously and …[he] completed without incident three and one half years of probation.").

Finally, the collateral consequences of Ms. Morgan's arrest, prosecution and conviction in this case have been nothing short of devastating.  The widespread media attention sets her case apart from the majority of cases in the criminal system.  Courts have recognized the punitive effect of public opprobrium and reputational harm that results from a conviction.  *United States* v. *Butina*, 1:18-cr-00218, ECF No. 120, at 37-38 (D.D.C. Apr. 26, 2019) (taking into consideration that defendant "suffered greatly because of the national attention that this case has received"); *see also United States v. Stewart*, 590 F.3d 93, 141-42 (2d Cir. 2009) (finding that "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.") (quoting with approval the district

court's observation that "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant."); *United States. v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive.").

This case represents the extreme version of that. Ms. Morgan has been subject to ceaseless pretrial publicity, much of it inaccurate. She will forever be associated with her worst decision. We respectfully ask this Court to account for this unique aspect of her case in determining the appropriate sentence.







## III.    RESTITUTION AND FORFEITURE.

For the reasons presented in the government's sentencing memorandum, this Court should order that the assets seized from Mr. Lichtenstein and Ms. Morgan be applied as in-kind restitution to Bitfinex.  Gov't Sent. Mem, at 19-24.  The Court should also order the entry of the agreed forfeiture judgment.  *Id*. at 24-27.  Finally, the Court should not impose a fine in this case given Ms. Morgan's financial condition, her acceptance of responsibility, and other factors.

## CONCLUSION

For all of the foregoing reasons, a sentence of time served is appropriate in this case.

Respectfully submitted,
By: /s/ Eugene Gorokhov

Eugene Gorokhov (D.C. Bar No. 979785)
Burnham & Gorokhov, PLLC
1634 K I Street NW, Suite 575
Washington, DC 20006
Telephone: (202) 386-6920
eugene@burnhamgorokhov.com

**CERTIFICATE OF SERVICE**

I hereby certify that I served this document upon counsel for the government by email and filed it through the ECF system.

/s/ Eugene V. Gorokhov
Counsel for Ms. Morgan