**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.                                          Case No. 23-cr-239 (CKK)

ILYA LICHTENSTEIN and HEATHER
MORGAN,

              Defendants.

**MEMORANDUM OF LAW OF THIRD-PARTY INTERVENOR AND VICTIM IFINEX
INC. IN SUPPORT OF THE GOVERNMENT'S REQUEST FOR RESTITUTION**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    A.    Bitfinex Is One of the World's Premier Cryptocurrency Exchanges ................... 3

    B.    Lichtenstein Stole 119,754 Bitcoins From Bitfinex By Hacking Bitfinex And Misappropriating Its Private Keys ............................................................... 5

    C.    Bitfinex Honored Customer Bitcoin Positions And Balances And Promptly Made Its Customers Whole ................................................................... 6

    D.    Defendants Left 94,643 Stolen Bitcoins In The Hack Wallet And Moved But Did Not Convert More Than 15,000 Additional Seized Bitcoins ................. 8

    E.    Defendants Pled Guilty And Admitted That Lichtenstein Perpetrated The Hack And Stole 119,754 Bitcoins From Bitfinex ...................................... 10

    F.    A Handful Of Disgruntled Bitfinex Customers Seek Additional Compensation Based On Their Individual Circumstances ................................. 10

    G.    Procedural History ........................................................................... 11

ARGUMENT ................................................................................................... 13

I.    The MVRA Requires That Defendants Be Ordered To Pay In-Kind Restitution Of The Stolen Bitcoins To Bitfinex ...................................................................... 13

    A.    The MVRA Requires The Court To Enforce Defendants' Plea Agreements And Order Them To Pay Restitution To Bitfinex ............................... 13

    B.    The MVRA Also Requires That The Court Order Defendants To Pay Bitfinex Restitution As The Undisputed Victim Of Defendants' Charged Conduct ............................................................................................ 15

    C.    Defendants Must Provide Bitfinex With In-Kind Restitution By Returning The Stolen Bitcoins To Bitfinex ................................................. 19

II.    The Handful of Individuals Seeking Restitution Does Not Affect Bitfinex's Right To Mandatory In-Kind Restitution .................................................................. 22

    A.    Bitfinex Customers Do Not Qualify As Victims Under The MVRA ................. 22

    B.    Bitfinex is Entitled to In-Kind Restitution Regardless of Whether the Court Recognizes Any Other Victims .............................................. 27

        1.    The Few Bitfinex Customer Claims Do Not Satisfy the MVRA's Limited Exceptions to Mandatory Restitution .................................... 27

        2.    Paying In-Kind Restitution to Bitfinex Will Not Affect Any Bitfinex Customer Rights Because They Cannot Obtain In-Kind Restitution .................................................................... 28

CONCLUSION ................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Dolan v. United States*,
  560 U.S. 605 (2010)................................................................................................................13

*In re Rendon Galvis*,
  564 F.3d 170 (2d Cir. 2009)...................................................................................................19

*Robers v. United States*,
  572 U.S. 639 (2014).................................................................................................22, 23, 26, 29

*United States v. Adefehinti*,
  510 F.3d 319 (D.C. Cir. 2007).................................................................................................17

*United States v. Ageloff*,
  809 F. Supp. 2d 89 (E.D.N.Y. 2011), *aff'd, United States v. Catoggio*, 698
  F.3d 64 (2d. Cir. 2012).............................................................................................................28

*United States v. Anieze-Smith*,
  923 F.3d 565 (9th Cir. 2019), *cert. denied sub nom, Gabra v. Unites States*,
  140 S. Ct. 613 (2019)...............................................................................................................19

*United States v. Benns*,
  740 F.3d 370 (5th Cir. 2014)...................................................................................................18

*United States v. Bikundi*,
  926 F.3d 761 (D.C. Cir. 2019).................................................................................................13

*United States v. Boscarino*,
  437 F.3d 634 (7th Cir. 2006)...............................................................................................27, 28

*United States v. Bradley*,
  692 F. App'x 118 (4th Cir. 2017)............................................................................................15

*United States v. Clinesmith*,
  2021 WL 184316 (D.D.C. Jan. 19, 2021)..............................................................................19

*United States v. Cutter*,
  313 F.3d 1 (1st Cir. 2002)........................................................................................................25

*United States v. Elson*,
  577 F.3d 713 (6th Cir. 2009)...............................................................................................16, 24

*United States v. Emor*,
  850 F. Supp. 2d 176 (D.D.C. 2012)....................................................................................16, 24, 27

*United States v. Farkas*,
  2016 WL 10585041 (E.D. Va. Oct. 3, 2016).........................................................................23

*United States v. Ferdman*,
  779 F.3d 1129 (10th Cir. 2015)...............................................................................................24

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Gratkowski*,
    964 F.3d 307 (5th Cir. 2020) .................................................................20

*United States v. Gushlak*,
    728 F.3d 184 (2d Cir. 2013) ..................................................................29

*United States v. Harmon*,
    474 F. Supp. 3d 76 (D.D.C. 2020) .............................................20, 21, 29

*United States v. Holmes*,
    673 F. Supp. 3d 1049 (N.D. Cal. 2023) ................................................20

*United States v. Hoover-Hankerson*,
    511 F.3d 164 (D.C. Cir. 2007) ...............................................................23

*United States v. Lazarenko*,
    624 F.3d 1247 (9th Cir. 2010), *as amended on denial of reh'g*, 2010 WL
    4888164 (Dec. 2, 2010) ........................................................................17

*United States v. Lutz*,
    237 F. App'x 849 (4th Cir. 2007) ..........................................................18

*United States v. Marsh*,
    2011 WL 5325410 (E.D.N.Y. Oct. 26, 2011) .......................................29

*United States v. Matos*,
    611 F.3d 31 (1st Cir. 2010) ....................................................................16

*United States v. Mejia*,
    326 F. App'x 710 (4th Cir. 2009) ..........................................................29

*United States v. Murry*,
    395 F.3d 712 (7th Cir. 2005) .................................................................18

*United States v. Naphaeng*,
    906 F.3d 173 (1st Cir. 2018) .................................................................14

*United States v. Patel*,
    2024 WL 1932871 (D.D.C. May 1, 2024) ............................................21

*United States v. Peterson*,
    268 F.3d 533 (7th Cir. 2001) .................................................................15

*United States v. Pole*,
    2024 WL 756781 (D.D.C. Feb. 23, 2024) .............................................18

*United States v. Rhodes*,
    330 F.3d 949 (7th Cir. 2003) .................................................................19

*United States v. Robertson*,
    493 F.3d 1322 (11th Cir. 2007) .............................................................26

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Sarad*,
  227 F. Supp. 3d 1153 (E.D. Cal. 2016)..................................................29

*United States v. Speakman*,
  594 F.3d 1165 (10th Cir. 2010) ...........................................................23

*United States v. Steele*,
  897 F.3d 606 (4th Cir. 2018) ...............................................................24

*United States v. Sterlingov*,
  719 F. Supp. 3d 65 (D.D.C. 2024) .......................................................21

*United States v. Wolf*,
  375 F. Supp. 3d 428 (S.D.N.Y. 2019)...................................................23

*United States v. Wyss*,
  744 F.3d 1214 (10th Cir. 2014) ...........................................................15

*In re W.R. Huff Asset Mgmt. Co., LLC*,
  409 F.3d 555 (2d Cir. 2005).................................................................15

### Statutes

18 U.S.C. § 3663A(a)(1).................................................................................15

18 U.S.C. § 3663A(a)(3).................................................................................14

18 U.S.C. § 3663A(b)(1)(A)...........................................................................20

18 U.S.C. § 3663A(b)(1)(B)(i)-(ii).................................................................22

18 U.S.C. § 3663A(c)(3).................................................................................28

18 U.S.C. § 3664(f)........................................................................................23

### Other Authorities

*100% Redemption of Outstanding BFX Tokens* (Apr. 3, 2017),
  https://blog.bitfinex.com/announcements/100-redemption-outstanding-bfx-
  tokens/ .................................................................................................8

*Bitfinex Announces Return of Seized Property to RRT Holders* (July 6, 2023),
  https://blog.bitfinex.com/media-releases/bitfinex-announces-return-of-seized-
  property-to-rrt-holders/ ..........................................................................8

S. REP. 104-179 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924....................14

Third-Party Intervenor and Victim iFinex Inc. ("**Bitfinex**") submits this memorandum of law and accompanying exhibits in support of the Government's request (ECF Nos. 170, 202), unopposed by Defendants Ilya Lichtenstein ("**Lichtenstein**") and Heather Morgan ("**Morgan**") (together, "**Defendants**"), that the Court order Defendants to pay Bitfinex in-kind restitution pursuant to their plea agreements, Lichtenstein Plea Agreement, ECF No. 96; Morgan Plea Agreement, ECF No. 101, the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A (the "**MVRA**"), 18 U.S.C. § 3664, and the Crime Victims' Rights' Act, 18 U.S.C. § 3771 (the "**CVRA**"), of all Bitcoins seized from Defendants that are traceable to Bitfinex.

## PRELIMINARY STATEMENT

Bitfinex is the undisputed victim of Defendants' criminal conduct:  The brazen theft of 119,754 Bitcoins from Bitfinex and subsequent attempted laundering of those Bitcoins. Lichtenstein hacked into Bitfinex's systems, misappropriated Bitfinex's private keys necessary to access Bitfinex's cryptocurrency wallets, and stole 119,754 Bitcoins directly from Bitfinex.  The Government and Defendants agree on these facts and agree that Bitfinex was the target and victim of Defendants' scheme.  The Government and Defendants also agree that the vast majority of the Bitcoins seized from Defendants are the same Bitcoins that were stolen from Bitfinex, and that Defendants can and should be ordered to return that stolen property to Bitfinex as restitution—as the MVRA requires in any property theft case.

*First*, Bitfinex supports the Government's request that, pursuant to the MVRA and Defendants' plea agreements, the Court order Defendants to pay in-kind restitution to Bitfinex of all seized Bitcoins that are traceable to Bitfinex.  Because both Defendants' plea agreements— negotiated by the Government and approved by the Court—designate Bitfinex as the proper recipient of restitution, that restitution is mandatory pursuant to 18 U.S.C. § 3663A(a)(3).  Bitfinex

also uniquely qualifies for mandatory restitution as the direct victim of Defendants' offenses pursuant to 18 U.S.C. § 3663A(a)(1). The Government, Defendants, and the Court have consistently defined Defendants' money laundering conspiracy to encompass Lichtenstein's theft of 119,754 Bitcoins from Bitfinex—the predicate criminal conduct for Defendants' money laundering. The Government defined Bitfinex as the "VICTIM VCE" in the charges against Defendants, and it has consistently represented to the Court that "[t]he victim's name is Bitfinex." Lichtenstein Plea Tr., ECF No. 110 at 23:5-7; Complaint Ex. A ("Statement of Facts"), ECF No. 1-1. At sentencing, the Court correctly described Lichtenstein's offense as "a scheme to steal money from Bitfinex." Lichtenstein Sentencing Tr., ECF No. 182 at 63:18-20. Under either basis for restitution, as the Government recognizes, Defendants must pay Bitfinex in-kind restitution of the Bitcoins that Lichtenstein stole from it, including the 94,643 Bitcoins seized from Lichtenstein's hack wallet. The Court should also order Defendants to return to Bitfinex an additional 15,085 Bitcoins seized by the Government which are traceable to the Hack and which are the same Bitcoins Lichtenstein stole from Bitfinex.

*Second*, the claims of a handful of Bitfinex customers do not affect Bitfinex's right to in-kind restitution. As the Government argues, Bitfinex customers did not incur losses as a direct and proximate result of Defendants' offenses. *See* Government's Supplemental Motion Regarding Restitution, ECF No. 202 at 2-3. Defendants acknowledge that they targeted Bitfinex, not its customers. After the hack, Bitfinex honored customer Bitcoin positions and balances regardless of whether they involved the stolen Bitcoins. While Bitfinex temporarily assigned its losses to customers across all assets, it made its customers whole within months of the hack. To the extent some customers believe in hindsight that they were not adequately compensated by Bitfinex, those claims are far too attenuated from Defendants' offenses for those customers to be victims. But

regardless of whether other persons seek restitution, the claims of a few individuals do not implicate the highly limited exceptions to mandatory restitution. And only Bitfinex is entitled to in-kind restitution of the specific Bitcoins stolen from Bitfinex wallets using its private keys. If the Court grants restitution to any individual based on his or her idiosyncratic circumstances, that obligation can easily be satisfied by other assets seized from Defendants.

Bitfinex respectfully requests that the Court grant the Government's request for an order requiring Defendants to pay in-kind restitution to Bitfinex of the Bitcoins that Lichtenstein stole from Bitfinex, including 94,643 Bitcoins seized from the original hack wallet and also at least 15,085 later-seized Bitcoins that are the same Bitcoins stolen from Bitfinex.

## STATEMENT OF FACTS

### A.    Bitfinex Is One of the World's Premier Cryptocurrency Exchanges

Bitcoin is the original cryptocurrency. *See* Exhibit A, Declaration of Matthew Price ("**Price Decl**.") ¶ 11. Bitcoin exists on the Bitcoin blockchain, a ledger of every Bitcoin transaction in history. *Id.* ¶ 12. Bitcoin and other cryptocurrencies are stored in cryptocurrency wallets. *Id.* ¶ 20. Cryptocurrency wallets can have multiple wallet addresses, which are like account numbers, holding Bitcoin or other cryptocurrency. *Id.* The owner of each wallet address has one or more private keys—equivalent to a password or PIN—that are necessary to authorize transactions of cryptocurrency at the wallet address. *Id.* ¶¶ 20-21.

Bitfinex is a British Virgin Islands company and the operator of one of the world's premier virtual currency exchanges. *See* Exhibit G, Declaration of Bjorn de Wolf ("**Wolf Decl.**") ¶ 2. It is the "victim virtual currency exchange" or "VICTIM VCE" referred to in Defendants' Statements of Offense and throughout the charging documents in this case. *See* Statement of Facts, ECF No. 1-1; Information, ECF No. 89; Lichtenstein Statement of Offense, ECF No. 95; Morgan Statement

of Offense, ECF No. 100; Consent Motion, ECF No. 141; ECF No. 143; ECF No. 146. Bitfinex customers engage in a variety of cryptocurrency transactions; in 2016, those transactions included spot purchases and sales, short sales, margin trades, and borrowing and lending. Ex. G, Wolf Decl. ¶ 2. Bitfinex predominately served non-U.S. customers in 2016, and it does not permit U.S. persons to become customers today. *Id.* ¶ 3.

In 2016, Bitfinex used multi-signature wallets. *Id.* ¶ 4. Multi-signature wallets require multiple private keys to authorize transactions of cryptocurrency. Ex. A, Price Decl. ¶ 21. Bitfinex held at least two private keys to the vast majority of its cryptocurrency wallets. Ex. G, Wolf Decl. ¶4. Bitfinex also contracted with a third-party security service called BitGo, which typically held an additional private key. *Id.* BitGo could only use its single private key (together with one of Bitfinex's private keys) to authorize Bitfinex wallet transactions following instructions from Bitfinex. *Id.*

Bitfinex created one or more wallet addresses corresponding to each customer's Bitfinex account to use for, among other things, depositing Bitcoin. *Id.* ¶ 5. But Bitfinex controlled those wallet addresses and the Bitcoin therein. *Id.*; *see also* Ex. A, Price Decl. ¶¶ 69-70. Bitfinex, not its customers, controlled the multiple private keys necessary to authorize transactions using the Bitfinex deposit wallet addresses, including its own private keys and a single private key held by BitGo. Ex. G, Wolf Decl. ¶ 5. The vast majority of customers did not hold any private keys to their Bitfinex deposit wallet addresses, and none of them held the multiple private keys needed to authorize wallet transactions.[1] *Id.* ¶¶ 6, 8. Bitfinex also routinely created and controlled thousands

---

[1] For a limited period in 2016, a small subset of U.S. customers who had margin accounts on the Bitfinex exchange could obtain a single private key to their Bitfinex deposit wallet addresses. Wolf Decl. ¶ 6. However, even those customers still lacked the two private keys necessary to directly authorize transactions using the wallets. *Id.*

of other wallet addresses to hold Bitcoin and facilitate Bitfinex exchange transactions. *Id.* ¶ 7.

Because Bitfinex customers did not hold the private keys to and could not directly authorize transactions involving the Bitfinex deposit wallet addresses, they entered transactions on the Bitfinex website. *Id.* ¶ 8. Those transactions would then be reflected in the customer's Bitfinex account on the Bitfinex website, but they would not immediately be reflected in Bitfinex's wallets or on the blockchain. *Id.* Instead, Bitfinex periodically used its private keys to settle transactions and reconcile customer positions by transferring cryptocurrency between various Bitfinex exchange wallet addresses, including Bitfinex customer deposit wallet addresses. *Id.* Bitfinex's control of the various types of Bitfinex exchange wallets was essential to the functioning of the Bitfinex exchange.

### B. Lichtenstein Stole 119,754 Bitcoins From Bitfinex By Hacking Bitfinex And Misappropriating Its Private Keys

Lichtenstein pled guilty and admitted to devising and executing a scheme to steal Bitcoins from Bitfinex in 2016. Lichtenstein identified and compromised Bitfinex's information technology systems, defeating numerous security measures on Bitfinex's network. *See* Lichtenstein Statement of Offense, ECF No. 95, ¶ 12; Lichtenstein Plea Tr., ECF No. 110 at 22:8-24. Having compromised Bitfinex's networks, Lichtenstein misappropriated Bitfinex's private keys necessary to access Bitfinex cryptocurrency wallets. Lichtenstein Statement of Offense, ECF No. 95 ¶¶ 12-14.

On or about August 2, 2016, Lichtenstein used Bitfinex's private keys and credentials to initiate 2,072 unauthorized Bitcoin transactions from Bitfinex wallets (the "**Hack**"). Lichtenstein transferred 119,754 Bitcoins (the "**Stolen Bitcoins**") directly from the Bitfinex wallets to addresses in a cryptocurrency wallet under his control (the "**Hack Wallet**"). *See* Lichtenstein Sentencing Memo, ECF No. 146 at 2; Statement of Facts, ECF No. 1-1, ¶ 4; Lichtenstein Statement of Offense,

ECF No. 95 ¶ 14; Lichtenstein Plea Tr., ECF No. 110 at 24:5-25:10.

In the immediate aftermath of the Hack, Bitfinex acted urgently to protect the remaining Bitcoin and other cryptocurrency assets on the Bitfinex exchange.  Bitfinex used its private keys to move all Bitcoins and other cryptocurrency assets on the Bitfinex exchange to Bitfinex wallets that were still secure.  Ex. G, Wolf Decl. ¶ 10.

### C.    Bitfinex Honored Customer Bitcoin Positions And Balances And Promptly Made Its Customers Whole

Once Bitfinex was confident the remaining assets held on its platform were secure, Bitfinex took extraordinary measures to ensure that only Bitfinex and its shareholders—not Bitfinex's customers—would ultimately bear the loss caused by the Hack.

*First*, Bitfinex honored all customer Bitcoin positions and balances, including margin trades and other financing transactions, on the Bitfinex exchange at the time of the Hack, regardless of whether any Bitcoin relating to such positions or balances was stolen.  Ex. G, Wolf Decl. ¶ 11. Bitfinex settled all open positions based on the value of the assets—including Bitcoin—at the time of the Hack.  *Id.*

*Second*, in the days after the Hack, Bitfinex temporarily allocated its losses from the Hack—comprising approximately 36% of Bitfinex's then total assets—pro rata across all customer accounts, regardless of whether they held Bitcoin.  *Id.* ¶¶ 10-12.  For example, if an account held $100 worth of assets, Bitfinex applied an approximate 36% temporary haircut to the account, and assigned the account a $64 value.  This temporary haircut had nothing to do with whether any Bitcoin in a customer deposit wallet address was stolen, or whether the Bitfinex customers even held Bitcoin at all.  *Id.* ¶ 12.

*Third*, Bitfinex issued "BFX" tokens to each customer in an amount equal to the 36% haircut Bitfinex applied to the customer's account.  *Id.*  For each $1 of loss assigned to a customer

account, Bitfinex issued 1 BFX token to that customer with a face value of $1. *Id.* For example, a customer with $100 of assets at the time of the Hack would receive 36 BFX tokens to reflect the $36 haircut temporarily assigned to the customer. Bitfinex "commit[ed] to deploy its efforts to **make you whole**," including through its "recovery of stolen property; funds raised in one or more financings; and available cash from ongoing operations." Ex. B at 1. Bitfinex could at its sole discretion redeem BFX tokens by paying customers $1 per token. *Id.* Additionally, customers could assign their right to compensation and any legal claims related to the Hack to other Bitfinex customers by selling their BFX tokens. Ex. G, Wolf Decl. ¶ 12; Ex. C at 1 ("By transferring a token to another person, all transferors thereby assign to the respective transferees any claim that the transferor has against the Bitfinex Group on account of the Losses.").

*Fourth*, Bitfinex permitted qualifying customers to exchange their BFX tokens for newly issued iFinex stock. Ex. G, Wolf Decl. ¶ 13. Customers exchanged tens of millions of BFX tokens for iFinex stock. *Id.* Customers who participated in such transactions entered subscription agreements with iFinex and received one share of iFinex common stock for each BFX token the customer redeemed. *Id.* Some customers also exchanged their BFX tokens for iFinex stock through intermediaries. *Id.* Customers who redeemed BFX tokens for iFinex stock generally also received RRT tokens. *Id.* ¶ 14. The RRT tokens were subordinated to the BFX tokens, and entitled the holder to any proceeds of the recovered Stolen Bitcoins after the BFX tokens were redeemed. Ex. D at 1. The RRT Terms contemplate that "[r]ecovery amounts available, if any, in excess of 1:1 to RRT holders shall **belong to and be solely vested in the Bitfinex Group**." *Id.*[2]

---

[2] Approximately 30 million outstanding RRT tokens are still held by Bitfinex customers; they will be redeemed and paid in full upon Bitfinex's recovery of the Stolen Bitcoins. Wolf Decl. ¶ 14; Ex. E at 1-2, *Bitfinex Announces Return of Seized Property to RRT Holders* (July 6, 2023), https://blog.bitfinex.com/media-releases/bitfinex-announces-return-of-seized-property-to-rrt-

*Fifth*, as customers exchanged more and more BFX tokens for iFinex stock, Bitfinex redeemed all outstanding BFX tokens for their full value. Ex. G, Wolf Decl. ¶ 15. By April 3, 2017—just eight months after the Hack—Bitfinex paid customers millions of dollars to redeem the BFX tokens that it had not already redeemed or that had not already been exchanged for iFinex stock, erasing all remaining temporary customer losses relating to the Hack. *Id.* Bitfinex publicly explained that it made "the decision to reduce [its] reserves in favor of" a 100% redemption of the outstanding BFX tokens. Ex. F at 1, 100% Redemption of Outstanding BFX Tokens (Apr. 3, 2017), https://blog.bitfinex.com/announcements/100-redemption-outstanding-bfx-tokens/.

As Bitfinex promised, it absorbed the losses from the Hack and made its customers whole. Bitfinex customers (or their assignees) holding BFX tokens received the entire value of their assets at the time of the Hack. Ex. G, Wolf Decl. ¶¶ 15-16. Bitfinex customers who exchanged their BFX tokens for iFinex stock earned significant profits as Bitfinex thrived and paid hundreds of millions of dollars in dividends. *Id.* ¶ 16. Moreover, those customers-turned-shareholders and customers who hold RRTs stand to further benefit when Bitfinex recovers the Stolen Bitcoins. Bitfinex offered these options to customers at its own expense, without any guarantee that it would ever recover the Stolen Bitcoins. In the more than eight years since the Hack, no customers have brought legal claims against Bitfinex regarding the amount or structure of Bitfinex's compensation to customers. *Id.* ¶ 17.

### D. Defendants Left 94,643 Stolen Bitcoins In The Hack Wallet And Moved But Did Not Convert More Than 15,000 Additional Seized Bitcoins

Immediately following the Hack, Lichtenstein held all 119,754 of the Stolen Bitcoins in the Hack Wallet. Beginning in or around January 2017, Lichtenstein moved approximately 25,000

holders/.

of the Stolen Bitcoins out of the Hack Wallet in a series of small transactions.  Statement of Facts, ECF No. 1-1 ¶ 5.; Information, ECF No. 89, ¶ 3(a); Lichtenstein Statement of Offense, ECF No. 95 ¶ 19; Lichtenstein Plea Tr., ECF No. 110 at 27:15-28:9.  But the 94,643 Bitcoins remaining in the Hack Wallet (the "**Hack Wallet Bitcoins**"), identified in paragraph e of the Corrected Second Amended Attachment A to the Court's Second Amended Preliminary Order of Forfeiture (ECF No. 195-1, the "**Preliminary Order of Forfeiture**"), remained untouched until the Government's seizure in 2022.  *See* Statement of Facts, ECF No. 1-1.  Additional versions of Bitcoin (the "**Hard Fork Assets**") were also distributed 1-to-1 to the wallets holding Bitcoin after a change in the programming (i.e., a "hard fork") of the Bitcoin blockchain.  Price Decl. ¶¶ 60-61.

Defendants attempted to launder the 25,000 Bitcoins removed from the Hack Wallet. Lichtenstein Statement of Offense, ECF No. 95 ¶ 19.  Some of the Stolen Bitcoins were lost or dissipated.  *Id.* ¶ 28; Lichtenstein Plea Tr., ECF No. 110 at 43:2-17.  However, because the Bitcoin blockchain has a record of every transfer of Bitcoin, many of the Stolen Bitcoins remain directly traceable to Bitfinex.

At least 15,085 of the Bitcoins that Defendants removed from the Hack Wallet (the "**Additional Seized Bitcoins**"), subject to seizures of 2,818.199 and 12,267.025 Bitcoins (reflected in paragraphs s and t of the Preliminary Order of Forfeiture, respectively), are directly traceable to Bitfinex.  Ex. A, Price Decl. ¶¶ 46-58.  Defendants attempted to obfuscate the origin of the Additional Seized Bitcoins by executing "peel chain" transactions that split these Bitcoins into small amounts and then transferred them between and among wallets under Defendants' control.  *Id.* ¶¶ 54-56.  But these Bitcoins were never converted into other assets.  *Id.* ¶ 58.  Nor were they placed in a "mixer," where Bitcoins are comingled from various sources.  *Id.*  They are traceable to the same Bitcoins that Lichtenstein stole from Bitfinex.  *Id.*

**E.      Defendants Pled Guilty And Admitted That Lichtenstein Perpetrated The Hack And Stole 119,754 Bitcoins From Bitfinex**

Law enforcement agents traced some of the Stolen Bitcoins to accounts associated with Defendants.  Statement of Facts, ECF No. 1-1 ¶ 5.  In 2021, government agents executed a search warrant of Lichtenstein's encrypted cloud storage account and decrypted a file which contained a list of the 2,072 addresses in the Hack Wallet, and the private keys to the Bitcoin held at those addresses.  *See* Statement of Facts, ECF No. 1-1 ¶¶ 5, 6; Notice Regarding Supplemental Statements Exhibit, ECF No. 175-1 at 8.

The 2,072 addresses in the Hack Wallet contained a total of 94,643 Bitcoin which held either (i) Bitcoin stolen from Bitfinex; or (ii) no virtual currency at all.  Statement of Facts, ECF No. 1-1 ¶ 6 n. 10.  In other words, the 94,643 Hack Wallet Bitcoins are *directly traceable* to the Hack and were stolen from Bitfinex.  Complaint Ex. A, ECF No. 1-1 ¶ 6.  In or about February 2022, law enforcement seized the Hack Wallet Bitcoins.  *Id.*

Since Defendants' arrest, the Government has seized significant additional assets from Defendants, including the Additional Seized Bitcoins, cash, gold, and other cryptocurrencies.  *See* Preliminary Order of Forfeiture, ECF No. 195-1 ¶¶ a-ll.  Excluding the Hack Wallet Bitcoins and Additional Seized Bitcoins (together, the "**Bitfinex Bitcoins**"), as of the date of sentencing, there are hundreds of millions of dollars of other assets (including thousands of Bitcoins) potentially subject to forfeiture.

**F.      A Handful Of Disgruntled Bitfinex Customers Seek Additional Compensation Based On Their Individual Circumstances**

A handful of Bitfinex customers have submitted correspondence in this case.  ECF Nos. 173, 175.  Not all these customers held Bitcoin on Bitfinex at the time of the Hack, let alone Bitcoin stolen by Lichtenstein.  *See, e.g.*, Notice Regarding Statements Appendix, ECF No. 173-1 at 9, 49.

Some of these customers acknowledge that Bitfinex made them whole long ago.  *See e.g.*, Notice Regarding Statements Appendix, ECF No. 173-1 at 5 ("Contrary to my initial statement, I have confirmed that Bitfinex did, in fact, fully refund my holdings"); *id.* at 10 ("we were all eventually made whole by Bitfinex"); ECF No. 175-1 at 12 ("Bitfinex . . . completely refunded my losses"); ECF No. 173-1 at 3 ("Bitfinex took efforts to make clients whole but it never returned the actual assets I had").

A few Bitfinex customers appear to regret, more than eight years later and after the significant price appreciation of Bitcoin, that they sold their BFX tokens and right to compensation to other customers at a discount (or that they did not reinvest their compensation in Bitcoin).  *See, e.g.* Appendix to Notice, ECF No. 173-1 at 9, 37.  The assignees of the customers then received compensation from Bitfinex instead.  *See supra* 6-9.  Additionally, a couple of individuals, with scant evidence, assert that Bitcoin was stolen from them by Lichtenstein and should be returned to them instead of Bitfinex, even though Bitfinex honored their Bitcoin positions and balances.  *See, e.g.*, Ancillary Petition of Hjalmar Peters, ECF No. 204.  Some of these Bitfinex customer submissions include information that is inconsistent with Bitfinex and/or public blockchain records.  Wolf Decl. ¶ 17.

### G.     Procedural History

The Government filed a criminal complaint against Defendants on or about February 2, 2022.  Complaint, ECF No. 1.  On July 20, 2023, the Government filed an Information charging each of the Defendants with a money laundering conspiracy in violation of 18 U.S.C. §§ 371 and 1956(h), and charging Defendant Morgan with a conspiracy to defraud the united states in violation of 18 U.S.C. § 371.  *See* Information, ECF No. 89.  On August 3, 2023, Defendants pled guilty before the Court.  *See* Defendants' Plea Agreements, ECF Nos. 96, 101.  The Government told the

Court then that "[t]he victim's name is Bitfinex." Lichtenstein Plea Tr., ECF No. 110 at 23:5-7.

Defendants admitted to the Court that Lichtenstein perpetrated the Hack and stole 119,754 Bitcoins

from Bitfinex. Information, ECF No. 89 ¶ 2; Lichtenstein Statement of Offense, ECF No. 95 ¶ 12;

Lichtenstein Plea Tr., ECF No. 110 at 22:7-23:7; Morgan Statement of Offense, ECF No. 100 at ¶

12; Morgan Plea Tr., ECF No. 111 at 21:23-23:13.

On October 8, 2024, the Government filed a motion regarding victim notification but

acknowledged that it "is not aware of any person who qualifies as a victim under the CVRA or for

restitution under the MVRA, beyond *perhaps Bitfinex*, the Victim Virtual Currency Exchange

('VICTIM VCE')." Consent Motion, ECF No. 141 at 1; Order, ECF No. 145.

On October 15, 2024, the Government filed its sentencing memorandum for Lichtenstein.

Lichtenstein Sentencing Memorandum, ECF No. 146. It requested an order of restitution requiring

Defendants to return the 94,643 Hack Wallet Bitcoins to Bitfinex, which "represents the return of

lost property to the owner of that property and is consistent with the statutory text and purpose of

[the MVRA]." *Id.* at 25. At Lichtenstein's sentencing, the Court deferred a determination on

restitution. *See* Minute Order, ECF No. 179. The Court subsequently ordered a restitution hearing

for Defendants on February 21, 2025, and a briefing schedule, which permitted third parties to file

any Motions to Intervene or Objections on or before January 28, 2025. *See* Consent Motion to

Schedule Restitution Hearing, ECF No. 184; Order, ECF No. 185. On January 14, 2025, the

Government filed its Supplemental Motion Regarding Restitution. ECF No. 202. It affirmed that

the Hack Wallet Bitcoins and Hard Fork Assets are the "residue of the property that was stolen

from Bitfinex in the 2016 hack" and the "specific property lost" by Bitfinex, and that "those assets

should be returned to Bitfinex as in-kind restitution." *Id.* at 3-5.

## ARGUMENT

I. **The MVRA Requires That Defendants Be Ordered To Pay In-Kind Restitution Of The Stolen Bitcoins To Bitfinex**

Restitution is meant to "simply restore[] a victim . . . to the position the victim occupied before sustaining injury." *United States v. Bikundi*, 926 F.3d 761, 790–91 (D.C. Cir. 2019) (cleaned up). The MVRA does not leave "restitution to the sentencing [court's] discretion." *Dolan* v. *United States*, 560 U.S. 605, 612 (2010). In determining restitution, "a sentencing court is not expected to undertake a full-blown trial." *United States v. Naphaeng*, 906 F.3d 173, 179 (1st Cir. 2018). Indeed, "'absolute precision is not required' in calculating restitution under the MVRA," and "a restitution award requires only 'a modicum of reliable evidence,'" not "metaphysical certainty." *Id.* at 179, 182 (citation omitted).

The Government is correct that Defendants must be ordered to pay Bitfinex in-kind restitution of the remaining Stolen Bitcoins. *First*, Bitfinex is entitled to restitution under 18 U.S.C. § 3663A(a)(3) because the Government and Defendants agreed that Defendants would pay restitution to Bitfinex in Defendants' plea agreements. *Second*, Bitfinex is entitled to mandatory restitution under 18 U.S.C. § 3663A(a)(1) because it is the direct victim of Defendants' offenses. *Third*, both provisions of the MVRA require in-kind restitution of the Bitfinex Bitcoins to Bitfinex.

### A. The MVRA Requires The Court To Enforce Defendants' Plea Agreements And Order Them To Pay Restitution To Bitfinex

Where, as here, the Government and Defendants have agreed "in a plea agreement" to provide restitution to a specific third party, the MVRA requires that "the court shall" enforce that agreement and order restitution. 18 U.S.C. § 3663A(a)(3). The Court's inquiry is straightforward. One of the terms of the plea agreements between the Government and Defendants is that Defendants will pay restitution to Bitfinex. *See* Plea Agreement, ECF No. 96 at 10. The Court

-13-

accepted those plea agreements.  Lichtenstein Plea Tr. at 74, ECF No. 110; Morgan Plea Tr. at 78, ECF No. 111.  The MVRA requires that the Court "shall . . . order" restitution as "agreed to by the parties in a plea agreement."  18 U.S.C. § 3663A(a)(3).  Indeed, Congress specifically "inten[ded] that, in addition to any restitution mandatory for the offense for which the victim is convicted, all other restitution included in the plea agreement and supported by fact be ordered by the court."  S. REP. 104-179, at 19 (1995*), reprinted* in 1996 U.S.C.C.A.N. 924, 932.

Thus, once Defendants voluntarily agreed to pay Bitfinex restitution in their court-approved plea agreements, restitution became mandatory under the MVRA.  *See United States v. Wyss*, 744 F.3d 1214, 1215 (10th Cir. 2014) (noting that 18 U.S.C. § 3663A(a)(3) is a statute "directing the court to order" restitution "if agreed to by the parties in a plea agreement"); *United States v. Bradley*, 692 F. App'x 118, 121 (4th Cir. 2017) ("the plea agreement controls" regardless of whether the third-party harmed by defendant is a "victim" under the MVRA).  Paying restitution to Bitfinex is a material term of Defendants' plea agreements that must be fulfilled as part of Defendants' guilty plea.  *See United States v. Peterson*, 268 F.3d 533, 533 (7th Cir. 2001) (rejecting defendant's appeal of restitution order pursuant to plea agreement because that would require setting aside the entire plea agreement).  Third parties do not have standing to challenge the terms of Defendants' plea agreements.  *See In re W.R. Huff Asset Mgmt. Co., LLC*, 409 F.3d 555, 564 (2d Cir. 2005) ("Nothing in the CVRA [or MVRA] requires the Government to seek approval from [potential] victims before negotiating or entering into a settlement agreement.").

Defendants' plea agreements and the MVRA require that the Court order Defendants to provide in-kind restitution to Bitfinex.

**B.    The MVRA Also Requires That The Court Order Defendants To Pay Bitfinex Restitution As The Undisputed Victim Of Defendants' Charged Conduct**

Bitfinex is also entitled to restitution under the MVRA as the direct victim of Defendants' offenses.  18 U.S.C. § 3663A(a)(1).  The MVRA defines "victim" to include "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2).  To ascertain who qualifies as a "victim under the MVRA," courts must first "determine the scope" of the scheme or conspiracy.  *United States v. Emor*, 850 F. Supp. 2d 176, 203 (D.D.C. 2012).  Where the offense of conviction is a scheme or conspiracy, "the district court may order restitution without regard to whether the conduct that harmed the victim was conduct underlying the offense of conviction."  *United States* v. *Matos*, 611 F.3d 31, 43 (1st Cir. 2010) (citation omitted).  "[T]o determine the scope of the 'offense of conviction' for purposes of restitution" when a defendant "was convicted pursuant to a guilty plea," as here, "the court should look to the plea agreement, the plea colloquy, and other statements made by the parties."  *United States v. Elson*, 577 F.3d 713, 723 (6th Cir. 2009) (cleaned up), *abrogated on other grounds by Lagos v. United States*, 584 U.S. 577 (2018); *see also Emor*, 850 F. Supp. 2d at 203 (when a defendant has pled guilty, "the scope of the underlying scheme is defined by the parties themselves").

The scope of Defendants' conspiracy indisputably encompassed their criminal conduct directed at Bitfinex and its 119,754 Bitcoins.  The Government alleged (and Defendants acknowledged) that "[i]t was the ***object of the conspiracy*** for the defendants, LICHTENSTEIN and Morgan, to unlawfully enrich themselves by laundering the proceeds of the 2016 hack and ***scheme to defraud the victim virtual currency exchange, Bitfinex***."  Information, ECF No. 89 at

¶¶ 2, 5 (emphasis added).  Lichtenstein specifically admitted that he devised and executed the Hack and stole 119,754 Bitcoins from Bitfinex.  Lichtenstein Statement of Offense, Doc. 95 ¶ 14.  In fact, Defendants "maintain that the *only potential victim* for CVRA or MVRA purposes, if any, *is Bitfinex*."  Consent Motion, ECF No. 141 at 2.  The Government has always maintained in this case that "*the victim's name is Bitfinex*" (Lichtenstein Plea Tr., ECF No. 110 at 23:5-7), the "*charges relate to a hack into the Bitfinex* virtual currency exchange, resulting in the theft of approximately 119,754 Bitcoin (BTC)" (Consent Motion, ECF No. 141 at 2), and "defendant [Lichtenstein] embarked on a *scheme to steal money from Bitfinex*" (Lichtenstein Plea Tr., ECF No. 146 at 2).  The Court told Lichtenstein at sentencing that he "*devised [and] carried out a scheme to steal money from Bitfinex*."  Lichtenstein Sentencing Tr., ECF No. 180, at 63:18-20.

Indeed, the Government needed to prove the Hack of Bitfinex to establish a predicate offense for Defendants' money laundering conspiracy.  *See United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) ("To convict a person for money laundering . . . the government must prove that . . . (2) the transaction involved the proceeds of unlawful activity; [and] (3) the defendant knew that the proceeds were from unlawful activity.").  The defined victim of that predicate offense is the victim of the conspiracy itself.  For instance, in *Lazarenko*, the former Prime Minister of Ukraine was convicted of a money laundering conspiracy.  *United States v. Lazarenko*, 624 F.3d 1247, 1249 (9th Cir. 2010), *as amended on denial of reh'g* 2010 WL 4888164 (Dec. 2, 2010).  The Government proved the offense by showing that the laundered funds included the proceeds of an extortion plot, and the trial court ordered restitution to the extortion victim.  *Id.* at 1249.  On appeal, Lazarenko argued, among other things, "that money laundering generally is considered a victimless crime" and therefore the district court erred by ordering restitution.  *Id.* at 1250 n.5.  The Ninth Circuit rejected Lazarenko's argument, reasoning:  "As part of the conspiracy to launder

money, Lazarenko extorted money from [the victim].  Accordingly, [the victim] qualifies as a

'victim' under the plain text of the restitution statutes."  *Id.*  Like the extortion victim in *Lazarenko*

(who was ultimately not eligible for restitution for reasons inapplicable here), Bitfinex is a victim

under the MVRA because it is the victim of the predicate crime for Defendants' conspiracy.

The Government has recently equivocated that Bitfinex is only "perhaps" a victim under

the MVRA because "[n]either defendant was convicted of the underlying intrusion into [Bitfinex]'s

network or the theft of cryptocurrency therefrom."  Consent Motion, ECF No. 141 at 1, 5; *see*

Lichtenstein Sentencing Memo, ECF No. 146 at 27.  But the cases cited by the Government

(Consent Motion, ECF No. 141 at 5 n.2) have no application to Bitfinex—the defined victim of

Defendants' offenses.  In *United States v. Benns*, the defendant pled guilty to making false

statements on a mortgage application, but the district court ordered restitution based on the

subsequent foreclosure of certain properties.  740 F.3d 370, 372-73 (5th Cir. 2014).  The Fifth

Circuit vacated that order because there was no evidence in the record that defendant's false

statements caused the subsequent foreclosure losses.  *Id.* at 377-78.  In *United States v. Lutz*, the

defendant was convicted of a fraudulent real estate scheme and the Court ordered restitution for

losses from an uncharged transaction.  237 F. App'x 849, 851 (4th Cir. 2007).  Defendant argued

that the evidence as to that specific property was "insufficient," and the Fourth Circuit agreed.  *Id.*

at 851-52.  And in *United States v. Murry*, defendant was convicted of fraudulently obtaining

merchandise across state lines.  395 F.3d 712, 714 (7th Cir. 2005).  At trial, the Government proved

approximately $240,000 in victim losses.  *Id.*, at 721.  The Seventh Circuit vacated the district

court's award of $654,000 in restitution because it was "unclear from the PSR how much of the

remaining loss calculation . . . can be attributed to relevant conduct."  *Id.*  These holdings regarding

uncharged relevant conduct are inapplicable here as to Bitfinex because the Government charged

and Defendants admitted that their conspiracy encompassed conduct that specifically harmed Bitfinex.[3]  *See* Information, ECF No. 89; Lichtenstein Plea Tr., ECF No. 110 at 23:4-7.

Finally, there is no dispute that the Hack directly and proximately harmed Bitfinex.  That analysis "incorporates both the traditional 'but for' and proximate cause analyses."  *United States v. Clinesmith*, 2021 WL 184316, at *1 (D.D.C. Jan. 19, 2021) (citing *In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir. 2009)).  As the Government and the Court recognize, and Defendants agree, Lichtenstein's "hack and theft caused serious solvency issues at Bitfinex."  Lichtenstein Sentencing Memorandum, ECF No. 146 at 18; Lichtenstein Sentencing Tr., ECF No. 182 at 64:2-3.  Lichtenstein misappropriated Bitfinex's private keys to its wallets and used them to steal 119,754 Bitcoins.  *See* Lichtenstein Sentencing Memorandum, ECF No. 146 at 2; Lichtenstein Statement of Offense, ECF No. 95 at 4.  Bitfinex then absorbed that loss, honored its customers' Bitcoin positions and balances, and promptly made its customers whole.  Ex. G, Wolf Decl. ¶¶ 11-16; *see also United States v. Rhodes*, 330 F.3d 949, 953 (7th Cir. 2003) (affirming award of restitution to a broker that absorbed the loss of a fraud and made its customers whole).  Lichtenstein has apologized for causing Bitfinex losses.  Lichtenstein Sentencing Tr., ECF No. 182 at 39:4-6.  Defendants' offenses were the but-for and proximate cause of Bitfinex's loss of the Stolen Bitcoins.

Because Bitfinex was directly and proximately harmed by conduct within the scope of

---

[3] The Government also suggests that there are not victims of the Hack under the MVRA because a substantive wire fraud charge for that offense would be "time-barred when the government brought charges in 2022."  Consent Motion, ECF No. 141 at 5.  Even if true, "[s]everal courts of appeal to consider the issue have concluded" that "although the statute of limitations may prevent the government from charging [defendant] for acts that occurred outside the statute of limitations, it poses no bar to imposing restitution under the MVRA for damages occurring from [his] full scheme."  *United States v. Pole*, 2024 WL 756781, at *30 (D.D.C. Feb. 23, 2024) (citations and quotation marks omitted) (emphasis added); *see also United States v. Anieze-Smith*, 923 F.3d 565, 573 (9th Cir. 2019) (same), *cert. denied sub nom, Gabra v. Unites States*, 140 S. Ct. 613 (2019).

Defendants' offenses as defined by the Government, the Defendants, and the Court, it is also entitled to restitution as a victim pursuant to 18 U.S.C. §§ 3663A(a)(1) & (2).

### C.    Defendants Must Provide Bitfinex With In-Kind Restitution By Returning The Stolen Bitcoins To Bitfinex

The MVRA requires that Defendants pay Bitfinex in-kind restitution by returning the remaining Stolen Bitcoins.  "[I]n the case of an offense resulting in damage to or loss or destruction of property," the Court "shall" order the defendant to "return the property to the owner of the property."  18 U.S.C. § 3663A(b)(1)(A); *see also United States v. Holmes*, 673 F. Supp. 3d 1049, 1057 (N.D. Cal. 2023) ("[T]he MVRA requires defendants, in the first instance, to 'return the property to the owner of the property.'").

The Government and Defendants agree that all recovered Stolen Bitcoins should be returned to Bitfinex as in-kind restitution.  *See* Lichtenstein Sentencing Memo, ECF No. 146 at 28 ("a restitution order should include the residue of the property that was stolen from Bitfinex"); ECF No. 161 at 45 ("[T]his Court should order that the assets seized from Mr. Lichtenstein and Ms. Morgan be applied as in-kind restitution to Bitfinex."); Government's Supplemental Motion Regarding Restitution, ECF No. 202.  As the Government argues, the return of the Stolen Bitcoins to Bitfinex "represents the return of lost property to the owner of that property and is consistent with the statutory text and purpose of the [MVRA]."  ECF No. 146 at 25.

Bitfinex has ownership interests in each and all of the Bitfinex Bitcoins because it held or controlled the private keys necessary to access the wallet addresses hacked by Lichtenstein.  *See supra* p. 4.  The Government and Defendants agree that Lichtenstein was able to steal Bitcoin from Bitfinex wallets by "us[ing] his access to [Bitfinex's] keys to fraudulently authorize more than 2,000 transactions in which approximately 119,754 BTC was transferred from [Bitfinex's] wallets

to [the Hack Wallet]."  Lichtenstein Statement of Offense, ECF No. 95 at 4; *see also* Consent Motion, ECF No. 141 at 3.  If Bitfinex did not control the Bitcoins, Lichtenstein could not have stolen them.  *See United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020) ("Bitcoin users send Bitcoin to other users through these addresses using a private key function that authorizes the payments."); *United States v. Sterlingov*, 719 F. Supp. 3d 65, 70 (D.D.C. 2024) (same).  For that reason, courts in the District of District of Columbia have consistently found that the owner of Bitcoin in a cryptocurrency wallet is the possessor of the private keys to that wallet.  "Ownership of bitcoin is thus based on a user's possession or knowledge of the private key associated with a public key and address."  *United States v. Harmon*, 474 F. Supp. 3d 76, 82 (D.D.C. 2020); *see also United States v. Patel*, 2024 WL 1932871, at *1 (D.D.C. May 1, 2024) ("An individual's '[o]wnership of bitcoin is thus based on [his] possession or knowledge of the private key associated with a public key and address.'") (citing *Harmon*, 474 F. Supp. 3d at 82); *see also* Ex. A, Price Decl. ¶ 19.

Indeed, less than two months before the Hack, the Commodities Futures Trading Commission found that even "when Bitfinex changed its model" to provide Bitfinex customers individual deposit wallet addresses, Bitfinex still "owned and controlled" the "bitcoin deposit wallets" because Bitfinex "retained control over the private keys to those wallets, and the [customers] had no contractual relationship with [BitGo]."  *In the Matter of BFXNA Inc. d/b/a Bitfinex*, CFTC Docket No. 16-19, at 2, 3, 6 (Jun. 2, 2016).[4]

---

[4] A few forfeiture claimants misread the CFTC's findings, which were relevant to CFTC registration requirements, as only applicable to Bitfinex's early 2015 wallet model.  *See* ECF Nos. 203, 204 ¶¶ 12-15.  But the CFTC maintained that Bitfinex rather than its customers owned and controlled the Bitfinex exchange wallets, and Bitfinex began exiting the U.S. market shortly after the Hack.  *In the Matter of: iFinex Inc., BFXNA Inc., and BFXWW Inc.*, CFTC Docket No. 22-05 (Oct. 15, 2021).

Because the Bitfinex Bitcoins—approximately 94,643 Hack Wallet Bitcoins and 15,038 Additional Seized Bitcoins—are traceable to the Hack and were stolen from Bitfinex, the Court must order in-kind restitution of those assets to Bitfinex. The Government itself argues that the Hack Wallet Bitcoins are "the specific property lost" by Bitfinex. Government's Supplemental Motion Regarding Restitution, ECF No. 202 at 1; Lichtenstein Sentencing Memorandum, ECF No. 146 at 28. And because the parties support payment of the Hack Wallet Bitcoins as in-kind restitution, there is no dispute that returning those Bitcoins to Bitfinex is not "impossible, impractical, or inadequate." 18 U.S.C. § 3663A(b)(1)(B)(i)-(ii).

The Government suggests that because the Additional Seized Bitcoins were laundered, they are no longer "the specific property lost" by Bitfinex. The Government cites *Robers*, where the Supreme Court addressed whether "any part of the property" is returned to the lender in a mortgage fraud (thereby reducing the amount of restitution) prior to the sale of the real estate collateral. Lichtenstein Sentencing Memorandum, ECF No. 146 at 28 (citing *Robers v. United States*, 572 U.S. 639, 640-41 (2014)). The Court held that "in the case of a fraudulently obtained loan," the property lost "is the money lent," so "no 'part of the property' is 'returned' to the victim until the [real estate] collateral is sold and the victim receives money"—i.e., the type of property lost— "from the sale." *Id.* at 641. The Court reasoned that real estate is not the "specific property lost" in a fraudulent loan; in contrast, the Court noted that when the "specific property lost" is fungible like money, the returned property "need not be the very same bills or checks." *Id.* at 643.

*Robers* is not implicated here because Lichtenstein stole a specific asset—Bitcoin—and Bitfinex seeks to recover that Bitcoin—the specific property lost. Moreover, the Additional Seized Bitcoins were not converted into or comingled with other assets—like the Hack Wallet Bitcoins,

they are the same Bitcoins stolen from Bitfinex.  *See* Ex. A, Price Decl. ¶¶ 50, 58.[5]  Defendants

should be ordered to return the Bitfinex Bitcoins to Bitfinex.

*      *      *

Consistent with the Government's position, the statutory purpose of the MVRA, and

Defendants' plea agreements, the Court should order Defendants to pay in-kind restitution to

Bitfinex of the Bitfinex Bitcoins to return it to its position before the Hack and amend the

Preliminary Order of Forfeiture to exclude the Bitfinex Bitcoins.[6]

## II.    The Handful of Individuals Seeking Restitution Does Not Affect Bitfinex's Right To Mandatory In-Kind Restitution

The Government's position that Bitfinex customers, unlike Bitfinex itself, do not qualify

for restitution is correct.  Moreover, Bitfinex is entitled to in-kind restitution regardless of whether

the Court determines that any individuals have a right to restitution.

### A.    Bitfinex Customers Do Not Qualify As Victims Under The MVRA

A handful of Bitfinex customers argue that they are victims of Defendants' offenses and

entitled to restitution.  To establish that an individual is a victim of a defendant's offense, "the

government must show both that the defendant's conduct is the 'but-for' cause of the individual's

---

[5] It is also within the Court's discretion to order in-kind payments to satisfy an order of restitution. *See* 18 U.S.C. § 3664(f) (permitting "in-kind payment" of "return of property" or "replacement of property"); *Robers*, 572 U.S. at 644.

[6] The Bitfinex Bitcoins were included in the Preliminary Order of Forfeiture because of the Government's requested delay of the restitution hearing.  ECF No. 171 at 1.    Because the Government maintains that at least the Hack Wallet Bitcoins are Bitfinex property, Government's Supplemental Motion Regarding Restitution, ECF No. 202 at 1, that property is not duly subject to forfeiture. *See United States v. Farkas*, 2016 WL 10585041, at *2 (E.D. Va. Oct. 3, 2016) ("[A]s the government correctly argues, the forfeiture authority extends only to defendant's property.") (citing *United States v. Hoover-Hankerson*, 511 F.3d 164, 171 (D.C. Cir. 2007)); *United States v. Wolf*, 375 F. Supp. 3d 428, 440 (S.D.N.Y. 2019) ("[C]riminal forfeiture under § 853 'reaches only the property of the criminal defendant[.]'") (citation omitted).

-22-

harm and that the defendant 'proximately' caused the harm." *United States v. Speakman*, 594 F.3d 1165, 1171 (10th Cir. 2010). The Government does not recognize the Bitfinex customers as victims under the MVRA—it has only recognized Bitfinex as the victim of Defendants' conduct. *See e.g.*, Lichtenstein Plea Tr**.**, ECF No. 110 at 23:5-7 ("The victim's name is Bitfinex.").

The Government is correct that Bitfinex customers are not victims of Defendants' offenses under the MVRA. When, as here, Defendants have pled guilty, the scope of Defendants' offenses is defined by the parties and the Court. *Elson*, 577 F.3d at 723; *Emor*, 850 F. Supp. 2d at 203. The Government, Defendants, and the Court have acknowledged that Bitfinex suffered losses from the Hack and was the direct victim of Defendants' offenses. *See supra* p. 2. In contrast, there are no admissions or evidence in the record regarding conduct directed at or harm to Bitfinex customers. Any purported harm to Bitfinex customers squarely falls into the category of "relevant conduct" that the Government suggests is insufficient to establish a right to restitution. *See* Government's Supplemental Motion Regarding Restitution, ECF No. 202 at 2-3. And no customer to date has substantiated such claims with reliable evidence, precluding restitution. *See United States* v. *Steele*, 897 F.3d 606, 613 (4th Cir. 2018) (potential "victim's unsupported loss estimate was insufficient, on its own, to substantiate a restitution amount"); *United States* v. *Ferdman*, 779 F.3d 1129, 1136-41 (10th Cir. 2015) (holding that a victim's unverified letter was insufficient to justify restitution ordered under the MVRA).

Moreover, Bitfinex customers are not victims because they did not suffer losses, let alone direct losses, because of the Hack. Bitfinex honored customer Bitcoin positions and balances, regardless of whether they involved Bitcoins that were stolen by Lichtenstein and absorbed the loss of the Stolen Bitcoins itself. Ex. G, Wolf Decl. ¶ 11. Bitfinex temporarily spread its losses across all customers and assets, but it promptly made its customers whole. *Id.* at ¶¶ 12-16. Bitfinex

-23-

customers who waited mere months received the entire value of their assets at the time of the Hack; some even obtained significant profits by opting for iFinex stock as compensation. *Id*. at ¶ 13. In fact, some Bitfinex customers have written to the Court or Government to acknowledge that Bitfinex made them whole eight years ago, while lamenting that they do not own more Bitcoin today. *See* Ex. 1 to Notice Regarding Statements, ECF No. 173-1 at 3 ("Bitfinex took efforts to make clients whole"); ECF No. 173-1 at 5 ("I have confirmed that Bitfinex did, in fact, fully refund my holdings"); ECF 173-1 at 10 ("we were all eventually made whole by Bitfinex"); ECF No. 175-1 at 12 ("Bitfinex . . . completely refunded my losses").

A handful of individuals have claimed that they were undercompensated by Bitfinex and therefore should receive restitution. *See generally*, ECF Nos. 173-1, 175-1. Some of these Bitfinex customers never owned Bitcoin that was stolen by Lichtenstein or any Bitcoin at all. Ex. G, Wolf Decl. ¶ 17. Rather, these customers allege that they sold their BFX tokens and thereby assigned, among other things, their right to compensation from Bitfinex at a discount to other Bitfinex customers. *See generally*, ECF Nos. 173-1, 175-1. The assignees of these customers then received compensation from Bitfinex. Ex. G, Wolf Decl. ¶ 15.

Even if such customers offered proof in support of their claims, such claims of incomplete compensation from Bitfinex are far too attenuated from the Hack for these Bitfinex customers to qualify as victims entitled to restitution under the MVRA. "[R]estitution is inappropriate if the conduct underlying the conviction is too far removed, either factually or temporally, from the loss … [t]his means, in effect that the government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated." *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002); *United States v. Robertson*, 493 F.3d 1322, 1335 (11th Cir. 2007) (vacating

award of restitution when there was a lack of evidence that alleged losses "were reasonably foreseeable consequences of [defendant's] fraud").

A customer's decision to sell his or her right to compensation at a discount such that Bitfinex paid his or her compensation to another customer is not a loss directly and proximately caused by Defendants' offenses or a reasonably foreseeable consequence of those offenses. There are multiple intervening causes between the Hack and such transactions, including (i) Bitfinex's decision to honor all customer Bitcoin positions and balances at the time of the Hack and to absorb the loss of the Stolen Bitcoins itself; (ii) Bitfinex's temporary allocation of its losses across all customers and assets; (iii) the decision of certain customers to sell their right to compensation to other customers; and (iv) Bitfinex's payment of compensation to the assignee customers instead of the original customers. *See supra* pp. 24-25. As the Supreme Court recognized in *Robers*, a defendant may not be responsible for attenuated harm such as the "sale [of collateral] to a friend for a nominal sum . . . which . . . could break the causal chain." 572 U.S., at 646. Likewise, here, the decision of some customers to sell their right to compensation to other customers (who received that compensation instead) "break[s] the causal chain" between the hack and the purported losses. *Id.*; *see also Robertson*, 493 F.3d at 1334 (vacating award of restitution to victim who settled lawsuit by another victim for reselling software fraudulently obtained by defendant because there were "several intervening events between [the] fraud on [Victim A] and the loss to [Victim B]").

That is particularly true where, as here, all individuals that might potentially seek restitution are customers of Bitfinex—the direct victim of Defendants' offenses. Any customer compensation claims can and should be resolved through Bitfinex's commercial relationship with its customers, not through the restitution hearing. When ordering restitution for offenses with a direct victim and other individuals who have allegedly suffered indirect harms, courts routinely order restitution to

-25-

the direct victim and permit any subsequent reimbursement obligations to be resolved outside of the restitution process. For instance, in *United States v. Boscarino*, 437 F.3d 634, 637 (7th Cir. 2006), the Seventh Circuit reviewed an order awarding restitution for a scheme to defraud an entity by diverting its client's money. *Id.* at 636. The district court ordered restitution to the entity, the "immediate victim" of defendant's fraud. *Id.* at 637 (overruled on other grounds by *United States v. Statham*, 581 F.3d 548 (7th Cir. 2009)). On appeal, Judge Easterbrook, writing for the unanimous panel, affirmed, holding that "[o]nce [the defendant] reimburses the immediate victim, [the company] will be able to repay [the client]. Instead of determining the ultimate incidence of costs created by criminal activity, *judges should direct restitution to the immediate victim*; *other persons' rights in the funds then may be sorted out under normal rules of contract and property law*." *Id.* (emphasis added). Likewise, in *Emor*, the court ordered MVRA restitution for defendant's wire fraud offense. 850 F. Supp. 2d at 202. The court found that the crime of conviction "directly harmed" the immediate victim, the District of Columbia, by diverting its funds. *Id.* at 212. While the crime also may have "indirectly harmed" the federal government because it may have reimbursed the District of Columbia for some of the diverted funds, the court only awarded restitution to the District of Columbia, recognizing that any obligation to reimburse the federal government did not need to be resolved in the restitution proceeding. *Id.*

Bitfinex maintains that it made its customers whole. For nearly a decade, no customer has brought a claim challenging the adequacy of his or her compensation from Bitfinex. Ex. G, Wolf Decl. ¶ 17. But if any Bitfinex customers believe that their compensation is inadequate or that they are entitled to some of the Bitfinex Bitcoins, that is a commercial matter between them and Bitfinex, which should be "sorted out under normal rules of contract and property law." *Boscarino*, 437 F.3d at 637.

**B.      Bitfinex is Entitled to In-Kind Restitution Regardless of Whether the Court Recognizes Any Other Victims**

Even if the Court determines that the idiosyncratic circumstances of any Bitfinex customer make him or her a victim under the MVRA, that does not affect Bitfinex's right to in-kind restitution.  *First*, there are too few alleged victims to satisfy the MVRA's highly limited exceptions for when the Court is not required to order restitution.  *Second*, even if any individuals could qualify as victims, they do not qualify for in-kind restitution of the Bitfinex Bitcoins, and Bitfinex's recovery will not affect the ability of any individuals to recover alleged losses.

**1.      The Few Bitfinex Customer Claims Do Not Satisfy the MVRA's Limited Exceptions to Mandatory Restitution**

The MVRA does not apply where "the number of identifiable victims is so large as to make restitution impracticable" or "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 § U.S.C. 3663A(c)(3).  Neither of these rare exceptions is applicable here.

*First*, even if any individuals qualify as victims based on their specific circumstances, there are far too few victims for the numerosity exception to the MVRA to apply.  Courts have refused to apply the numerosity exception even when there are thousands of potential victims—which is clearly not the case here.  *See, e.g.*, *United States v. Ageloff*, 809 F. Supp. 2d 89, 99 (E.D.N.Y. 2011), *aff'd*, *United States v. Catoggio*, 698 F.3d 64 (2d. Cir. 2012) (ordering restitution notwithstanding the existence of thousands of victims); *see also United States* v. *Marsh*, 2011 WL 5325410, at *15 (E.D.N.Y. Oct. 26, 2011) (declining to apply exception where there were 1,059 identified victims).  The number of individuals asserting victim status here does not come close to that which would make restitution impracticable.

-27-

*Second*, the additional claims do not affect the calculation of Bitfinex's losses and the exception for complex loss calculations does not apply.  The complexity exception to the MVRA is rarely applied by courts.  *See United States v. Sarad*, 227 F. Supp. 3d 1153, 1158 (E.D. Cal. 2016) ("The Ninth Circuit has analyzed the MVRA complexity exception only twice, and both times found it inapplicable.").  The MVRA only requires a "reasonable approximation of loss."  *United States v. Gushlak*, 728 F.3d 184, 195-96 (2d Cir. 2013); *United States v. Mejia*, 326 F. App'x 710, 712 (4th Cir. 2009) (same).  Here, no complex loss calculation is necessary.  Defendants admit that they stole and laundered 119,754 Bitcoins from Bitfinex.  Lichtenstein Statement of Offense, ECF No. 95 at ¶ 14.  Bitfinex seeks the return of 109,728 Bitfinex Bitcoins seized from Defendants that were stolen from Bitfinex.

## 2.    Paying In-Kind Restitution to Bitfinex Will Not Affect Any Bitfinex Customer Rights Because They Cannot Obtain In-Kind Restitution

Regardless of whether any individuals could establish themselves as victims, Bitfinex alone is entitled to in-kind restitution.  The Government argues that only "the specific property lost" by a victim can be subject to in-kind restitution.  *See* Government's Supplemental Motion Regarding Restitution, ECF No. 202 at 1; Lichtenstein Sentencing Memo, ECF No. 146 at 28 (citing *Robers*, 572 U.S., at 640-41).  The Bitfinex Bitcoins are Bitfinex property because they were stolen from Bitfinex owned and controlled wallets and they are only traceable to a single origin:  Bitfinex.  *See supra* pp. 5-6; *Harmon*, 474 F. Supp. 3d. at 82 (ownership of Bitcoin is based on "possession or knowledge of the private key associated with a public key and address").  Setting aside the fact that Bitfinex honored its customers Bitcoin positions and balances as if the Hack had not happened, no customer to date has attempted to show that any specific Bitcoins among the more than 100,000 Bitcoins seized by the Government are the "specific property" that they purportedly lost.  And because the Hack pooled the Stolen Bitcoins together, it is unlikely that any

customer could do so.

If there are any MVRA victims other than Bitfinex, such victims would not be entitled to in-kind restitution of the Bitfinex Bitcoins, and any restitution order could be satisfied using other property. The Government has seized hundreds of millions of dollars of assets other than the Bitfinex Bitcoins, including thousands of other Bitcoins, which can be used to easily satisfy any other potential order of restitution.

Defendants' in-kind restitution of the Bitfinex Bitcoins to Bitfinex—as required by their plea agreements and the MVRA—will not affect any other person and will only benefit existing Bitfinex customers.


REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

## CONCLUSION

For the foregoing reasons, Bitfinex respectfully requests that the Court: (i) order Defendants to pay in-kind restitution to Bitfinex of the 109,728.542 Bitfinex Bitcoins, including the 94,643.298 Hack Wallet Bitcoins and the 15,085.244 Additional Seized Bitcoins, and the Hard Fork Assets; (ii) amend the Preliminary Order of Forfeiture to remove those assets; and (iii) direct the U.S. Marshals to facilitate Defendants' payment of in-kind restitution to Bitfinex.

Dated: January 28, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:

Barry H. Berke (*pro hac vice pending*)
Daniel M. Ketani (*pro hac vice pending*)
Trevor Gopnik (*pro hac vice pending*)
200 Park Avenue
New York, NY 10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035
bberke@gibsondunn.com
dketani@gibsondunn.com
tgopnik@gibsondunn.com

Stephanie L. Brooker
D.C. Bar No. 475321
1700 M Street N.W.
Washington, D.C. 20036
Telephone:    202.955.8500
sbrooker@gibsondunn.com

*Attorneys for Bitfinex.*