# EXHIBIT A

## UNITED STATES DISTRICT COURT DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- v —<br><br>ILYA LICHTENSTEIN AND HEATHER MORGAN,<br><br>Defendants. | No. 23-CR-239 (CKK) |

## DECLARATION OF MATTHEW PRICE

I, Matthew Price, hereby declare under penalty of perjury that the following is true and correct:

## I.    Relevant Professional Background

1.    I am the Strategic Engagement Lead at Elliptic Inc.,[1] a leading blockchain analytics firm.  I received my B.S. in Accounting from the University of Scranton and my M.S. in Accounting and Information Systems from the University of Maryland Global Campus.  I have nearly 20 years of experience addressing complex financial fraud investigations including global cryptocurrency and cybercrimes, and have completed specialized training in blockchain investigation techniques.

2.    Prior to entering private practice, I spent 17 years working in government in law enforcement and intelligence roles.  I previously served as a Special Agent with the Internal Revenue Service, Criminal Investigation–Cyber Crimes Unit (IRS-CI CCU) leading multi-agency, multinational investigations of darknet markets, illicit virtual currency tumblers, sanctions

---

[1] I have been retained as an expert in this case independent of my employment with Elliptic.  The opinions expressed in this report are my own.

evasion, and banking-integrity violations.  In that role, I investigated cases involving virtual currency, money laundering, the Darknet, and other criminal schemes perpetrated via the Internet.

3.      Prior to my work at IRS-CI, I was a Targeting Officer for the Central Intelligence Agency for five years and was based in Washington, D.C.  I focused on foreign intelligence, counterterrorism, and counterintelligence threats.

4.      I also previously served as a Special Agent for the IRS-CI.  In this role, I conducted advanced accounting and financial investigations into complex financial fraud cases, and served as the lead case agent for white collar fraud and money laundering investigations.

5.      Immediately prior to my work at Elliptic, I was the Global Head of Investigations for Binance, one of the world's largest cryptocurrency exchanges.  I led a team of nearly 25 investigators focused on cryptocurrency investigations, advanced blockchain analysis, forensics, decentralized finance, and blockchain crimes.

6.      This section only includes my relevant experience and does not include my full professional background.  A copy of my curriculum vitae, which includes a list of my testimony and trial experience over my career, is attached as Appendix A.

II.      **Scope of Work**

7.      I have been retained by counsel for iFinex Inc. and its subsidiaries ("**Bitfinex**") to opine based on my experience and expertise, my analysis of publicly available blockchain data, and the statements by the Government and the Defendants in this case, whether certain assets seized by the Government in connection with *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C.), specifically Paragraphs e., f., g., s., and t. of the Government's Corrected Second Amended Attachment to the Preliminary Order of Forfeiture ("Corrected Second Attachment") (ECF No. 198-1), are traceable to wallets controlled by Bitfinex.

III.    **Summary of Work**

8.    Based on my review and analysis, I have formed the following opinions:

a.  The approximately 94,643.29837084 Bitcoin (BTC) seized by the Government from wallets recovered from Defendants' online storage account, as referenced in Paragraph e. of the Corrected Second Attachment, ECF No. 198-1, are directly traceable to wallets controlled by Bitfinex at the time of the Hack.

b.  The approximately 2,818.199 Bitcoin (BTC) seized by the Government from wallets recovered from Defendants' online storage account, as referenced in Paragraph s. of the Corrected Second Attachment, ECF No. 198-1, are directly traceable to wallets controlled by Bitfinex at the time of the Hack.

c.  The approximately 12,267.025 Bitcoin (BTC) seized by the Government from wallets recovered from an external hard drive seized from Defendants' residence, as referenced in Paragraph t. of the Corrected Second Attachment, ECF No. 198-1, are directly traceable to wallets controlled by Bitfinex at the time of the Hack.

d.  The approximately 117,376.52651940 Bitcoin Cash (BCH) and 117,376.58178024 Bitcoin Satoshi Vision (BSV) seized by the Government from wallets recovered from Defendants' online storage account, as referenced in Paragraphs f. and g. of the Corrected Second Attachment, ECF No. 198-1, are directly traceable to wallets controlled by Bitfinex at the time of the Hack.

IV.    **Materials Relied Upon**

9.    A list of the materials I relied upon in preparing this declaration is attached as Appendix B.

V.    **Independence of Opinions and Compensation**

10.    The analyses and opinions expressed in this report are my own.  I am being compensated by Bitfinex at a rate of $500 per hour for my work on this matter.

VI.    **Cryptocurrency and Bitcoin Basics**

11.    Virtual currency is a digital form of value that is circulated over the Internet.  The oldest and most famous virtual currency is Bitcoin (BTC).  Bitcoin was first announced as a concept via white paper in late 2008.

3

12.    The BTC blockchain is essentially a ledger of all transactions that have ever occurred within the BTC network.  Because the entire blockchain is public, it is possible to follow the flow of BTC across the blockchain by reviewing the public transactions recorded on the ledger.

13.    BTC operates on a proof-of-work basis using a distributed network of specialized computers (known as nodes).  This network of nodes is the system by which BTC is created, and it is also the system that validates each transaction.  When a user initiates a BTC transaction, the details of the transaction are broadcast across the network.  Certain nodes within the BTC network then begin the work of validating—i.e. confirming the legitimacy—these pending transactions and adding them to the blockchain.  The validation process is referred to as mining and the nodes that validate transactions are referred to as miners.   A Bitcoin miner node examines pending transactions, sorts them by transaction fee and creates what is referred to as a candidate block for validation.  A candidate block is a temporary collection—or block—of transactions that the miner proposes to add to the blockchain.

14.    Bitcoin miners race to validate their candidate blocks by solving complex computational problems to generate a unique code called a hash. Once the miner identifies the correct hash, the information is transmitted back to the Bitcoin network, validating the transaction. Miners receive a small portion of each transaction they validate as a reward. These rewards are referred to as "transaction fees."

15.    Once a block has been validated, the validation and hash are broadcast back to the BTC network, allowing the transaction to proceed.  Validated transactions are posted to the BTC blockchain in groups called "blocks" thus forming the "blockchain."

16.    All of this activity is recorded on a distributed ledger known as a blockchain. The BTC blockchain contains a permanent, immutable record of all validated transactions across the

BTC network.  This includes the transaction hash, sending address, receiving address, amount of BTC sent or received, transaction fee paid and a timestamp denoting (in Coordinated Universal Time, "UTC") the time the transaction was validated by the blockchain.  The blockchain is public and can be viewed using free blockchain explorers or specialized commercial software that allows users to visualize transactions in a graphical display.

**VII.    BTC Wallets, Addresses, and Keys**

17.    BTC is spent using the principle of Unspent Transaction Output (UTXO) transactions, which is very similar to how a cash transaction functions.  For example, if one wanted to purchase a cup of coffee for $3 but only had a $5 bill, one would have to use the entire $5 dollar bill and receive $2 in change.  The same concept applies with UTXO-based cryptocurrencies such as BTC.  A user cannot send a specific portion of the BTC they hold in an address.  Rather, the user must send the entire balance and will receive "change" which is generally deposited into a newly created BTC address.  For instance, if an individual had 2 BTC in their wallet and wanted to send 1 BTC to a friend, the individual must send the entire 2 BTC and would receive 1 BTC (less transaction fees) back as change.  The change is usually credited to a separate BTC address, referred to as a "change address."

18.    BTC is designed as a peer-to-peer version of electronic cash that allows users to make online payments directly without the need to route a payment through a third-party institution, such as a bank or payment processor.  In practice, this means one BTC user can send value directly to another user in an electronic version of a traditional cash transaction.  BTC users send and receive value using public key addresses.  Public key addresses are a series of letters and numbers formatted in a specific way which functions similar to an account number.  Each address is paired with a private key, another series of specifically formatted letters and numbers, that acts

like a password.  Bitcoin addresses—i.e. public key addresses—are public and viewable on the Bitcoin blockchain.

19.    Private keys, by contrast, are a closely guarded secret only known to the individual or entity that controls a particular Bitcoin address.  A BTC public key address is like a bank account number, while a private key is the password or PIN code to the account.  A public key is the address that is visible on the BTC blockchain ledger, and allows those who know the public key to search for and view the past activity conducted in that address.  But a public key does not grant an ability to actually access or use any of the assets in the account.  The holder of the private key, on the other hand, actually owns and controls the assets because he or she is capable of accessing and utilizing the digital currency held at that specific address.

20.    BTC is stored using specialized software called a wallet.  A wallet can store multiple addresses and private keys and is used to send, receive, and store bitcoin.  In order to send BTC, a user must authenticate a transaction using the private key(s) which corresponds to the public key address(es) from which they want to debit BTC.  To send BTC, a user enters a destination address into their wallet software and enters the amount of BTC they wish to send. The user must then approve the transaction by signing it with the private key that corresponds to their sending public key address.  The private key functions much like a password and is used to confirm the user's ownership and control over the BTC held in the sending public key address. Without the private key, the transfer cannot be completed.

21.    Some wallets have added security that requires multiple signatures or private keys to access.  A multi-signature address, referred to as "multsig," is a type of cryptocurrency address that can only be accessed by and can only execute transactions in the address using two or more

private keys. A multisig address provides enhanced security by requiring multiple signatures before funds can be moved.

22.    BTC wallets fall into two broad categories based upon which party has custody of the BTC and private keys contained within a wallet. The two broad categories of wallets are "unhosted" and "hosted" wallets.

23.    An unhosted wallet is a wallet in which a user has total, independent control of the BTC contained therein because the user retains control of the private keys associated with each public key address in the wallet. There are many different types of unhosted wallet software, including wallets used on personal computers, mobile phones, specialized hardware devices, and even paper wallets. Unhosted wallets provide a BTC user with enhanced privacy and security because only the user holds the private keys necessary to authorize transactions from their wallets. Unhosted wallets also allow a user to conduct transactions directly without any third-party involvement. However, unhosted wallets generally have no mechanism in place to protect a user from losing their private keys, meaning a user may not be able to access funds held within their wallet should they lose the private keys.

24.    A hosted wallet is a wallet in which a user agrees to allow a third party to manage their BTC and private keys for them. Virtual currency exchanges are typical hosted wallet providers. Hosted wallets provide user-friendly interfaces that make it simpler for a user to send, receive, and store BTC by eliminating the need to store and maintain the security of their own private keys. The account creation process typically requires the creation of a username and password, and may also include enhanced security features such as two-factor authentication. A user is then able to access and transact their BTC on the virtual currency exchange using their assigned username and password.

25.     The benefit of a hosted wallet is that it is incredibly easy to use and there is little risk of losing access to the wallet because you can easily reset your password and account information.  This is the case because the user of a hosted wallet almost never holds the private key actually necessary to access their public key address.  Instead, the hosted wallet provider retains control of the BTC addresses and corresponding private keys for all addresses in the hosted wallet.  For example, in general, a user wishing to send BTC from a hosted wallet will simply login to their hosted wallet using their username and password, enter the destination address to which they would like to send funds into the hosted wallet provider's user interface and approve the transaction.  A hosted wallet user does not validate its transfer using a private key because they do not possess the private key.  The actual signing of the transaction using the private key is handled by the hosted wallet provider, not the individual user.

26.     A hosted wallet provider such as an exchange typically assigns a user an address or group of addresses to send, receive and store BTC. These addresses are controlled by the provider and interact with internal provider-controlled wallets, generally referred to as "hot wallets." Typically, a hosted wallet provider maintains control of the customer addresses and internal provider-controlled wallets, and the corresponding private keys for each.

## VIII.   August 2, 2016 Bitfinex Hack[2]

27.     Bitfinex suffered a compromise of its internal servers in 2016.  Ilya Lichtenstein admitted utilizing various hacking tools and techniques to gain access to Bitfinex's servers.  The compromise allowed Lichtenstein access to private keys held by Bitfinex.  In or about August 2016, Lichtenstein used his access to private keys held by Bitfinex to fraudulently authorize approximately 2,000 transactions in which approximately 119,754 BTC were transferred from

---

[2] The factual information contained in this section is based on my review of the publicly available blockchain data and the papers filed in this case.

addresses controlled by Bitfinex to an outside, unhosted wallet (labelled "1CGA4s" by the Government) controlled by Lichtenstein. Approximately 94,636 BTC never left the 1CGA4s wallet.

28.    The remaining approximately 25,000 BTC from the original hack were moved from Lichtenstein's wallet over the course of the scheme, as outlined in Lichtenstein's Statement of the Offense and Related Conduct. Beginning in or around January 2017, these funds were moved out of Lichtenstein's wallet in a variety of transactions. Over time, and through the use of sophisticated techniques, the Government traced some of the stolen funds that were moved out of Lichtenstein's wallet across the Bitcoin blockchain to various other virtual currency exchanges, mixing and obfuscation services, and darknet markets. This analysis allowed the Government to develop evidence identifying Lichtenstein as the likely perpetrator of the Bitfinex hack and the subsequent laundering of the stolen funds.

29.    Portions of the stolen BTC were dissipated from the original wallet as follows:

a.    Transferred from the original theft wallet to another large staging wallet;

b.    Transferred from the staging wallet into new, unlinked wallets;

c.    Transferred through darknet markets, coinjoin services, mixers, and exchanges that did not require KYC information; and

d.    Converted to fiat currency, other virtual currencies including, Monero ("XMR"), Tether ("USDT"), USD Coin ("USDC"), gold and other property.

30.    On January 31, 2022, the Government obtained access to Lichtenstein's unhosted wallet (the "Lichtenstein Hack Wallet") by decrypting a file saved to Lichtenstein's cloud storage account, pursuant to a search warrant. The file contained a list of more than 2,000 addresses along with the corresponding private keys for each address. On or around February 1, 2022, the

Government used the private keys obtained from Lichtenstein's cloud storage account to seize the approximately 94,636 BTC remaining in the Lichtenstein Hack Wallet by transferring those assets to Government-controlled wallets.

31.    On February 28, 2024, the Government seized an additional approximately 15,085.244 BTC (made up of two separate seizures of 2,818.199 BTC and 12,267.025 BTC respectively). All of these additional BTC were sourced from additional wallets recovered from Lichtenstein's cloud storage wallets.

32.    The Government also seized approximately 117,376.52651940 Bitcoin Cash (BCH) and 117,376.58178024 Bitcoin Satoshi Vision (BSV) using the private keys obtained from Lichtenstein's cloud storage account. BCH and BSV are so-called "hard fork" assets derived from BTC.

33.    The seizure transfers from Lichtenstein's wallets to the Government's wallet are visible on the BTC, BCH, and BSV blockchains. It is possible to determine the source of BTC, BCH, and BSV seized by the Government by reviewing historical transactions present on their respective blockchains prior to the seizure transactions.

34.    The Government's Amended Order of Forfeiture identifies additional property linked to the theft that is subject to forfeiture, including other virtual currencies such as Ethereum ("ETH"), USDT, USDC and several other tokens stored in wallets controlled by Lichtenstein. It is likely that Lichtenstein obtained these tokens by exchanging portions of the stolen BTC through services such as cryptocurrency exchanges. The actual conversion of BTC to other tokens is not visible on the blockchain. Therefore, this report only addresses the sources of BTC, BCH, and BSV seized by the Government that can be traced on their respective blockchains.

**IX.     The Approximately 94,643 BTC Seized By the Government and Referenced in Paragraph e. of ECF No. 198-1 Are Directly Traceable to the Bitfinex Hack.**



Paragraph e. – BTC Tracing Summary

35.     Paragraph e. of the Government's Corrected Second Attachment, ECF No. 198-1, identifies approximately 94,643.29837084 BTC that were seized from wallets recovered from Lichtenstein's online storage account (the "**Lichtenstein Hack Wallet**").  The Government specifies that this seizure did not happen in one fell swoop, but instead occurred in 23 separate transactions represented by the individual transaction hashes noted on the chart provided by the Government in Paragraph e.  By conducting a tracing analysis through a review of the blockchain and other public sources I was able to determine that the BTC referenced in Paragraph e. are directly traceable to Bitfinex Source Addresses.[3]

36.     Through this tracing analysis I was able to confirm the date of these transactions, the addresses that transferred the BTC, the address that received the BTC, and the amount of BTC transferred in total and as part of each transaction.  For example, one of the 23 transaction hashes identified in Paragraph e. begins:  11bae4.[4]  The public blockchain data shows that hash 11bae4 represents the transfer of 10,000 BTC on February 1, 2022, at 05:51 UTC from the Lichtenstein Hack Wallet into BTC wallet bc1qaz.[5]  Wallet bc1qaz is the Government's seizure wallet.  The public blockchain data also shows that the 10,000 BTC contained in hash 11bae4 was sourced

---

[3] *See* Appendix C for data and demonstratives related to my Paragraph e. tracing analysis.
[4] The full transaction hash is:
11bae40ae4315a1e8f7d9a8df676db6bdb497b153711d1bf7952c540ed1a5966.
[5] The full wallet address is: bc1qazcm763858nkj2dj986etajv6wquslv8uxwczt

from 150 distinct addresses, all of which were contained within the Lichtenstein Hack Wallet. In essence, hash 11bae4 represents the transfer of 10,000 BTC from 150 addresses controlled by Lichtenstein to an address at a wallet controlled by the Government.



Paragraph e. – Transaction 11bae4 BTC Seizure Tracing Summary

37.     By repeating this same review and analysis across all 23 transaction hashes identified in Paragraph e., I was able to confirm the Government's account that the approximately 94,643 BTC were transferred from the Lichtenstein Hack Wallet to the Government on February 1, 2022.



Paragraph e. – BTC Seizure Tracing Summary

38.     In the same way that it is possible to trace the BTC transferred from the Lichtenstein Hack Wallet to the Government, it is possible to trace the BTC backwards from the Government, to Lichtenstein, and to the source that provided the BTC to Lichtenstein. By tracing the BTC backwards from the Lichtenstein Hack Wallet, it is possible to determine with specificity the source of the seized BTC.

39.     To continue with the representative tracing of hash 11bae4, the public blockchain data shows that the 150 addresses contained in the Lichtenstein Hack Wallet that provided the BTC for hash 11bae4, were funded by BTC withdrawn from 465 Bitfinex Source Addresses

through 150 transactions. All of these 150 transactions took place between on or about 10:18 UTC and 11:50 UTC on August 2, 2016, the acknowledged date of the Bitfinex hack.

40.     One of these 150 transactions is transaction hash 4e7d1.[6] Transaction hash 4e97d9 represents a transfer of approximately 10.588 BTC[7] from Bitfinex Source Address 32SLh[8] into Lichtenstein Hack Wallet address 15W347[9] on August 2, 2016, at 11:50 UTC. The approximately 10.588 BTC then remained in the Lichtenstein Hack Wallet until they were transferred to the Government on about February 1, 2022, as part of hash 11bae4. I conducted the same analysis for the remaining 149 transactions that supplied the BTC in seizure transaction 11bae4 and likewise found that the BTC originated from Bitfinex Source Addresses on the date of the Hack.



Paragraph e. – Transaction 11bae4 BTC Tracing Summary

41.     By repeating this same process across all 23 transaction hashes identified in Paragraph e., I was able to confirm that all of the approximately 94,643 BTC that were transferred from Lichtenstein to the Government on February 1, 2022, were all first transferred into the Lichtenstein Hack Wallet on August 2, 2016—the date of the Bitfinex hack. *See* Appendix C for relevant charts demonstrating the flow of BTC represented by all 23 Paragraph e. transaction hashes.

---

[6] The full transaction hash is:
4e97d912faa1673b1e2583d0a2776d65bf2f1a18324956d326414480096b5c13.
[7] This represents 10.598 BTC debited from the Bitfinex Source Addresses less fees. *See supra* Section VI for a discussion of BTC transaction fees.
[8] The full wallet address is: 32SLhBwSQozNknoX7gpRFKqwviFwTvqDxB.
[9] The full wallet address is: 15W34755yn74mbPjyVepSaqq4bbDDwwxs5



Paragraph e. – BTC Tracing Summary

42.     The data contained on the public blockchain offers even more information about these transfers when the transactions are analyzed together. The blockchain shows that each of the addresses in the Lichtenstein Hack Wallet was funded with a single deposit transaction on the exact date of the Bitfinex hack. Tellingly, many of the deposit transactions—the transactions in which BTC was deposited into the Lichtenstein Hack Wallet—share the same timestamp and block on the BTC blockchain. Sharing a block on the chain is a strong indication that these transactions were conducted en masse and essentially simultaneously. All the BTC transferred into these addresses remained dormant in the Lichtenstein Hack Wallet between the date of the Bitfinex hack and their seizure by the Government.

43.     Public information available on the blockchain and elsewhere—including the timing of the transfers, the manner of the transfers, and the behavior of the transferring wallets—as well as the papers filed by the Government and Defendants strongly indicate that all the addresses that transferred BTC into the Lichtenstein Hack Wallet simultaneously on the date of the Bitfinex hack were Bitfinex-controlled addresses. *See infra* Section XIII, for a discussion of the techniques used to form this opinion.

44.     Based on my analysis of the public blockchain data, the publicly filed documents in this case, and my personal knowledge, it is my opinion that the approximately 94,643.29837084 BTC seized by the Government from wallets recovered from Defendants' online storage account, as referenced in Paragraph e. of the Government's Corrected Second Attachment, ECF No. 198-

1, represents BTC that Lichtenstein hacked from Bitfinex and that these BTC are directly traceable to accounts controlled by Bitfinex.

## X.     The Approximately 2,818.199 BTC Seized By the Government and Referenced in Paragraph s. of ECF No. 198-1 Are Directly Traceable to the Bitfinex Hack.



Paragraph s. – BTC Tracing Summary

45.     The Government's Corrected Second Attachment, ECF No. 198-1, Paragraph s., identifies an additional approximately 2,818.199 BTC that were seized from wallets recovered from Lichtenstein's online storage account.  Through similar tracing techniques as those described in my analysis of the BTC referenced in Paragraph e., I was able to determine through my review of the blockchain and other public sources that the BTC referenced in Paragraph s. are traceable to Bitfinex Source Addresses.[10]

46.     On or about February 28, 2024, the Paragraph s. BTC was transferred from address 14EGUf[11] in two transactions (hashes 20b367[12] and 879a2d[13]) to Government-controlled address

---

[10] *See* Appendix D for data and demonstratives related to my Paragraph s. tracing analysis.

[11] The full wallet address is: 14EGUfpkDaqe3b6dSkdfUxF3vondVS8kDQ.

[12] The full transaction hash is: 20b3673bf0d6294c46faf88204349530b694902797ce726d800ab0f342cd88d4.  This transaction appears to be a small test transaction, which is common when transferring large quantities of cryptocurrency.  Only .999 BTC was transferred as part of this transaction.

[13] The full transaction hash is: 879a2d574abe141c4a932767ec59302520f7b7dda5c59e9230d32dd51fcbe5ee.

bc1qw8.[14]  By tracing these transactions backwards, I was able to determine that address 14EGUf was funded via five transactions totaling approximately 2,818.19899771 BTC that were executed on or about April 29, 2022—approximately two months after Lichtenstein was arrested and the Government gained control of his wallet.  The BTC that supplied 14EGUf was sourced from 33 distinct addresses (the "Paragraph s. Intermediary Addresses").



Paragraph s. – BTC Seizure Tracing Summary

47.    Blockchain  tracing  shows  that  the  Paragraph  s.  Intermediary  Addresses  were themselves funded through a series of 15 transactions, on or about April 14, 2021.  By tracing these 15 transactions I was able to confirm that they all came from addresses the Government and Defendants acknowledge were controlled by Lichtenstein in the Lichtenstein Hack Wallet.  For example:  1,000 BTC was transferred to address 14EGUf on April 29, 2022, at 16:49 UTC as part of transaction hash 18075b.[15]  The BTC transferred in hash 18075b was sourced from 10 Paragraph s. Intermediary Addresses.  One of these addresses—address 3JjqWW[16]—supplied 126.15 of the BTC transferred in hash 18075b.  The blockchain shows that address 3JjqWW was itself funded through a transfer of BTC represented by hash 794922.[17]  Hash 794922 represents an April 14, 2021, transfer of approximately 259.75 BTC from address 1J2Tem.[18]  Address 1J2Tem is one of

---

[14] The full wallet address is: bc1qw8pd8qftyfv5d2waz90ulqn5hxxa79j934fmqe.
[15] The full transaction hash is:
18075b0dfc9e6b4642b193ee93acea858eb750c35dc29c3c57bedc1b6800195c.
[16] The full address is:  3JjqWWL8CNHnopbtHJvHNZLFT3SBcG9Rx8.
[17] The full transaction hash is:
7949228ac8c41e6f7f9b0369030f3ca454de0da8cf2a952f1225a10773920f6bI.
[18] The full address is:  1J2Tem6ZSHnpppVhBpSq5pAZYmfjENqoD3.

the addresses in the Lichtenstein Hack Wallet. I repeated this exercise for each of the transactions that funded 14EGuf and found the same results: the BTC in 14EGuf that was seized by the Government was originally transferred from Lichtenstein Hack Wallet addresses.

48. The addresses within the Lichtenstein Hack Wallet that funded the Paragraph s. Intermediary Addresses—like 1J2Tem—and that ultimately funded 14EGuf and the Government's seizure, share common patterns of on-chain activity. As with the Lichtenstein Hack Wallet addresses relevant to the transactions in Paragraph e., the Paragraph s. Lichtenstein Hack Wallet addresses were funded by a series of transactions all of which occurred on or about August 2, 2016—the date of the Bitfinex Hack. For example: Lichtenstein Hack Wallet address 1J2Tem was funded by a transfer of approximately 259.75 BTC from four Bitfinex Source Addresses on August 2, 2016 via hash 3de328.[19] By repeating this same tracing process across all of the transaction hashes identified in Paragraph s., I was able to confirm that all of the approximately 2,818.20 BTC that were transferred from Lichtenstein to the Government, were all first transferred into the Lichtenstein Hack Wallet on August 2, 2016 from Bitfinex Source Addresses.



Paragraph s. – BTC Tracing Summary

49. As described in more detail in Section XIII *infra*, public information available on the blockchain and elsewhere, as well as the information contained in the papers filed by the Government and Defendants, strongly indicate that all of the addresses that transferred BTC into

---

[19] The full transaction hash is:
3de328a20ad94d7935ce1e7bffe5bc006ca36ba6dac484dbdfc8a119e3010b1d.

the Lichtenstein Hack Wallet simultaneously on the date of the Bitfinex hack were Bitfinex-controlled addresses.

50.    Based on my analysis of the public blockchain data, the publicly filed documents in this case, and my personal knowledge, it is my opinion that the approximately 2,818.199 BTC seized by the Government from wallets recovered from Defendants' online storage account, as referenced in Paragraph s. of the Corrected Second Attachment, ECF No. 198-1, represents BTC that Lichtenstein hacked from Bitfinex and that these BTC are directly traceable to accounts controlled by Bitfinex.  These BTC were not converted into other assets, and I have not seen evidence that these BTC were transferred through mixers, coinjoin services, or were otherwise comingled with BTC that did not originate from the Bitfinex-controlled wallets.

## XI.    The Approximately 12,267.025 BTC Seized By the Government and Referenced in Paragraph t. of ECF No. 198-1 Are Directly Traceable to the Bitfinex Hack.



Paragraph t. – BTC Tracing Summary

51.    The Government's Corrected Second Attachment, ECF No. 198-1, Paragraph t., identifies an additional approximately 12,267.025 BTC seized from wallets contained on an external hard drive recovered from Defendants 'residence.  Through similar tracing techniques as those described in my analysis of the BTC referenced in Paragraph e., I was able to determine

through my review of the blockchain and other public sources that the BTC referenced in Paragraph s. are traceable to Bitfinex Source Addresses.[20]

52.     The BTC identified in Paragraph t. was transferred on or about February 28, 2024 in two transactions (hashes a0d881[21] and 0c425d[22]) from address 1DNUjp[23] to Government-controlled address bc1qkm.[24]   Wallet 1DNUjp, in turn, was funded by six primary input transactions totaling approximately 12,267.025282 BTC, on or about August 9, 2022.  The primary input transactions were funded from approximately 5,296 source addresses ("Paragraph t. Intermediary Addresses").

53.     The Government's Statement of Facts, ECF No. 1-1, describes the laundering techniques Defendants undertook to hide the proceeds of the Hack, including the use of computer programs to automate transactions and moving the stolen BTC in a series of smaller amounts, totaling thousands of transactions.   These techniques are evident when reviewing the source addresses of the BTC eventually deposited into the Paragraph t. Intermediary Addresses.

54.     One specific technique that is evident with respect to the Paragraph t. transactions is a "peel chain."   A "peel chain" occurs when BTC is gradually moved from one address to another through a long chain of intermediary transactions.  The BTC moves to a new address after each transaction and a small portion is "peeled off"—i.e. lost through fees and deposits—each

---

[20] *See* Appendix E for data and demonstratives related to my Paragraph t. tracing analysis.
[21] The full transaction hash is:
a0d8817455f004426e56cd502d2fc47d60ed1489363c97cd3dd1c2070f12659c.  This transaction appears to be a small test transaction, which is common when transferring large quantities of cryptocurrency.  Only .00068 BTC was transferred as part of this transaction.
[22] The full transaction hash is:
0c425db3da697bde3277852c8cea3c9bd9adc6575e593ef349c207ee3f4ab5a2.
[23] The full address is:  1DNUjpHPNKMoKYBHxJz2Sh1uQQdJkGsXj5.
[24] The full address is:  bc1qkmk4v2xn29yge68fq6zh7gvfdqrvpq3v3p3y0s.

time.  While this technique is complex, the public nature of the blockchain ultimately makes it entirely possible (though time-consuming) to trace each of these layers back to its source.

55.    For example, transaction hash 5db5e[25] accounts for 6,000 of the approximately 12,267.025282 BTC sent to 1DNuJp.  The BTC in transaction hash 5db5e was sourced from 19 separate BTC addresses.  One of these addresses, 39pY2f[26] is the source of 337.7333232 of the BTC contained in hash 5db5e.  The BTC in 39pY2f, traversed approximately 66 "hops" between August 2, 2016 and April 14, 2021.  After each hop, small portions of the BTC were peeled off from the original BTC as it traversed the chain, before finally arriving at 39pY2f.   The address from which this peel originated, address 18xR5f,[27] is found within the Lichtenstein Hack Wallet and was funded in a single transaction 5c698b[28] on August 2, 2016—the date of the Bitfinex hack

56.    The remaining BTC constituting the Paragraph t. seizure transfers (hashes a0d881 and 0c425d) can be traced through laundering patterns similar to those described above.  In each instance, the stolen BTC was transferred from a series of addresses associated with the Lichtenstein Hack Wallet to Paragraph t. Intermediary Addresses through various layering transactions, including peel transactions, which are observable on the blockchain.  The layering activity occurred between the date the BTC was stolen on August 2, 2016 and continued until about late January 2022, as the stolen BTC was gradually transferred into the Paragraph t. Intermediary Addresses.  The stolen BTC was held in the Paragraph t. Intermediary Addresses until it was seized by the Government.

---

[25] The full transaction hash is:
5bd5e8cf4884ab3258ba14b55ca7e869350f4986eb10e9864abe0e46096532fa.
[26] The full address is:  39pY2Fmedo1HvztnLQQT7ABGTviqbvCiFS.
[27] The full address is:  18xR5fcA7g7kmd44HhQiAux6DskikcvHjb.
[28] The full transaction hash is:
5c698b9279445005cb03f8af84c5e4b50c25cc124a4458b5170d54a9bc186b1e.

57.    In each case, the BTC was originally transferred to addresses associated with the Lichtenstein Hack Wallet on or about August 2, 2016.  Likewise, in each case, public information available on the blockchain and elsewhere, as well as the information contained in the papers filed by the Government and Defendants, strongly indicate that all of the addresses that transferred BTC into the Lichtenstein Hack Wallet simultaneously on the date of the Bitfinex hack were Bitfinex-controlled addresses, as described *infra* in Section XIII.

58.    Based on my analysis of the public blockchain data, the publicly filed documents in this case, and my personal knowledge, it is my opinion that the approximately 12,267.025 BTC seized by the Government from wallets recovered from an external hard drive seized from Defendants residence, as referenced in Paragraph t. of the Government's Corrected Second Attachment, ECF No. 198-1, represents BTC that Lichtenstein hacked from Bitfinex and that these BTC are directly traceable to accounts controlled by Bitfinex.  These BTC were not converted into other assets, and I have not seen evidence that these BTC were transferred through mixers, coinjoin services, or were otherwise comingled with BTC that did not originate from the Bitfinex-controlled wallets.

**XII.    The Approximately 117,376.52651940 Bitcoin Cash (BCH) and 117,376.581788024 Bitcoin Satoshi Vision (BSV) Seized By the Government and Referenced in Paragraphs f. & g. of ECF No. 198-1 Are Directly Traceable to the Bitfinex Hack.**

59.    Paragraph f. of the Government's Corrected Second Attachment, ECF No. 198-1, identifies approximately 117,376.52651940 Bitcoin Cash (BCH) that were seized from wallets recovered from the Lichtenstein Hack Wallet and transferred to the Government.  Paragraph g. of the Government's Corrected Second Amended Attachment to the Preliminary Order of Forfeiture, identifies approximately 117,376.58178024 Bitcoin Satoshi Vision (BSV) that were seized from wallets recovered from the Lichtenstein Hack Wallet and transferred to the Government.  Through similar tracing techniques as those described in my analysis of the BTC referenced in Paragraphs

e., s. and t., I was able to determine through my review of the blockchain and other public sources that the BCH and BSV referenced in Paragraphs f. and g. are traceable to Bitfinex Source Addresses.[29]

60.    BCH is a cryptocurrency that launched in August 2017 as a "hard fork" of the Bitcoin blockchain.  A hard fork in a blockchain is a change in programming which essentially creates a new blockchain and cryptocurrency.  BCH was created by a group of developers to resolve perceived transaction limitations in the Bitcoin network.  After the launch of the new software that represents the BCH blockchain, the Bitcoin blockchain was effectively split in two. The existing Bitcoin blockchain continued to exist and was unchanged by the fork, while the BCH network launched with a new protocol which conducted transactions wholly separate from the BTC blockchain.  Likewise, BSV is a cryptocurrency that launched in November 2018 as a hard fork of the BCH blockchain.  Anyone holding BCH as of November 2018 received a one-for-one match of BSV for use on the BSV blockchain.

61.    All holders of BTC received an equivalent amount of BCH credited to the new BCH blockchain after the hard fork.  For example, if a wallet contained 100 BTC before the hard fork, after the hard fork a user would continue to hold their 100 BTC, but would also now hold 100 BCH for use on the BCH blockchain.  Likewise, all holders of BCH received an equivalent amount of BSV credited to the new BSV blockchain after the BSV hard fork.

62.    Just as with BTC, it is possible to trace the BCH and BSV backwards from the Government, to Lichtenstein, and to the source that provided the funds to Lichtenstein.  By reviewing information available on the public BCH and BSV blockchains, I was able to confirm

---

[29] *See* Appendixes F and G, respectively, for data and demonstratives related to my Paragraph f. and g. tracing analysis.

the date of the transactions, the addresses that transferred the BCH and BSV, the addresses that received the BCH and BSV, and the amount of BCH and BSV transferred in total and as part of each transaction as denoted in Paragraphs f. and g. of the Government's Corrected Second Attachment, ECF No. 198-1.

63.    Based on my analysis of the public blockchain data and the publicly filed documents in this case it is my opinion that the approximately 117,376.52651940 BCH and 117,376.58178024 BSV seized by the Government from wallets recovered from Defendants online storage account, as referenced in Paragraph f. and g. of the Government's Corrected Second Attachment, ECF No. 198-1, are directly traceable to accounts controlled by Bitfinex.

## XIII.    The Assets Seized by the Government and Referenced in Paragraphs e., f., g., s., and t., Are All Traceable to Bitfinex-Controlled Wallets.

64.    Based on my review of the public blockchain data and the filings in this case, it is my conclusion that the seized funds identified by paragraphs e., f., g., s., and t. of the Preliminary Order of Forfeiture were all held in Bitfinex-controlled addresses immediately prior to the Hack. This conclusion is based on the following:

65.    *First*, the Government and Defendants acknowledge that the source of the hacked funds was Bitfinex. *See* Lichtenstein Sentencing Memorandum, ECF No. 146 at 25; Lichtenstein Statement of Offense, Doc. 95 ¶ 14; Consent Motion, ECF No. 141 at 2. The Government and Defendants acknowledge that Lichtenstein perpetrated the Hack by breaching Bitfinex's security systems and gaining access to private keys for wallets that were controlled by Bitfinex. Lichtenstein Sentencing Memorandum, ECF No. 146 at 2.  The Government further acknowledges that on or about August 2, 2016, Lichtenstein used Bitfinex's private keys to initiate unauthorized transactions from Bitfinex-controlled addresses to addresses in the Lichtenstein Hack Wallet. Consent Motion, ECF 141 at 3.  It is my understanding that the Government and Defendants

acknowledge that the property listed in the Government's Corrected Second Attachment, ECF No. 198-1 are proceeds of the Hack and Defendants'conspiracy to launder the proceeds stolen from Bitfinex. Lichtenstein Sentencing Memorandum, ECF No. 146 at 5-7. Based on these admissions, it appears clear that the source of all of the BTC transferred to the Lichtenstein Hack Wallets on August 2, 2016, was Bitfinex.

66.    *Second*, the source and subsequent laundering of the stolen BTC as described by the Government and admitted by Defendants is observable on the public blockchain. The blockchain data shows that all the relevant transfers of BTC into the Lichtenstein Hack Wallet occurred on August 2, 2016—the acknowledged date of the Hack. In fact, each of the addresses in the Lichtenstein Hack Wallet was funded with a single deposit transaction on the exact date of the Bitfinex hack. Tellingly, many of the deposit transactions—the transactions in which BTC was deposited into the Lichtenstein Hack Wallet—share the same timestamp and block on the BTC blockchain. Sharing a block on the chain is a strong indication that these transactions were conducted essentially simultaneously, and the fact that multiple of the transactions share the same block indicates the transactions are related and were conducted en masse.

67.    *Third*, the hacked addresses display characteristics consistent with addresses that are part of a cryptocurrency exchange service, such as Bitfinex. Cryptocurrency exchanges such as Bitfinex typically consist of many addresses, including those used for customer deposits, those generated as change addresses from UTXO transactions, and specialized "hot wallets," which are used to sweep cryptocurrency from deposit and change addresses into secure cold storage. On-chain, deposit addresses controlled by a cryptocurrency exchange display characteristics such as pass-through transactions. For example, a deposit address may have several inputs before an aggregated output to an exchange hot wallet. An exchange change address will generally only

include one input (the change from a UTXO transaction) before an output back to an exchange controlled hot wallet.

68.     I observed these characteristics across the over 5,000 addresses that provided BTC to the Lichtenstein Hack Wallet addresses on August 2, 2016, indicating the addresses are part of a cryptocurrency exchange.    Further, the hacked addresses interact directly on-chain with additional service addresses that display high volume input/output activity consistent with a cryptocurrency exchange hot wallet.    The suspected hot wallets I observed are attributed as Bitfinex wallets by at least one commercial blockchain intelligence provider.

69.     *Finally*, the transaction patterns displayed by the hacked wallets and their on-chain interactions with known Bitfinex hot wallets are very strong indicators that the hacked wallets were controlled by Bitfinex.[30]    The circumstances of the hack as acknowledged by both the Government and Lichtenstein, coupled with the timing of the hack transactions on-chain further confirm the hacked wallets were controlled by Bitfinex.    As explained *supra* paras 14 to 17, cryptocurrency transactions can only be authorized using private keys, a closely guarded secret that is only known to the entity that controls a particular address.    Only someone with access to the private keys for all of the hacked addresses could have authorized the hacked transactions and Bitfinex controlled the private keys.    The fact that the withdrawal transactions all occurred within the same short time window on August 2, 2016 further indicates that all of the hacked wallets were controlled by a centralized entity, as it would be almost impossible to simultaneously initiate transactions from over 2,000 transactions if the addresses were not closely related/controlled.

---

[30] I reviewed attributions utilizing the Blockchain Intelligence Group's QLUE tool, a commercial blockchain intelligence tool that identifies and labels cryptocurrency addresses through proprietary clustering heuristics.

70.    It is my conclusion that the BTC that funded the Lichtenstein Hack Wallet addresses on August 2, 2016, and that were later transferred to and seized by the Government as described in the Government's Corrected Second Attachment, ECF 198-1, was obtained by Lichtenstein from Bitfinex-controlled addresses.

Dated:  Gaithersburg, Maryland

January 17, 2025

By:

Matthew Price

# APPENDIX A

# MATTHEW PRICE

**Curriculum Vitae**

## SUMMARY

Highly skilled cryptocurrency investigations expert with a 8-year track record of leading innovative projects in the FinTech industry and government. Extensive experience with blockchain analysis tools, data analysis, intelligence collection, and investigations. Working at leading blockchain intelligence firm Elliptic, I manage global investigations support to law enforcement, intelligence and compliance customers, including providing Subject Matter Expertise, supporting product design and leading global training efforts. I previously was Global Head of Investigations at Binance, the world's largest cryptocurrency exchange, where I built and led a team of nearly 25 investigators setting the standard for global cryptocurrency investigations. I'm a 17-year veteran of the US law enforcement and the Intelligence Community, having previously served as Special Agent with the Internal Revenue Service, Criminal Investigation - Cyber Crimes Unit (IRS-CI CCU) leading multi-agency, multinational investigations of darknet markets, illicit virtual currency tumblers, sanctions evasion, and banking-integrity violations. A proven leader in the cybercrimes/virtual currency space who brings a wealth of investigative and intelligence experience to the field. Highly skilled, respected and experienced investigator with extensive international experience. Led the investigations of several high-profile criminal targets, including Grams/Helix, Bitcoin Fog, Buyer's Club and Hydra Market.

## PROFESSIONAL EXPERIENCE

### *2023 TO PRESENT*
### *STRATEGIC ENGAGEMENT LEAD, ELLIPTIC*

- Serve as Elliptic's cryptocurrency investigations Subject Matter Expert, supporting product development, driving intelligence collection and providing investigations guidance for all sectors of the business.
- Built, grew and manage Elliptic's relationships with public sector agencies across the globe, including law enforcement, intelligence and regulatory agencies.
- Maintain extensive contacts with key law enforcement, intelligence, and regulatory agencies focused on cryptocurrency issues across the globe.
- Provided training, guidance and expertise to cryptocurrency investigators in compliance departments at major Fintech firms and throughout the global law enforcement community.
- Developed and led new product and intelligence initiatives in the areas of Decentralized Finance, cross-chain crime and public/private sector collaboration.
- Planned, organized and hosted public-private sector forums to drive collaboration between the FinTech industry, law enforcement and the Intelligence Community.
- Provide Subject Matter Expertise to compliance organizations in the Centralized Exchange, Decentralized Exchange and Web3 marketplaces.

*2021 TO 2023*
*GLOBAL HEAD OF INVESTIGATIONS, BINANCE*

- Globally recognized expert in the field of cryptocurrency investigations, including blockchain analysis techniques, forensics, decentralized finance, and modus operandi related to blockchain crimes.
- Built and led a high functioning investigations team of nearly 25 investigators worldwide that is recognized globally for its cryptocurrency expertise.
- Led the development and implementation of blockchain analysis tools, case management system, and data analysis tools.
- Created policies and procedures governing investigative operations, strategic priorities, and resource allocation.
- Built strong relationships with global law enforcement agencies, regulatory agencies and blockchain analysis firms.
- Developed a cryptocurrency investigations training program and delivered training to law enforcement and corporate partners globally.
- Sought after speaker at numerous domestic and international Fintech and law enforcement conferences, media appearances in Tier 1 media outlets, television and book appearances.


*2017 TO 2021*
*SPECIAL AGENT, IRS-CI CYBER CRIMES UNIT, WASHINGTON, DC*

- Conducted complex, cutting-edge international cyber investigations, including the first-ever investigations of illicit bitcoin mixing services. My case work directly led to new case law affirming the applicability of U.S. FinCEN regulations to virtual currency mixers.
- Planned and led numerous international investigations, coordinating the actions of investigative, prosecutorial and regulatory authorities both in the U.S. and abroad.
- Collaborated closely with the U.S. Department of Justice, FinCEN and Treasury regulators to successfully target and dismantle illicit bitcoin mixing services.
- Developed new tools and methodologies to successfully identify, arrest and prosecute cyber criminals using cryptocurrency to protect their anonymity.
- Developed and conducted innovative cyber undercover operations to identify and target cyber-criminal actors.
- Seized hundreds of millions of dollars in illicit crypto currency.
- Provided training, education and outreach to U.S. and foreign law enforcement partners and corporate partners in the crypto currency space. Developed strong relationships with domestic and international law enforcement, regulatory and corporate partners.
- Speaker at numerous domestic and international conferences, including 2019 Korean National Police International Symposium on Cybercrime Response, 2021 Europol EC3 Cryptocurrencies Conference, and 2019 Inspectors General Conference.
- Recipient of IRS-CI Chief's Award and IRS Commissioner's Award for investigative excellence.

*2012 TO 2017*
*TARGETING OFFICER, CENTRAL INTELLIGENCE AGENCY, WASHINGTON, DC*

- Served as an integral member of a multi-agency team pursuing high value targets of critical importance to the U.S. Intelligence Community.
- Independently identified people, relationships, and organizations having access to the information needed to address the most critical U.S. foreign intelligence requirements and found opportunities to disrupt terrorist attacks, illegal arms trading, drug networks, cyber threats and counterintelligence threats.
- Served a one-year Joint Duty Assignment detailed to the Federal Bureau of Investigation, Counterintelligence Division.

*2009 TO 2012*
*SPECIAL AGENT, IRS-CI, BALTIMORE, MARYLAND*

- Independently conducted complex criminal investigations of money laundering, identity theft, fraud and criminal tax statutes leveraging the full range of investigative tools and techniques.
- Successfully served as the lead case agent for a multi-million dollar white collar fraud and narcotics money laundering investigations that led to convictions in Federal court.
- Planned, executed and led numerous successful enforcement operations including search warrants, surveillance, arrest and undercover operations.
- Leveraged advanced accounting and financial investigative skills to gather, analyze and present complex financial evidence to obtain criminal convictions.
- Served as a leader in several multi-agency investigations of major white-collar fraud, identity theft and narcotics money laundering cases.

*2007 TO 2009*
*POLICE OFFICER, MONTGOMERY COUNTY POLICE, ROCKVILLE, MARYLAND*

- Solo patrol officer providing proactive community-oriented police services in a high call volume area.
- Successfully investigated misdemeanor and felony crimes, prepared detailed incident and arrest reports, criminal complaints, civil and criminal citations, search and arrest warrants and testified in court.
- Experienced in conflict resolution, crisis management and emergency response.
- Built close professional relationships within a diverse community to foster collaboration and mutual respect.

# TESTIMONY/TRIAL EXPERIENCE

- Lead Case Agent Testimony in *United States v. Roman Sterlingov* US District Court for the District of Columbia, March 2024
- Financial Analysis Witness in *United States v. Andrew Hamilton Williams*, US District Court for Maryland, March 2012
- Testimony Regarding the Technical Functions of a Bitcoin Mixer, *United States v. Larry Harmon*, US, District Court for the District of Columbia. Note this ruling is the first instance confirming 18 U.S.C. 1960 applies to Bitcoin Mixing Services.
- Corporate Witness Testimony before the Commodities Futures Trading Commission
- Corporate Witness Testimony before the Eleventh Judicial District of Florida

## TRAINING/CERTIFICATIONS

- Certified Fraud Examiner
- Operational and Analysis Training, CIA
- Specialist Investigator Certification, Elliptic
- TRM Certification

- Financial Investigations, IRS-CI
- Reactor Certification, Chainalysis
- Cybercrimes Investigations, IRS-CI

## EDUCATION

DECEMBER 2008
M.S. University of Maryland,  Accounting and Information Systems

MAY 2004
B.S. University of Scranton, Accounting

# APPENDIX B

## **Materials Relied Upon**

- Open source blockchain data available on mempool.space and blockchair.com.
- Open source blockchain data accessed and visualized using Qlue, a blockchain analytics software created by Blockchain Intelligence Group.
- Complaint, ECF No. 1, *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C. Feb. 7, 2022).
- Complaint Ex. A, ECF No. 1-1, *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C. Feb. 7, 2022).
- Information, ECF No. 89, *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C. Jul. 20, 2023).
- Lichtenstein Statement of Offense, ECF No. 95, *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C. Aug. 3, 2023).
- Lichtenstein Plea Tr., ECF No. 110, *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C. Aug. 15, 2023).
- Consent Motion, ECF No. 141, *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C. Oct. 8, 2024).
- Lichtenstein Sentencing Memorandum, ECF No. 146, *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C. Oct. 15, 2024).
- Corrected Second Amended Attachment A, ECF No. 198-1, *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C. Dec. 11, 2024).
- Supplemental Motion Regarding Restitution, ECF No. 202, *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C. Jan. 14, 2025).

# APPENDIX C

**Paragraph E, Consolidated Tracing Summary (94,643 BTC):**



**Paragraph E, Transaction Hash 1 (15k BTC):**

c49ff6bd054fb386cd02fc94ca34b8773229ed8a5538e023ef7bea772d70c17a



**Paragraph E, Transaction Hash 2 (15k BTC):**

9d06994238d0de958033f42db39a6d2cc0de35e84be0ed080e41f017f02dffb3



**Paragraph E, Transaction Hash 3 (10k BTC):**

afdfeeadb9f0a4691cbb8ace33a7c24c052b3608c4c8cc2e25afe053926b6389



**Paragraph E, Transaction Hash 4 (10k BTC):**

77ad70fadfbbad5191c47c951469095ca845006f25fe9814f30f2853af367459



**Paragraph E, Transaction Hash 5 (10k BTC):**

b0aa2d76fd9463da6a7aff59e37d7ebf7b6aa1b660de2b2e9ab7755cf6f60ac3



### Paragraph E, Transaction Hash 6 (10k BTC):
11bae40ae4315a1e8f7d9a8df676db6bdb497b153711d1bf7952c540ed1a5966



### Paragraph E, Transaction Hash 7 (10k BTC):
e6088723889de70fa985e7b8c012c77ea693a6ef9379fb26a951a2bb5c722525



### Paragraph E, Transaction Hash 8 (10k BTC):
3fe798be890c7db8beaca9d005cd650e787b1b16bc5e47eef26bfa87124b6a95



### Paragraph E, Transaction Hash 9 (2.5k BTC):
ee56a9957f1f6166440bea01d0c0c29e4cec6230bb8231eced6ba844bb095d2a



### Paragraph E, Transaction Hash 10 (2k BTC):
8e5102edd876f71e3482b7602dd9141fbce3ac869fba55a757b4354c70536f34



### Paragraph E, Transaction Hash 11 (100 BTC):

ed1812e8310bb25fbd138aae17be738ad3fa20e0783a8598c8dea56d3be5dad7



### Paragraph E, Transaction Hash 12-22 (43 BTC):

d006075f40136ea7733aec2d6f32c31abc09f779de01a33e7e07804907d339c7
b18e40d96906b7b17f337ad6250f0c5aa9db93498832125374102dd2f5e0ed47
8e53ca8952fbf2d1a272ab376555a1ccee1ff0bcab0747a8c91b0ccfc77cc3fb
98281f388a4441d7bb00537e65b1a4581dcaddd3606fc09f6cf19598343be34d
d1dbc472abe47902aa71e639ba2feb2098b474ab20b853168ecdb0d87ce02955
61594a56cd2ef501cdb55b9037cd5785d1ad2eedfb1a4fab7ded50b1052a0650
c250725cfc9671d3849a3e85343ec5f3d045f805d002e56725c8ea2aebb9131a
97e4eb7ca5d0b2b6d501a53478486d5ed75ce58d1204c6036f25b33439d48627
658a550600e814f7bf7d032b7984912857f37c96a68e4dd3eb1dce4fc774e26f
6e0d701ac2ea3ad87fc8bcaa786b994aa943f5eb9a67a1e345769bb090bf5b9e
b7bf853fd6eb27f66963d219d29b85e13796e315473b7c08484335a0b0da7669



### Paragraph E, Transaction Hash 23 (.29 BTC):

9af41957244e97e70378a7afd2d41b73d0a64d94c9b2df9049c29dd1919741cb



# APPENDIX D

**Paragraph S, Consolidated Tracing Summary (2,818.199 BTC):**

**Paragraph S, Transaction Hash 1 (.999 BTC)**

879a2d574abe141c4a932767ec59302520f7b7dda5c59e9230d32dd51fcbe5ee

**Paragraph S, Transaction Hash 2 (2,817.199 BTC)**

20b3673bf0d6294c46faf88204349530b694902797ce726d800ab0f342cd88d4



# APPENDIX E

### Paragraph T, Consolidated Tracing Summary (12,267.025 BTC):

### Paragraph T, Transaction Hash 1 (.00068 BTC)

a0d8817455f004426e56cd502d2fc47d60ed1489363c97cd3dd1c2070f12659c

### Paragraph T, Transaction Hash 2 (12,267.02 BTC)

0c425db3da697bde3277852c8cea3c9bd9adc6575e593ef349c207ee3f4ab5a2



# APPENDIX F

**Paragraph F, Consolidated Tracing Summary (117,376.52 BCH):**





# APPENDIX G

**Paragraph G, Consolidated Tracing Summary (117,376.58 BSV):**



**Paragraph G, Transaction Hash 1 (100 BSV):**

2cf808c73bda45a6ee1c266c60da50f01250d9452f7b51e1caaf3ecec605b416

**Paragraph G, Transaction Hash 3 (117,176.58 BSV):**

6b46c0067f786acf4f5a1925f12b9860ad61817829f30fefd898ad0c3bbaeaf0

**Paragraph G, Transaction Hash 2 (100 BSV):**

a0ede2c37597976de79a67db2096b3d8f7a4f60f357c09953a7342ad1948b4b5

