REDACTED

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> ILYA LICHTENSTEIN and <br> HEATHER RHIANNON MORGAN, <br><br> Defendants. | Criminal No. 1:23-cr-239 (CKK) |

## <u>MOTION TO INTERVENE AND FOR ORDER OF RESTITUTION</u>

Victim Account Holder, ▮▮▮▮▮▮▮ ("Victim AH 1"), by and through counsel,

respectfully moves this Court to grant his request to intervene and to enter an order of in-kind

restitution as to Victim AH 1. Victim AH 1 is a former Bitfinex account holder whose account was

accessed and hacked without authorization as part of a larger security breach that occurred on or

about August 2, 2016 (the "Hack"). The Hack resulted in Victim AH 1's assets being directly

stolen and laundered by the defendants in the above-captioned case, Ilya Lichtenstein and Heather

Morgan (collectively, "Defendants"). Victim AH 1 requests an equal and fair opportunity to

participate in the hearing for purposes of setting restitution.[1]

There are identifiable victims of the crimes charged in this case. The Government's

argument to the contrary ignores both the purpose and plain language of the applicable victims'

rights statutes. It also relies on an incorrect and overly narrow understanding of conduct that falls

within the scope of the money laundering conspiracy and the determination of who was directly

and proximately harmed. The illogic of the Government's position is evidenced by, among other

---

[1] Victim AH 1 has diligently pursued this claim through counsel, who provided notice of the claim to the
Department of Justice ("DOJ") in May of 2022, met with the DOJ on August 29, 2024, and November 8, 2024, and
exchanged emails with the DOJ throughout this period. Victim AH 1 has also filed an ancillary claim to assets
seized by the United States and that are the subject of the related forfeiture action in this case.

things, Defendants' admissions in their respective Statements of the Offense that they illegally accessed and stole "funds belonging to customers" and then laundered those customer assets to cover their tracks and prevent recovery of the stolen assets. Far from being a victimless crime, the charged conduct directly resulted in Bitfinex customer assets being stolen and never returned.

The conduct that resulted in this harm was well within the scope of the conspiracy charged. The money laundering conspiracy (agreement to launder stolen assets) necessarily started *before* the Hack and included the plan to immediately transfer assets out of customer accounts and into the spiderweb of locations carefully described in the Government's initial criminal Complaint and Statement of Facts. *See* Compl. (Dkt. 1). The theft of assets from Bitfinex accounts was a necessary part of laundering the stolen assets; it defies common sense to suggest that Defendants did not begin planning where they were immediately going to transfer/launder the stolen assets until after the Hack.

But even if there are no victims under a constrained reading of the restitution statutes, Bitfinex should not be awarded roughly ten billion dollars in restitution, and certainly should not receive any funds before all the account holders are fully compensated. The Government's recommendation ignores that Defendants stole "funds belonging to account holders," as well as the fact that Bitfinex was never the owner of the stolen assets nor promised to return or replace the stolen assets to its customers. As one of the account holders whose funds were stolen, Victim AH 1 is a victim who suffered direct harm from the money laundering conspiracy, not to mention the other wrongful conduct of the Defendants, and therefore he should be awarded restitution.

## FACTUAL BACKGROUND

### A.    The Bitfinex Hack and Initial Response

On August 2, 2016, Bitfinex, a cryptocurrency exchange, experienced a significant security breach—the Hack—during which approximately 119,754 BTC was stolen from its customers'

accounts.[2] Victim AH 1 had a Bitfinex account at the time of the Hack where he held personal assets—identified with the username "███████" and the user email address "███████████████." He was subsequently assigned the rights to assets held in a second Bitfinex account—identified with the user email address "███████████████"—(referred to collectively hereafter as "Victim AH 1's Accounts").[3] Through the Hack, Defendants gained unauthorized access to Bitfinex's and account holders' (including Victim AH 1's) private keys, which enabled Defendants to fraudulently authorize over 2,000 transactions that transferred Bitcoin stolen from Victim AH 1's Accounts, and the accounts of others, to external wallets controlled by Defendants.[4] Defendants' used private keys to access blockchain addresses designated and segregated exclusively for Victim AH 1's Accounts, and then transferred those assets to a series of blockchain addresses controlled by Defendants.[5] Accordingly, Victim AH 1 was directly and proximately harmed by Defendants overt acts in support of the money laundering conspiracy, which necessarily included planning the theft of the account holders' assets, executing the theft through the Hack, and hiding these assets by creating accounts with fictitious identities and transferring assets to accounts under Defendants' control.

For unknown reasons, and without legal authority, Bitfinex responded to the Hack by redistributing losses across *all* customer accounts.[6] Rather than compensate account holders, this unilateral action resulted in a 36.067% reduction in value of every account holder on the platform

---

[2] Def. Heather Morgan's Statement of the Offense and Related Conduct at 5 (Dkt. 100) ("Morgan Statement of Offense").

[3] All but the first characters of the personally identifiable information of username and email addresses have been omitted to protect the personally identifiable information, safety, and security of the account holders.

[4] Compl. at 2 (Dkt. 1).

[5] Morgan Statement of Offense at 4, ¶ 14 (Dkt. 100); Def. Ilya Lichtenstein's Statement of the Offense and Related Conduct at 4, ¶ 14 (Dkt. 95) ("Lichtenstein Statement of Offense"); Bitfinex, *Terms of Service*, § 5.1 (as of Jun. 9, 2016), https://web.archive.org/web/20160609181027/https://www.bitfinex.com/terms (before the Hack) ("Pre-Hack Terms"), included herewith as Exhibit 1; Bitfinex, *Terms of Service*, § 5.1 (as of Aug. 8, 2016), https://web.archive.org/web/20160808165440/https://www.bitfinex.com/terms (after the Hack) ("Post-Hack Terms"), included herewith as Exhibit 2.

[6] Letter to Judge Kollar-Kotelly at 3 (Nov. 12, 2024) ("Letter of Nov. 12"), included herewith as Exhibit 3; Bitfinex.statuspage.io, *Interim Update: Incident Report for Bitfinex* (Aug. 6, 2016), https://bitfinex.statuspage.io/incidents/8qd35qxs01mm ("Bitfinex Update of Aug. 6").

REDACTED

and imposed additional harms. Bitfinex also issued a new fungible token ("BFX") and deposited BFX into customer accounts, including into Victim AH 1's Accounts, without obtaining Victim AH 1's prior consent.[7] Importantly, Bitfinex agreed that the BFX token was issued to all account holders "without reduction of or other release or waiver of any claims you may have against the Bitfinex Group," according to the terms set out by Bitfinex.[8] After account holders were given BFX tokens that they did not ask to receive, and which were of questionable value and legal origins, they had three options. First, customers were informed they could sell their BFX tokens on the secondary market for the prevailing market price. Sometime thereafter, customers were given the additional options of either redeeming their BFX tokens for a cash payment from Bitfinex at a rate of $1 per BFX token, or exchanging their BFX tokens for shares of iFinex Inc., Bitfinex's parent company, valuing BFX tokens at $1 per token.[9] Additionally, customers who chose to exchange their BFX tokens for iFinex stock also received fungible cryptocurrency tokens known as Recovery Right Tokens ("RRTs"), which were redeemable for up to $1 of recovered stolen funds if sufficient funds were ever recovered.[10]

### B.    Victim AH 1's Losses and Subsequent Actions

Victim AH 1's Accounts were two of the accounts *specifically and individually* targeted during the Hack. As a result of the Hack to Victim AH 1's Accounts, 391.98 BTC, 3,156.14 ETH, and $48,324.34 USD were stolen.[11] Bitfinex acknowledged that the assets in the individualized wallets associated with Victim AH 1's Accounts belonged to Victim AH 1.

---

[7] Letter of Nov. 12 at 3, Ex. 3; Bitfinex Update of Aug. 6. There is a substantial question as to whether Bitfinex's unilateral issuance of BFX was in compliance with U.S. securities laws.

[8] Bitfinex, *BFX Token Terms* (as of Nov. 3, 2016), https://web.archive.org/web/20161103084718/ https://www.bitfinex.com/bfx_token_terms ("Token Terms"), included herewith as Exhibit 4.

[9] Letter of Nov. 12 at 3–4, Ex. 3; Bitfinex Update of Aug. 6; Token Terms, Ex. 4; Consent Motion for Order Authorizing Alternative Notification Procedures at 3–4 (Dkt. 141) ("Alt. Notice Motion").

[10] Alt. Notice Motion at 3–4.

[11] Transaction Ledgers of Victim AH 1's Accounts (showing sums of Bitcoin ("BTC"), Ether (here designated at "ETC"), and U.S. dollars ("USD") being removed from both of Victim AH 1's Accounts) ("Victim AH 1's Account Ledgers"), included herewith as Exhibit 5.

REDACTED

Specifically, Bitfinex's terms of service stated that "Notwithstanding the distribution of the private keys and subject to any valid liens, encumbrances, and pending settlements, all bitcoins in your Multi-Signature Wallets belong to and are owned by you."[12] Notably, both the Government and Defendants have acknowledged that same fact: "LICHTENSTEIN ultimately gained access to the keys, or credentials, used to authorize transactions involving virtual currencies held by [Bitfinex], *including funds belonging to customers of [Bitfinex]*."[13] It therefore follows that the account holders, not Bitfinex, are victims entitled to in-kind restitution (which can logically be made from the BTC and other assets that the Government has seized).

Victim AH 1 never agreed that the BFX tokens that Bitfinex deposited in Victim AH 1's Accounts in any way compensated him for the assets stolen from the accounts; indeed, Victim AH 1 has never been compensated for the loss of the assets in his accounts.[14] In fact, Victim AH 1 disposed of the BFX tokens as soon as practicable, leaving his accounts at a significant net deficit. The financial impact of this action was substantial—BFX tokens did not hold anywhere near the same value as the original assets, and moreover, could not compensate Victim AH 1 for his loss of the specific assets in his accounts.[15]

On May 4, 2022, Victim AH 1, through prior counsel, notified the Department of Justice ("DOJ") of his losses and asserted his claim to the assets seized in connection with the Hack. He reiterated his status as a victim during a meeting with the DOJ on August 29, 2024, and through subsequent communications with the DOJ. At that time, Victim AH 1 provided detailed evidence of his ownership of the stolen assets, including transaction logs from his Bitfinex accounts and documentation of the losses incurred.[16] These transaction logs, which were downloaded from his

---

[12] Pre-Hack Terms, § 5.1, Ex. 1; Post-Hack Terms, §§ 2, 5.1, Ex. 2.
[13] Morgan Statement of Offense at 4, ¶ 14 (Dkt. 100); Lichtenstein Statement of Offense at 4, ¶ 14 (Dkt. 95) (emphasis added).
[14] Letter of Nov. 12 at 3–4, Ex. 3.
[15] *Id.*
[16] Victim AH 1's Account Ledgers, Ex. 5.

REDACTED

Bitfinex accounts, show the specific transactions where Bitfinex replaced the assets in Victim AH 1's Accounts with BFX tokens after applying the significant reduction described above.[17] Logic also dictates that the DOJ could have obtained access to this information as well—prior to agreeing to recommend that Bitfinex be awarded restitution to the prejudice of its customer account holders whose assets were stolen and laundered.

## C.    Government Seizure and Legal Proceedings

Following an extensive investigation, the Government traced the stolen bitcoins to multiple accounts controlled by Defendants.[18] On January 31, 2022, law enforcement gained access to the primary wallet used in the Hack, seizing approximately 94,643 BTC, worth $3.629 billion at the time (and valued at far more now).[19] Additional assets were also seized from accounts and storage locations controlled by Defendants, including an additional 19,957.7 BTC, 7,221.0 ETH, and $3,084,377.52, along with other cryptocurrencies and physical items.[20] Lichtenstein and Morgan were subsequently charged and convicted of conspiracy to commit money laundering and conspiracy to defraud the United States. Both Defendants entered into plea agreements in which they admitted to the Hack, theft of account holder assets, and laundering of those assets.

Despite the Government's awareness of victim account holders (including Victim AH 1) whose assets were stolen and laundered by Defendants, the plea agreements only identified and required Defendants to "to pay restitution to Bitfinex," ignoring (and perhaps misunderstanding) the harm to individual account holders such as Victim AH 1 who were directly targeted and impacted by the Hack.[21] Indeed, the Government elsewhere acknowledged that the Hack

---

[17] *Id*.

[18] Compl. at 3 (Dkt. 1).

[19] *Id*. at 2.

[20] *See* Corrected Second Amended Attachment A (Dkt. 198-1); Public Notice of the Order, which was posted to the Government's website, www.forfeiture.gov, on December 17, 2024, included herewith as Exhibit 6.

[21] Plea Agreement as to Ilya Lichtenstein at 10 (Dkt. 96); Plea Agreement as to Heather Morgan at 10 (Dkt. 101).

authorized "transactions involving virtual currencies held by [Bitfinex], *including funds belonging to customers of [Bitfinex]*."[22] It therefore follows that Victim AH 1 and others similarly situated should be awarded restitution.

### D.    Victim AH 1's Ownership of Stolen, Laundered Assets at Center of Conspiracy

Victim AH 1 suffered a direct loss of assets due to the Hack and money laundering conspiracy. He is a victim of the crimes committed by Defendants Lichtenstein and Morgan because his assets were stolen and laundered by Defendants. Victim AH 1 has account records that demonstrate his ownership of the stolen assets, which included his 391.98 BTC, 3,156.14 ETH, and $48,324.34 USD.[23] Significantly, Bitfinex's issuance of BFX tokens and deposit of BFX in Victim AH 1's account without his request or prior consent neither compensated him for his losses nor waived his claims to the stolen assets. Indeed, Bitfinex explicitly acknowledged by its own BFX token terms that it issued the BFX tokens to Victim AH 1 "without reduction of or other release or waiver of any claims."[24] And Bitfinex, the Government, and Defendants have all acknowledged that Victim AH 1, as an account holder, owned the stolen assets that were specifically held in his account.[25]

Victim AH 1 either owned the assets in his account at the time they were deposited into his Bitfinex account and that he acquired through his subsequent trading activity, or via assignment when he stepped into the place of the owner of a second account that, similarly, had assets that were deposited into the second account and acquired additional assets through subsequent trading activity—all of which occurred prior to the Hack. In total Victim AH 1 owned 391.98 BTC, 3,156.14 ETH, and $48,324.34 USD that were stolen from Victim AH 1's Accounts on the date of

---

[22] Morgan Statement of Offense at 4, ¶ 14 (Dkt. 100); Lichtenstein Statement of Offense at 4, ¶ 14 (Dkt. 95) (emphasis added).
[23] Victim AH 1's Account Ledgers, Ex. 5.
[24] Token Terms, Ex. 4.
[25] Pre-Hack Terms, § 5.1, Ex. 1; Post-Hack Terms, § 5.1, Ex. 2; Morgan Statement of Offense at 4, ¶ 14 (Dkt. 100); Lichtenstein Statement of Offense at 4, ¶ 14 (Dkt. 95) (emphasis added).

REDACTED

the Hack. Bitfinex has transaction IDs for each transaction associated with the assets owned by Victim AH 1 and maintained in his accounts. The Bitfinex transaction IDs associated with Victim AH 1's Accounts that demonstrate the loss of Victim AH 1's assets are as follows: 122928858 (loss of 165.42 BTC), 123121002 (loss of 1,441.23 ETH), and 122928854 (loss of $17,969.33), all removed from Victim AH 1's personal account; and 122935700 (loss of 226.56 BTC), 123117424 (loss of 1714.90 ETH), and 122935696 (loss of $30,355.01), all removed from the account assigned to Victim AH 1.[26] These Bitfinex transaction IDs demonstrate that the assets owned by Victim AH 1 were lost as a result of the Hack.

## ARGUMENT

### A.    Victim AH 1's intervention is justified.

"On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute … ." Fed. R. Civ. Proc. 24(b)(1). Under the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA"), a crime victim also has the right, among other things, "to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding" and "to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(4), (6). Thus, Victim AH 1's right to participate and be heard in the restitution process and to receive full and timely restitution is set forth by statute, which satisfies the requirements under Rule 24(b) for intervention.[27]

---

[26] Victim AH 1's Account Ledgers, Ex. 5.

[27] Victim AH 1's right to be heard in the restitution process is not in doubt under the CVRA. However, note that it may not be technically correct to require victims asserting their rights to restitution and to be heard to satisfy the standards for intervention in a criminal matter. Crime victims are given rights to participate in aspects of the criminal matter by, for example, the CVRA with the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"), but that is not the same as intervention nor is intervention required. *See, e.g.*, *United States v. Collins*, No. 09-CR-155, 2013 WL 4780927, at *1 (E.D. Wis. Sept. 5, 2013) ("[C]rime victims, who enjoy various statutory rights of participation, have no right to intervene in the district court in a criminal case."); *United States v. Laraneta*, 700 F.3d 983, 985 (7th Cir. 2012) (noting distinction between crime victims' ability to intervene and the right "to be heard" and acknowledging the right to be heard is "a right granted them by the [CVRA]"); § 3771(d)(3) (setting forth crime victims' process for asserting rights by motion under § 3771(a)—including right to be heard and right to full and timely restitution—in the district court, requiring the district court to "take up and decide any motion asserting a victim's right forthwith," and granting the crime victim the ability to petition the court of appeals for a writ of mandamus if "the district court denies the relief sought.). Thus, by statute, Victim AH 1 has the right to be

REDACTED

**B.    Victim AH 1 was a direct victim of Defendants' conspiracy.**

The facts underlying the Hack demonstrate that Bitfinex held the cryptocurrency assets of each customer in individually identifiable and segregated accounts when the Hack occurred.[28] Each Defendant's Statement of the Offense explains that "LICHTENSTEIN ultimately gained access to the keys, or credentials, used to authorize transactions involving virtual currencies held by [Bitfinex], *including funds belonging to customers of [Bitfinex]*." Def. Heather Morgan's Statement of the Offense and Related Conduct at 4, ¶ 14; Def. Ilya Lichtenstein's Statement of the Offense and Related Conduct at 4, ¶ 14 (emphasis added). After breaching Bitfinex's security, Defendants started stealing crypto assets from the largest accounts first. Victim AH 1's Accounts had large balances that were specifically targeted by the Hack, and a significant portion (if not all) of Victim AH 1's assets were stolen directly from those accounts. Thus, Victim AH 1 was directly harmed when Defendant Lichtenstein, with Defendant Morgan's help, stole assets directly from customer accounts as part of a plan and conspiracy to launder those stolen assets, as has been described in great detail by the Government.

The Government contends that account holders were not victims of the conspiracy because their assets were being held within accounts over which Bitfinex had custodial control. Even if true, this does not change the fact that Defendants gained access to and stole actual customer assets (*e.g.*, Bitcoin) from individually segregated accounts containing assets purchased by individual

---

heard in this restitution process and the right to full and timely restitution, but Victim AH 1 satisfying the requirements for intervention may be unnecessary. Similarly, interested parties have the ability to assert their rights to property subject to forfeiture under Fed. R. Crim. P. 32.2(c) and 21 U.S.C. § 853(n) without necessarily intervening in the technical sense. In this case, Victim AH 1 has taken advantage of both statutory rights in 18 U.S.C. § 3771(a) (applicable with this filing) and 21 U.S.C. § 853(n) (applicable in the ancillary proceeding).

[28] *See, e.g.*, Business Wire, *Bitfinex and BitGo Partner to Create World's First Real-Time Proof of Reserve Bitcoin Exchange* (Jun. 3, 2015), https://businesswire.com/news/home/20150603005462/en/Bitfinex-and-BitGo-Partner-to-Create-World%E2%80%99s-First-Real-Time-Proof-of-Reserve-Bitcoin-Exchange (stating: "Bitfinex … for the first time ever offers complete segregation of all customer bitcoins" and noting "[t]he era of commingling customer Bitcoin and all of the associated security exposures is over." ). *See also* Bitfinex, *Bitfinex and BitGo Partner to Create World's First Real-Time Proof of Reserve Bitcoin Exchange* (Jun. 4, 2015), https://blog.bitfinex.com/announcements/bitfinex-and-bitgo-partner-to-create-worlds-first/.

account holders. There is no reason to award restitution to Bitfinex for assets owned by the account holders who were Bitfinex customers.

To conclude that the account holders were not victims ignores the factual underpinnings of the case presented by the Government—namely, that the charged money laundering conspiracy began at the same time as the Hack and necessarily included in the course of conduct of the conspiracy the plans and preparations to *obtain* the assets to be laundered as well as to determine where the funds would be transferred for purposes of carrying out the laundering conspiracy. The Government has acknowledged and presented facts supporting this conclusion in its filings. Specifically, the Complaint alleged Defendants "employed numerous money laundering techniques, including … using accounts set up with fictitious identities." Compl., at 3 (¶ 8) (Dkt. 1.1). The Complaint then acknowledged that Defendants created eight accounts on a different virtual currency exchange as part of the money laundering conspiracy, and that those eight accounts, among other things, "were tied to similarly styled email addresses hosted by [an] India-based provider" and "were created around the same time period surrounding the hack of [Bitfinex] in or around August 2016." *Id*. at 6 (¶16). Thus, the Government acknowledged that a key component of the money laundering conspiracy charged was creating accounts with fictitious identities. Defendants did exactly that in or around August 2016. Additionally, Defendants necessarily created the email accounts with the India-based provider before using those emails to create the fictitious accounts with the intermediate virtual currency exchange in order to further their money laundering activity. This demonstrates that Defendants' preparation and planning prior to the Hack were an essential part of the money laundering conspiracy charged.[29]

---

[29] The Government repeated these same factual bases in other key filings in this case. Gov't's Mot. for Downward Departure and Memorandum in Aid of Sentencing [for Lichtenstein], at 5 (Dkt. 146) ("During the period from in or around August 2016 through in or around February 2022, the defendant and Ms. Morgan used false and fictitious identifying information to establish accounts … ."); Gov't's Mot. for Downward Departure and Memorandum in Aid of Sentencing [for Morgan], at 5 (Dkt. 143) (same); Lichtenstein's Statement of the Offense, at 10 (¶25.a) ("Between on or about August 22, 2016, and on or about April 20, 2017, LICHTENSTEIN established

The nature of the crime indicates, and the Government also freely acknowledges, that Defendant Lichtenstein planned the Hack months in advance: "Beginning in or around late winter and early spring of 2016, the defendant embarked on a scheme to steal money from Bitfinex, one of the largest virtual currency exchanges in operation at the time. The defendant conducted online research and reconnaissance to gather information about computer infrastructure used by Bitfinex." Gov't's Mot. for Downward Departure and Memorandum in Aid of Sentencing [for Lichtenstein], at 2 (Dkt. 146). Yet, the Government is now taking the position that the conspiracy began after Defendants stole the assets, ignoring their own factual statements and the meticulous planning that went into planning the crime (which necessarily involved the transfer of assets from account holders to addresses controlled by Defendants). That inconsistency that Defendant Lichtenstein's meticulous planning of the theft was separate and apart from planning how to hide the theft from detection defies logic and common sense. Indeed, the Government's own presentation of the facts confirms that Defendant Lichtenstein created multiple accounts with fictitious identities as part of the money laundering conspiracy at the same time as the Hack. At all times in question, it remained true that Defendants' objective with the charged conspiracy was to both obtain and hide/launder assets to avoid being caught. Moreover, even if the conspiracy had begun only after the Hack (which we dispute), Victim AH 1 was still directly and proximately harmed each moment that Defendants successfully hid and laundered the assets from his account, preventing them from being recovered.

Further, if for any reason the Government believes that Bitfinex covered the losses suffered by account holders, the facts demonstrate such a position to be mistaken. The simple fact is that Bitfinex never replaced or returned the stolen assets (which have now appreciated considerably). Instead, Bitfinex (i) unilaterally, and without prior consent, removed customer assets from their

---

multiple accounts at VCE 1 using email addresses from the same India-based email provider and in the names of third parties unrelated to LICHTENSTEIN"); Morgan's Statement of Offense, at 10 (¶25.a) (same).

individual accounts, causing more harm and spreading losses across all customers; (ii) unilaterally issued and deposited newly minted BFX tokens into account holders' accounts that were issued "without release or waiver";[30] (iii) listed BFX tokens on the Bitfinex platform for trading; and (iv) gave account holders who had not sold BFX on the Bitfinex platform or who purchased BFX after they were listed the opportunity to redeem BFX tokens for shares of iFinex.[31] The legality of these actions has never been adjudicated, and the net result was that through a the combined actions of Defendants and Bitfinex, each account holder had approximately 36% percent less assets in their account after the Hack.

The unsolicited deposits of BFX tokens remained outstanding until redeemed by Bitfinex or exchanged by customers for shares of iFinex Inc. (Bitfinex's owner) in what appeared to be another unregistered offering of securities designed to give Bitfinex a series of cash infusions.[32] Bitfinex published "terms for the BFX token" *after* depositing BFX into Victim AH 1's account, and those terms did not waive, replace, or abrogate any claims to the assets previously taken from the account. Importantly, Victim AH 1 did not ask to receive (nor did he want to hold) BFX tokens—in fact, Victim AH 1 disposed of the BFX tokens as soon as practicable,[33] causing Victim AH 1's account to remain thereafter at a significant net deficit. Accordingly, Bitfinex's deposit of a newly created token in Victim AH 1's account did not compensate for losses in that account and has no bearing on Victim AH 1's status as victim. It certainly did not make Bitfinex the sole victim entitled to restitution for assets Bitfinex never owned in the first place, as the Government's position suggests.

---

[30] Bitfinex Update of Aug. 6.
[31] Alt. Notice Motion at 3; Bitfinex Update of Aug. 6.
[32] Bitfinex Update of Aug. 6.
[33] Besides being forced to accept the BFX token, Victim AH 1 was concerned that its issuance might be illegal and that holding it could expose him and his portfolio to risks.

In short, the facts demonstrate that Victim AH 1 and other account holders were directly harmed by Defendants' conspiracy, have never been appropriately compensated, and are victims of the conspiracy for purposes of awarding restitution.[34]

## C.    Victim AH 1's claim is based on conduct that falls squarely within the scope of the conspiracy charged.

The Government's argument that there are no victims is an unnecessarily constrained interpretation of the restitution statutes and stands at odds with the harms directly caused by the charged conspiracy. The pro-victim CVRA and Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"), both support Victim AH 1's status as a victim. Further, the case law demonstrates that Victim AH 1's status as a victim within the scope of the conspiracy.

### 1.    The CVRA and MVRA confirm that Victim AH 1 was a victim of the money laundering conspiracy.

Account holders are entitled to victims' rights and restitution under the CVRA and MVRA. Under a plain reading of the MVRA, a "victim" means "any person directly harmed by the defendant's criminal conduct *in the course of [a] scheme, conspiracy, or pattern*." 18 U.S.C. § 3663A(a)(2) (emphasis added). That is what occurred here—Victim AH 1 was directly and proximately harmed by Defendants' conduct in the course of the charged money laundering conspiracy. When the underlying offense of conviction is a conspiracy, courts look to "the defendant's criminal conduct *in the course of that conspiracy* as the basis for restitution." *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021) (emphasis added); *see also United States v. Battista*, 575 F.3d 226, 231 (2d Cir. 2009), overruled on other grounds by *Lagos v. United States*, 584 U.S. 577 (2018) (holding that in a case involving illegal wagering, a victim claimant was directly and proximately harmed even though the claimant was not defrauded by the illegal

---

[34] According to Bitfinex, the purpose of the BFX token was to approximate "what would happen in a liquidation scenario," and was not intended to compensate the accountholders of one of the largest security breaches in the history of cryptocurrency. *See* Bitfinex, *Security Breach & BFX Token FAQ* at Q6 (Aug. 26, 2016), https://blog.bitfinex.com/announcements/security-breach-faq/.

REDACTED

wagering directly.). "The requirement that the victim be "directly and proximately harmed" encompasses the traditional "but for" and proximate cause analyses." *In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir. 2009).

Where, as here, Defendants are "convicted of a conspiracy, courts may 'order restitution for damage resulting from any conduct that was part of the conspiracy.'" *United States v. McCormick*, No. CR 18-359-4 (JDB), 2023 WL 8697851, at *4 (D.D.C. Dec. 15, 2023) (quoting *United States v. Emor*, 850 F. Supp. 2d 176, 203 (D.D.C. 2012)). Specifically, "restitution can extend beyond a specific criminal act to cover losses resulting from the overall scheme." *Id.* (citing *United States v. Thomas*, 862 F. Supp. 2d 19, 21 (D.D.C. 2012)). The court must then determine both the scope of the conspiracy or scheme and the harm caused to victims as part of the conspiracy or scheme. *Id.* (quoting *Emor*, 850 F. Supp. 2d at 203); *see United States v. Bogart*, 490 F. Supp. 2d 885, 903 (S.D. Ohio 2007) (explaining that, under the MVRA, courts "must order restitution that relates directly to a victim's losses *within the course of the entire scheme and not simply the loss caused by the specific conduct* that is the basis for the offense of conviction.") (emphasis added).

Although Defendants are not charged with the underlying Hack/theft itself, Victim AH 1 is a victim of the actions that were part of the money laundering conspiracy before the Hack, as well of the actions that were part of the conspiracy after the Hack. As discussed above, the prior court filings in this case establish that the money laundering conspiracy did not arise out of whole cloth after the assets were stolen, but rather necessarily began much earlier. And all these acts were the "but for" cause of harm to Victim AH 1. *See Battista*, 575 F.3d at 232 (finding NBA was "clearly harmed" although defendant did not "defraud the NBA directly"). As the charging documents, plea agreement, and statement of facts establish, the conspiracy to engage in money laundering started at least as early as August of 2016, and included setting up fictitious accounts

REDACTED

prior to the Hack for the purpose of transferring and concealing the assets Defendants planned to steal. The computer hacking and theft were of course separate crimes, but there can be little doubt that those crimes overlapped with—and were a critical component of—the conspiracy to launder assets, and moreover, that Victim AH 1 was directly harmed as a result. To suggest that the conspiracy to launder money started *after* the Hack (as the Government now argues) defies the facts the Government previously presented against Defendants. It is therefore wholly arbitrary for the Government to decide that, for purposes of awarding restitution, the conspiracy began after the Hack, especially when Defendants began setting up the fictitious accounts to launder the assets before the Hack. An arbitrary determination—contrary to evidence—of when a conspiracy began cannot be the basis for depriving account holders directly harmed by that conspiracy of justice and restitution, nor can it be the basis for diverting approximately $10 billion to the entity that was hacked and moved customer assets around without permission or consent. As such, Victim AH 1 is a victim of this conspiracy under a plain application of the law.

      2.     *The purpose of the MVRA confirms that Victim AH 1 was a victim.*

The statutory purpose of the MVRA also supports Victim AH 1's status as a victim. The MVRA defines "victim" to include "any person directly harmed by the defendant's criminal conduct *in the course of [a] scheme, conspiracy, or pattern*," § 3663A(a)(2). This definition, especially in view of the pro-victim purpose of the MVRA, reaches Victim AH 1, who was a victim of the theft and money laundering conspiracy here. The MVRA's purpose is to favor victims and restitution for victims. This is made plain by the precursor to the MVRA, the Victim and Witness Protection Act of 1982, Pub. L. 97-291, 96 Stat. 1248 (Oct. 12, 1982), in which the record of the legislation states, "The goal of the legislation is to ensure that Federal crime victims receive the fullest possible restitution from criminal wrongdoers." 128 CONG. REC. 27391 (Oct. 1, 1982). Fourteen years later, procedural mechanisms and improvements for restitution were added—

including the language in § 3663A(a)(2)—through the Mandatory Victims Restitution Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996). According to the Senate Committee report, the purposes of the MVRA were to "improve the administration of justice in Federal criminal cases by requiring Federal criminal defendants to *pay full restitution to the identifiable victims of their crimes*" and establish "one set of procedures for the issuance of restitution orders in Federal criminal cases." S. REP. NO. 104-179, at 12 (1995) (emphasis added). The Committee report stated in part: "This legislation is needed to *ensure that the loss to crime victims is recognized, and that they receive the restitution that they are due*. It is also necessary to ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society." *Id.* (emphasis added).

Courts have recognized this pro-victim and pro-restitution purpose. *Dolan v. United States*, 560 U.S. 605, 612 (2010) ("the statute seeks primarily to ensure that victims of a crime receive full restitution"); *United States v. Eastman*, No. 22-CR-22-1 (CKK/GMH), 2023 WL 6446931, at *10 (D.D.C. Sept. 8, 2023), *report and recommendation adopted*, No. 22-CR-22-1 (CKK/GMH), 2023 WL 6441837 (D.D.C. Oct. 3, 2023) (noting purpose, as recognized in *Dolan*, of MVRA is that crime victims receive full restitution and explaining the considerable discretion vested in district courts to fashion restitution orders).

Given this pro-victim, pro-restitution purpose, the natural interpretation of "victim" in this matter includes Victim AH 1, who was directly harmed by the conduct in the course of the scheme, conspiracy, or pattern of Defendants' conduct consistent with the plain language of the MVRA. Defendants' conspiracy included setting up false accounts *prior* to the Hack and necessarily must have included planning to launder the assets as the objective of the Hack—Defendants knew that without the laundering pursuant to conspiracy, the assets would be unusable by them and worthless. Thus, Victim AH 1 was directly harmed by the conspiracy to deprive him of the assets

in his account and launder those assets so that Defendants could obtain the beneficial use of the stolen and laundered assets. The purpose of the MVRA supports finding Victim AH 1 was an identifiable victim of Defendants' conspiracy. To conclude otherwise would leave all of the victim account holders—those most harmed by Defendants' conspiracy—without "full restitution to the identifiable victims" and would frustrate the central purpose of the MVRA in order to apply the constrained and unjust interpretation suggested by the Government. The natural interpretation consistent with the purpose of the MVRA is the right one.

3.  *Arguments to the contrary came solely from iFinex without input from the account holders who were directly harmed by the Hack and laundering conspiracy.*

Further, the Government's position appears to rely solely on "information provided by counsel for iFinex" without input from Victim AH 1 or others.[35] This undoubtedly self-serving input from iFinex appears to have caused the Government to conclude that Bitfinex was the only party entitled to restitution for Defendants' crimes. But a more complete understanding of the facts demonstrates that the account holders are the true victims, and they in fact have a superior claim to restitution. And to the extent any facts are in doubt, Victim AH 1 welcomes the opportunity to seek discovery from both Bitfinex and the DOJ to ensure that the Court has an opportunity to make accurate determinations regarding the victims of Defendants' crimes and the appropriate award of restitution.

**D.    Even if the technical definition of "victim" under the MVRA was not met, Victim AH 1 should be awarded restitution.**

Even if there were no victims under the MVRA and CVRA, as the Government contends, its assertion that Bitfinex should be awarded approximately $10 billion worth of Bitcoin in restitution would only serve to deprive Victim AH 1 and other account holders of any opportunity to recover their stolen assets, whether through restitution, by seeking recovery through ancillary

---

[35] Alt. Notice Motion at 3–4.

actions in forfeiture, or otherwise. The Government acknowledges that the MVRA provides that restitution may be awarded to those other than the victim of the offense if set forth in a plea agreement. Gov't Supp. Mot. re Restitution at 3 (Dkt. 202); *see* 18 U.S.C. § 3663A(a)(3) ("The court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense."). Yet the Government arbitrarily decided to include Bitfinex in the plea agreement and exclude the account holders who were directly harmed by Defendants' conspiracy to steal and launder the account holders' assets. In fact, the Government did not provide any notice or opportunity to be heard to Victim AH 1 before it negotiated plea agreements with Defendants and, in doing so, ignored critical facts underlying the conspiracy charged, which include that Defendants conspired to hide their theft of Victim AH 1's assets through money laundering in order to frustrate any attempt by Victim AH 1 or other account holders to recover their stolen assets. Arbitrarily picking which victim obtains justice and restitution—which the Government did here by selecting only Bitfinex—is contrary to the Government's obligations under the CVRA to ensure the harmed victims' rights to "full and timely restitution" and to "be treated with fairness." 18 U.S.C. § 3771(a)(6), (8). As such, the Court need not consider the Government's agreement with Defendants regarding restitution, and the Government's request that Bitfinex receive restitution should be denied.

Although Victim AH 1 has the right to make a claim to the stolen assets as part of the separate forfeiture proceedings related to this case—and has filed such a claim—the award of restitution to Bitfinex under the terms of the Plea Agreements will prejudice and hinder Victim AH 1's ability to recover stolen assets. The Plea Agreements state that the U.S. Department of Justice, Computer Crime & Intellectual Property Section and the Department of Justice "agree[d] to make a non-binding referral to the Money Laundering and Asset Recovery Section at the Department of Justice that any monies obtained from the defendant[s] through forfeiture be

distributed to the victims of the offense in accordance with any restitution order entered in [the] case." Ilya Lichtenstein Plea Agreement, at 12, § 14(i); Heather Morgan Plea Agreement at 13, § 14(i). Because Victim AH 1 has been excluded as a victim entitled to restitution, if restitution is awarded to Bitfinex and not Victim AH 1, the Government's promised actions could adversely impact or completely foreclose any ability for Victim AH 1 to recover his stolen assets. As such, Victim AH 1 respectfully requests an award of in-kind restitution for the assets removed from Victim AH 1's Accounts—391.98 BTC, 3,156.14 ETH, and $48,324.34—or in an amount that fully compensates Victim AH 1 in-kind for the loss of those assets as a result of the Hack based on present day conversion rates.

Victim AH 1 appreciates the dedicated efforts and good work that has gone into arresting and prosecuting Defendants Lichtenstein and Morgan and recovering large volumes of stolen and laundered assets. At the same time, pursuant to the CVRA and MVRA, the request that the DOJ has made in regard to restitution is not supported by the facts or the law, and it will further harm the account holders directly wronged by Defendants' conduct in the conspiracy. Justice for the account holders includes the tremendous and rare opportunity to make those harmed whole through restitution. Issuing a restitution award of approximately $10 billion worth of assets to Bitfinex instead of the account holders whose assets were stolen is not justice.

Victim AH 1 respectfully requests that the Court grant his motion to intervene, deny the Government's restitution motion, and award restitution to Victim AH 1 in the full amount of the 391.98 BTC, 3,156.14 ETH, and $48,324.34 that was removed from Victim AH 1's Accounts.

REDACTED

Dated:  January 28, 2025

Respectfully submitted,

*/s/ David W. T. Daniels*

David W. T. Daniels (D.C. Bar No. 457524)
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
DDaniels@perkinscoie.com

Kevin R. Feldis*
**PERKINS COIE LLP**
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350
KFeldis@perkinscoie.com

*admission pending*

*Attorneys for* ████████████

REDACTED

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2025, I caused a true and correct copy of the foregoing to be electronically filed via the Court's CM/ECF system which will accomplish service on all parties who are registered users.

I further certify that on March 19, 2025, I caused a service copy of the foregoing to be sent via email to the persons listed below who may not be included on the CM/ECF service list:

Francisco Cavazos
frankiecavazos@outlook.com

Louis Zuijderwijk
le.zuijderwijk@gmail.com

Jonas Paasch
jonas-paasch@proton.me

Rafal Bielenia
rafal@bielenia.pl

Pablo Garcia Illescas
lmusa@dfllp.com

*/s/ David W. T. Daniels*
David W. T. Daniels