## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

     v.

ILYA LICHTENSTEIN, *et al.*,

       Defendants.

Case No. 23-CR-239 (CKK)

## THIRD-PARTY PETITIONERS IFINEX INC. AND BFXNA INC.'S REDACTED MEMORANDUM OF LAW IN OPPOSITION TO XYZ'S MOTION TO DISMISS <u>ANCILLARY PETITION</u>

Dated:  New York, New York
       May 7, 2025

## Table of Contents

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

    A.    Bitfinex Owned and Controlled Its Cryptocurrency Wallets and Held Legal Interests in the Bitcoin Therein ................................................. 3

    B.    Defendant Lichtenstein Hacked Bitfinex and Stole Bitcoin from Bitfinex Wallets Using Bitfinex's Private Keys ......................................... 5

    C.    Bitfinex Seeks Return of Its Bitcoins Through an Ancillary Proceeding .................................................................................................... 5

    D.    The Court's Restitution Order Delineates the Scope of the Forfeiture Proceeding .................................................................................. 7

    E.    XYZ Moves to Dismiss Bitfinex's Petition ................................................. 8

LEGAL STANDARD ........................................................................................................ 9

ARGUMENT ..................................................................................................................... 9

    I.    XYZ LACKS STANDING TO CHALLENGE BITFINEX'S CLAIMS .............. 9

    II.    BITFINEX'S ALLEGATIONS ARE SUFFICIENT TO ESTABLISH ITS RIGHT TO PARTICIPATE IN THE ANCILLARY HEARING ....................... 11

    A.    Petitioners Need Only Plead Facts Plausibly Giving Rise to a Legal Interest in the Stolen Bitcoin .................................................................. 12

    B.    Bitfinex Pleads Ample Facts Showing a Legal Interest in the Stolen Bitcoin ....................................................................................... 13

    III.    XYZ'S ARGUMENTS FOR DISMISSAL ARE MERITLESS ......................... 16

    A.    XYZ's Interpretation of One Version of Bitfinex's Terms of Service Is Premature and Incorrect ........................................................... 16

    B.    XYZ's Assignment Arguments Mischaracterize Bitfinex's Petition and in Fact Demonstrates Why XYZ's Petition Must Be Dismissed ....... 19

CONCLUSION ................................................................................................................. 20

# Table of Authorities

## Cases

*Great Am. Ins. Co. v. Powersouth Energy Coop.*,
  2022 WL 4277241 (S.D. Ala. Sept. 15, 2022)........................................................11

*Halkin v. Helms*,
  690 F.2d 977 (D.C. Cir. 1982) ..............................................................................10

*Heuer v. Smithsonian Inst.*,
  619 F. Supp. 3d 202 (D.D.C. 2022)........................................................................10

*In re Kwok*,
  663 B.R. 151 (Bankr. D. Conn. 2024), *aff'd*, 2025 WL 252855 (D. Conn. Jan.
  21, 2025) ...............................................................................................................13

*In re LGI Energy Sols, Inc.*,
  460 B.R. 720 (8th Cir. B.A.P. 2011)..................................................................17, 18

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)...............................................................................................10

*Mac'Avoy v. The Smithsonian Inst.*,
  757 F. Supp. 60 (D.D.C. 1991).........................................................................17, 19

*Maramont Corp. v. Barks & Sons, Inc.*,
  1999 WL 55175 (E.D. Pa. Jan. 13, 1999) ..............................................................19

*Marino v. Nat'l Oceanic & Atmospheric Admin.*,
  33 F.4th 593 (D.C. Cir. 2022)................................................................................11

*MBC Fin. Servs. Ltd. v. Boston Merchant Fin., Ltd.*,
  2016 WL 5946709 (S.D.N.Y. Oct. 4, 2016) ...........................................................13

*New York Stock Exch. LLC v. Sec. & Exch. Comm'n*,
  962 F.3d 541 (D.C. Cir. 2020)................................................................................11

*Passut v. Cardona*,
  540 F. Supp. 3d 27 (D.D.C. 2021)..........................................................................10

*Penkoski v. Bowser*,
  486 F. Supp. 3d 219 (D.D.C. 2020)........................................................................10

*United States v. $148,840.00 in U.S. Currency*,
  521 F.3d 1268 (10th Cir. 2008) ..............................................................................13

*United States v. $244,320.00 in U.S. Currency*,
  295 F. Supp. 2d 1050 (S.D. Iowa 2003) .................................................................12

*United States v. Alcaraz-Garcia*,
  79 F.3d 769 (9th Cir. 1996) ...............................................................................17, 19

*United States v. All Assets Held at Bank Julius Baer & Co.*,
  959 F. Supp. 2d 81 (D.D.C. 2013) ..............................................................13, 15, 17

*United States v. Dupree*,
  919 F. Supp. 2d 254 (E.D.N.Y. 2013), *aff'd in part, vacated in part on other*
  *grounds by United States v. Watts*, 786 F.3d 152 (2d Cir. 2015) ...........................18

*United States v. Emor*,
  785 F.3d 671 (D.C. Cir. 2015) ...............................................................................9, 10

*United States v. Furando*,
  40 F.4th 567 (7th Cir. 2022) .........................................................................................12

*United States v. Harmon*,
  474 F. Supp. 3d 76 (D.D.C. 2020) ...........................................................................2, 14

*United States v. Kennedy*,
  201 F.3d 1324 (11th Cir. 2000) ....................................................................................12

*United States v. Lester*,
  85 F.3d 1409 (9th Cir. 1996) ........................................................................................12

*United States v. Patel*,
  2024 WL 1932871 (D.D.C. May 1, 2024) ...................................................................14

*United States v. Peters*,
  732 F.3d 93 (2d Cir. 2013)............................................................................................12

*United States v. Preston*,
  123 F. Supp. 3d 108 (D.D.C. 2015).............................................................9, 11, 16, 17, 18

*United States v. Reckmeyer*,
  836 F.2d 200 (4th Cir. 1987) .......................................................................................12

*United States v. Sanchez*,
  2023 WL 5844958 (11th Cir. Sept. 11, 2023), *cert. denied*, 145 S. Ct. 139
  (2024)...........................................................................................................................12

*United States v. Speed Joyeros, S.A.*,
  410 F. Supp. 2d 121 (E.D.N.Y. 2006) ........................................................................13

*United States v. Stark*,
  2011 WL 5444057 (S.D. Ill. Nov. 9, 2011) ................................................................10

*United States v. Timley*,
  507 F.3d 1125 (8th Cir. 2007) ......................................................................................16

*United States v. Under Seal*,
  2023 WL 4146234 (4th Cir. June 23, 2023) ................................................................13

*United States v. U.S. Currency, $81,000.00*,
  189 F.3d 28 (1st Cir. 1999)...........................................................................................12

*United States v. Von NotHaus*,
   2017 WL 1396043 (W.D.N.C. Apr. 18, 2017) ........................................................12

**Statutes**

21 U.S.C. § 853(k) ...........................................................................................................9

21 U.S.C. § 853(n)(2) ...................................................................................................2, 11

21 U.S.C. § 853(n)(6)(A)...............................................................................................11

**Other Authorities**

8A Am. Jur. 2d Bailments § 200 (2025 ed.) ..............................................................19

8 C.J.S. Bailments § 2 (2024 ed.) ...............................................................................18

*Crumpler v. Yoong*, Claim No. BVIHC (COM) 2023/0003, ¶ 148 (E. Caribbean
   Sup. Ct. V.I. Comm. Div. Dec. 12, 2023) ...............................................................14

UK Law Commission, *Digital Assets: Final Report* § 5.104 (June 27, 2023) ...........14, 19

Stefan D. Cassella, Criminal Forfeiture in 2014: An Annual Survey of
   Developments in the Law, Crim. L. Bull. at 50 (Aug. 3, 2014) ..............................16

UK Jurisdiction Taskforce, LawTech Delivery Panel, *Legal Statement on
Cryptoassets and Smart Contracts* ¶ 43 (Nov. 2019) ...............................13, 14, 19

**Rules**

Fed. R. Crim. P. 32.2(c)(1)(A)........................................................................................9

iFinex Inc. and BFXNA Inc. (together, "**Bitfinex**"), through their attorneys at Gibson, Dunn & Crutcher LLP and Kirkland & Ellis LLP, respectfully submit this memorandum of law in opposition to XYZ, Inc.'s ("**XYZ**") motion to dismiss Bitfinex's ancillary petition filed in *United States v. Ilya Lichtenstein and Heather Morgan*, No. 23-cr-239-CKK (D.D.C.).

## PRELIMINARY STATEMENT

Bitfinex filed an ancillary petition in this forfeiture proceeding to recover the remainder of the 119,754 Bitcoin that Defendants stole from Bitfinex nearly a decade ago. Both the Government and Defendants acknowledge that most if not all of the recovered Bitcoin should be returned to Bitfinex. Yet, XYZ—a pseudonymous shell company controlled by ███████████████ ████████████████████—seeks to dismiss Bitfinex's ancillary petition in its entirety. XYZ's motion is baseless, and a distraction from the fact that XYZ has no right to participate in this proceeding because it did not lose any Bitcoin during the Hack. And XYZ's motion directly contradicts ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ The motion should be denied.

*First*, XYZ lacks standing to challenge any, much less all, of Bitfinex's claim. XYZ lacks statutory standing to participate in this forfeiture proceeding because its claim is based entirely on allegations of post-Hack harm, which this Court has already ruled are not cognizable in the present proceeding. And, at a minimum, XYZ lacks Article III standing to challenge the vast majority of Bitfinex's claim. XYZ and the remaining third-party petitioners have submitted petitions challenging Bitfinex's claim to approximately 4,500 of the Bitcoin subject to forfeiture. Even assuming all of those claims are satisfied by this Court, there would still be approximately 110,000 Bitcoin subject *only* to Bitfinex's claims. Neither XYZ nor any other petitioner has an interest in those undisputed Bitcoin, and therefore no other petitioner—including XYZ—can challenge

1

Bitfinex's claims to those undisputed assets.

*Second*, Bitfinex has more than met its burden of pleading that it has a "legal interest" in the stolen Bitcoin that was superior to that of the Defendants at the time of the Hack—which is all that is required at the motion-to-dismiss stage. 21 U.S.C. § 853(n)(2). It is undisputed that through its operation of the Bitfinex exchange prior to the Hack, Bitfinex lawfully obtained control of the 119,754 stolen Bitcoin and owned and controlled the private keys necessary to authorize transactions and move the Bitcoin throughout the exchange. Indeed, Defendant Lichtenstein was able to steal Bitcoin only by compromising Bitfinex's systems and misappropriating Bitfinex's private keys to Bitfinex's cryptocurrency wallets. Bitfinex's allegations that it controlled the private keys connected to the hacked wallets plausibly establishes its ownership of the stolen Bitcoin—and at a minimum its dominion and control over it—which suffices to establish a legal interest under the forfeiture statute. "Ownership of bitcoin," after all, is "based on a user's possession or knowledge of the private key associated with a public key and address." *United States v. Harmon*, 474 F. Supp. 3d 76, 82 (D.D.C. 2020).

XYZ's contrary arguments are meritless and premature. XYZ claims that Bitfinex acted merely as a bailee of its customers' Bitcoin. But even if Bitfinex were a bailee (and it was not), Bitfinex's interest in the Bitcoin as a bailee would *still* represent a legal interest sufficient to survive a motion to dismiss. And, in any event, the existence of a bailment relationship turns on questions of fact that cannot be decided on a motion to dismiss. XYZ's bailment argument further fails because even assuming the Court could resolve factual disputes about the nature of Bitfinex and its customers' relationship at this stage, no bailment is possible for intangible property like Bitcoin under the law likely applicable here (British Virgin Islands law). XYZ's alternative argument—that Bitfinex has not alleged a legal interest through a post-Hack assignment—rests on

a misunderstanding of Bitfinex's position.  Bitfinex's interest arose *before* the Hack; it is XYZ that asserts an impermissible post-Hack property interest.

The Court should deny XYZ's motion.

## FACTUAL BACKGROUND

### A.    Bitfinex Owned and Controlled Its Cryptocurrency Wallets and Held Legal Interests in the Bitcoin Therein

Bitcoin and other cryptocurrencies are stored by their owners in digital cryptocurrency wallets, which are like virtual bank accounts.  *See* Bitfinex Ancillary Petition ("Pet."), ECF No. 219 ¶ 12.  These digital wallets use one or more private keys, which function like a password or PIN and are used to authorize cryptocurrency wallet transactions.  *Id.* ¶ 13.  The holder of the private keys to a digital wallet is the owner of that wallet because he or she has the right and ability to control the wallet and the cryptocurrency therein.  *Id.* ¶ 14.  In addition to private keys, digital wallets are associated with specific wallet addresses, which are essentially public account numbers that are shared with third parties to facilitate the transfer of cryptocurrencies.  *Id.* ¶ 15.

Founded in 2012 and organized under the laws of the British Virgin Islands ("BVI"), Bitfinex is a cryptocurrency exchange that allows users to buy, sell, and store various types of virtual currency, including Bitcoin.  *Id.* ¶ 16.  In 2016, the wallets on the Bitfinex exchange required at least two private keys to authorize transactions of cryptocurrency.  *Id.* ¶ 19.  Bitfinex controlled all or a majority of the private keys for its cryptocurrency wallets, such that no customer had unilateral control over the private keys for a Bitfinex wallet.  *Id.*

Bitfinex had thousands of cryptocurrency wallets on the Bitfinex exchange that served different purposes in facilitating the exchange's operations.  *Id.* ¶¶ 20-21.  Some of the wallets on the Bitfinex exchange were created to allow customers to deposit Bitcoin held off the exchange. *Id.*  To fund a Bitfinex account, customers could deposit Bitcoin (or other cryptocurrencies) with

Bitfinex by sending it to a Bitfinex-created deposit wallet associated with that customer's account. *Id.* ¶¶ 16, 20. Once Bitfinex received the Bitcoin, it would register that deposit in the customer's account on the Bitfinex website. *Id.*

Bitfinex had sole control of the Bitcoin in those wallets. *Id.* ¶ 21. Bitfinex customers could also deposit fiat currency or other cryptocurrencies into their Bitfinex accounts, and use those assets to buy or trade Bitcoin (or other assets) on the Bitfinex exchange. *Id.* ¶ 20. But these trades were not immediately reflected on the blockchain; instead, Bitfinex would periodically use its private keys to settle transactions and reconcile customer positions by Bitcoin between the various Bitfinex exchange wallet addresses. *Id.* ¶ 21.

Bitfinex owned and controlled the wallets created on the exchange, including the deposit wallet addresses for customer accounts. *Id.* Only Bitfinex was able to control the movement of Bitcoin into and out of the thousands of wallets on the Bitfinex exchange—its customers could only make requests for transactions or withdrawals through the Bitfinex website. *Id.* Bitfinex customers could not directly authorize transactions involving the deposit wallet addresses or any other Bitfinex wallets. *Id.* As the U.S. Commodities Futures Trading Commission found in a 2016 consent order, Bitfinex held Bitcoin on the exchange "in bitcoin deposit wallets that it owned and controlled," and customers could not withdraw Bitcoin from Bitfinex until certain conditions were met. *In re BFXNA Inc. d/b/a Bitfinex*, CFTC Docket No. 16-19, at 2, 3, 6 (June 2, 2016).

Bitfinex also had terms of service posted on its website, which changed frequently between Bitfinex's founding in 2012 and 2016 (including throughout 2016), and contained different terms for various types of customers and wallets. *See* Government's Second Supplemental Submission, ECF No. 262 at 11 (noting that it "does not know . . . what particular version or versions of Bitfinex's terms of service [petitioners] agreed to").

**B.**    **Defendant Lichtenstein Hacked Bitfinex and Stole Bitcoin from Bitfinex Wallets Using Bitfinex's Private Keys**

Beginning in or about early 2016, Lichtenstein unlawfully gained access to Bitfinex's computer infrastructure and used that access to compromise additional servers and defeat numerous security measures on Bitfinex's network. Pet. ¶ 26. Lichtenstein also unlawfully gained access to Bitfinex's private keys for its cryptocurrency wallets, which he ultimately used to authorize transactions involving Bitcoin held by Bitfinex in its wallets. *Id.*

On August 2, 2016, Lichtenstein used Bitfinex's private keys to steal approximately 119,754 Bitcoin from thousands of Bitfinex wallets (the "**Hack**") and transfer them to a wallet under his control (the "**Hack Wallet**"). *Id.* ¶ 27. While the Hack was significant and devastated Bitfinex's finances, the majority of the cryptocurrency wallets on the exchange were not affected. *See id.* ¶¶ 28, 33.

After the Hack, Bitfinex absorbed the loss of the stolen Bitcoin. *Id.* ¶¶ 30-42. It did so by applying a temporary "haircut" of approximately 36% to all customers and assets, including non-Bitcoin assets (the "**Haircut**"). *Id.* ¶ 33. Bitfinex provided its customers "BFX" tokens equivalent to the Haircut as compensation. *Id.* ¶ 34. Over the next eight months, it redeemed all of those BFX tokens for either their full cash value or iFinex common stock. *Id.* ¶¶ 30-42. As a result, certain Bitfinex customers directly or indirectly became Bitfinex stockholders. *Id.* ¶¶ 38-42. Some Bitfinex customers also received RRT tokens, providing them additional compensation should Bitfinex recover the stolen Bitcoin. *Id.* ¶¶ 38-40. Customers who elected these forms of compensation will benefit if and when Bitfinex recovers the stolen Bitcoin. *Id.*

**C.**    **Bitfinex Seeks Return of Its Bitcoins Through an Ancillary Proceeding**

In 2022, after locating and arresting Defendants, the Government seized a variety of assets from Defendants, including approximately 115,000 Bitcoin. *Id.* ¶ 49; Lichtenstein Information,

ECF No. 89 at 7-11.  On August 3, 2023, Defendants Lichtenstein and Morgan pled guilty to two counts of conspiracy to commit money laundering and one count of conspiracy to defraud the United States.  Pet. ¶ 50; Information, ECF No. 89; Lichtenstein Plea Agreement, ECF No. 96; Morgan Plea Agreement, ECF No. 101.  The Government then obtained preliminary orders of forfeiture for the assets it seized from Defendants and published a notice of forfeiture.  Pet. ¶¶ 55-56; ECF Nos. 154, 155, 178; Government's Supplemental Restitution Motion, ECF No. 202 at 5.

On January 22, 2025, Bitfinex timely filed an ancillary petition seeking to recover the approximately 115,0000 seized Bitcoin that are traceable to Bitfinex.  *See* Pet. ¶¶ 1-2; *see also* Declaration of Matthew Price, Pet., Ex. A ¶ 8.  Bitfinex alleges throughout its petition that "Bitfinex held a legal right, title, and/or interest in each and all of the Bitcoins in [the hacked] Bitfinex wallets," including through its ownership and control of the wallets and private keys.  Pet. ¶ 62.  Bitfinex further alleges that it "held or controlled the private keys to the Bitfinex wallet addresses, including for customer deposit wallet addresses," and, as a result, "[o]nly Bitfinex had the ability to transfer the Bitcoins in the Bitfinex wallets."  *Id.* ¶ 23.

The Government, which is the party seeking forfeiture of the stolen Bitcoin, has agreed that Bitfinex is entitled to the vast majority of the seized Bitcoin.  For example, the Government requested that the Court order the return of 94,643 Bitcoin to Bitfinex to effectuate "the return of lost property to the owner of that property."  Lichtenstein Sentencing Memorandum, ECF No. 146 at 25.  The Government further affirmed that at least 94,643 Bitcoin are the "specific property lost" by Bitfinex and that "those assets should be returned to Bitfinex."  ECF No. 202 at 3-5.  The Government has explained that Bitfinex was "directly and proximately" harmed by the Hack because the Bitcoin was "stolen from Bitfinex's coffers" and came "out of Bitfinex's wallets." ECF No. 262 at 9, 15.  The Government has repeatedly recognized that Bitfinex may assert

meritorious claims in the ancillary proceeding, and it has declined to move to dismiss its ancillary petition. *See* ECF No. 202 at 2 n.1; Government's Notice, ECF No. 315 at 1.

Between December 30, 2024 and March 20, 2025, sixteen Bitfinex customers, including XYZ, asserted claims to the stolen Bitcoin, and most also filed ancillary petitions.[1]  These claimants collectively seek at most 4,661 Bitcoin, or less than 4% of the total Bitcoin seized by the Government. *See* ECF No. 300 at 18 n.11.  Of that amount, XYZ seeks to recover roughly 2,770 Bitcoin. *See* XYZ Ancillary Petition ("XYZ Pet."), ECF No. 289-4, ¶ 41.  XYZ's claim is based solely on losses it alleges it suffered as a result of the Haircut, not the Hack. *See, e.g.*, *id.* ¶¶ 17, 19, Figure 1; ECF No. 308-1 at 16-18.  Apart from this small fraction of the total Bitcoin subject to competing claims by XYZ and other claimants, Bitfinex is the only petitioner to have asserted a legal interest in any of the approximately 110,000 remaining seized Bitcoin.

### D.  The Court's Restitution Order Delineates the Scope of the Forfeiture Proceeding

On April 4, 2025, the Court issued a decision awarding Bitfinex $0 in restitution, denying restitution to all other claimants, and setting out the scope of the ancillary forfeiture proceeding. *See* Restitution Memorandum Opinion, ECF No. 300 at 2.  The Court concluded that there were complex legal and factual issues that precluded restitution and that it would be "more efficient and time-effective to resolve all claims in the context of the third-party ancillary proceeding" where "Petitioners and Bitfinex will both be able to make claims against the Bitfinex Hack Wallet Funds." *Id.* at 17.  The Court also stated that "the total amount of BTC and other property claimed by all

---

[1] On April 21, 2025, more than two months after the statutory deadline and the Court's final deadline, an additional claimant sought leave to file an ancillary petition.  ECF Nos. 310 & 311. For the reasons stated in its brief at ECF No. 323, Bitfinex objects to this late filing and respectfully urges the Court to reject this belated claim.

Petitioners constitutes a small percentage of the total Bitfinex Hack Wallet Funds, and this would leave the remainder of the Bitfinex Hack Wallet Funds subject to claim by Bitfinex." *Id.* at 17-18.

The Court further emphasized that, in this ancillary proceeding, claimants could assert claims only "if [they] can show that their accounts were included among the Bitfinex hacked accounts." *Id.* at 17. As the Court explained, "the purpose of the ancillary forfeiture proceeding is <u>not</u> for litigating any damages claimed by Bitfinex accountholders that are attributable to Bitfinex's 36% across-the-board haircut." *Id.* at 18 (emphasis in original). Rather, "[t]hose disputed between Bitfinex and its accountholders arise from Bitfinex's voluntary actions in imposing an across-the-board [hair]cut on all accounts, and such disputes may be litigated in another forum." *Id.* Only "[i]f petitioners can tie their accounts back to the accounts that were hacked, the Court must then engage in an inquiry as to whom has a superior interest in the forfeited assets, as Bitfinex is claiming entitlement to the same forfeited assets." *Id.* at 19.

### E.    XYZ Moves to Dismiss Bitfinex's Petition

On April 21, 2025, XYZ moved to dismiss Bitfinex's ancillary petition. *See* ECF No. 309 ("Mot."). XYZ is controlled by ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████.[2]

Before authorizing XYZ to file its petition, ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

---

[2] ███████████████████████████████████████████████████████████████████████████

[3] ███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████, has contradicted himself by not only

arguing that Bitfinex should not recover any of the stolen Bitcoin, but also seeking to recover for

himself *more* Bitcoin than he held before the Hack.  XYZ Pet. ¶¶ 13-14, 17, 19, 41.

### LEGAL STANDARD

Federal criminal forfeiture proceedings are governed by 21 U.S.C. § 853 and Federal Rule

of Criminal Procedure 32.2.  *United States v. Emor*, 785 F.3d 671, 675 (D.C. Cir. 2015).  "A

motion to dismiss a petition under Section 853(n) prior to discovery or a hearing is treated similarly

to a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)."  *United

States v. Preston*, 123 F. Supp. 3d 108, 113 (D.D.C. 2015).  "A third party petition must only

provide 'enough facts to state a claim to relief that is plausible on its face' to survive dismissal."

*Id.*  "For purposes of deciding any motion to dismiss, 'the facts set forth in the petition are assumed

to be true.'"  *Emor*, 785 F.3d at 675 (quoting Fed. R. Crim. P. 32.2(c)(1)(A)).

### ARGUMENT

Bitfinex has sufficiently pleaded standing and a claim for relief under Section 853(n)—

which is all that is required at this stage.  XYZ lacks standing to argue otherwise, and its merits

arguments are both wrong as a matter of law and are premised on disputed factual issues that are

properly the subject of the ancillary hearing, not a motion to dismiss.  Bitfinex respectfully requests

that the Court deny XYZ's motion to dismiss.

## I.    XYZ LACKS STANDING TO CHALLENGE BITFINEX'S CLAIMS

XYZ lacks standing to seek dismissal of Bitfinex's claims.  Third-party claimants in

forfeiture proceedings, like XYZ and Bitfinex, are "interven[ors]" in a defendant's criminal case.

───────────────────────────

████████████████████████

21 U.S.C. § 853(k).  As with intervenors in civil cases, third-party intervenors in criminal forfeiture

proceedings must sufficiently allege standing.  *Emor*, 785 F.3d at 677; *Preston*, 123 F. Supp. 3d at

116.

To establish Article III standing, a petitioner must show "(1) that they suffered an injury in

fact that is concrete, particularized and actual or imminent; (2) that the injury was likely caused by

the defendant; and (3) that the injury would likely be redressed by the relief sought."  *Heuer v.*

*Smithsonian Inst.*, 619 F. Supp. 3d 202, 208 (D.D.C. 2022) (citing *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560-61 (1992)).  To establish statutory standing, a petitioner must adequately plead "a

'legal interest' in the forfeited property."  *Emor*, 785 F.3d at 677.  If a court dismisses an

intervenor's petition for want of standing, it must also deny that party's pending motions as moot.

*See, e.g.*, *Halkin v. Helms*, 690 F.2d 977, 1009 (D.C. Cir. 1982) (affirming the district court's

standing-based dismissal and denial of pending motions as moot); *United States v. Stark*, 2011 WL

5444057, at *1 (S.D. Ill. Nov. 9, 2011) ("Stark does not have standing to challenge the adequacy

of the notice given to potential claimants.  Therefore, Stark's motion fails.").

Here, XYZ lacks standing to challenge Bitfinex's claim to *any* of the stolen Bitcoin.  As

explained in Bitfinex's motion to dismiss XYZ's petition, XYZ concedes that its claims are based

on the Haircut, not the Hack.  ECF No. 308-1 at 11-13.  As this Court recognized in its restitution

Memorandum Opinion, "the purpose of the ancillary forfeiture proceeding is <u>not</u> for litigating any

damages claimed by Bitfinex accountholders that are attributable to Bitfinex's . . . haircut."  ECF

No. 300 at 18 (emphasis in original).  Because XYZ does not have a legal interest in *any* of the

stolen Bitcoin, the Court should grant Bitfinex's motion, dismiss XYZ's petition for lack of

standing, and deny XYZ's motion to dismiss as moot.  *See, e.g.*, *Passut v. Cardona*, 540 F. Supp.

3d 27, 45 (D.D.C. 2021) (dismissing plaintiffs' motion as moot "because the plaintiffs lack

standing to pursue this matter against the defendants"); *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 240 (D.D.C. 2020) (denying plaintiffs' motion for summary judgment as moot because plaintiffs lacked standing).

Even if XYZ had standing to file its petition, that standing could extend only to the roughly 2,770 Bitcoin that XYZ claims. XYZ Pet. ¶ 41; *see New York Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 552 (D.C. Cir. 2020) ("[I]n establishing standing, a [petitioner] must assert and rely on its own alleged injuries, not those of a third party . . . ."). XYZ is "not empowered to seek dismissal" of Bitfinex's claims to the remaining 110,000 Bitcoin when vindicating Bitfinex's rights to those Bitcoin would "visit[] no meaningful harm" upon XYZ. *Great Am. Ins. Co. v. Powersouth Energy Coop.*, 2022 WL 4277241, at *2 (S.D. Ala. Sept. 15, 2022). To the contrary, under bedrock Article III standing principles, parties may bring claims only where they "plausibly [] plead that a favorable decision would" redress the harm alleged. *Marino v. Nat'l Oceanic & Atmospheric Admin.*, 33 F.4th 593, 599 (D.C. Cir. 2022). XYZ has not done so here. Despite its limited claim, XYZ seeks to preclude Bitfinex from asserting its claim to approximately 110,000 Bitcoin in which XYZ concededly has zero legal interest.

The Court should deny XYZ's motion to dismiss in its entirety for lack of standing, or, at a minimum, deny XYZ's motion with respect to the roughly 110,000 Bitcoin in which XYZ has not asserted and cannot assert an interest.

## II.    BITFINEX'S ALLEGATIONS ARE SUFFICIENT TO ESTABLISH ITS RIGHT TO PARTICIPATE IN THE ANCILLARY HEARING

Contrary to XYZ's motion (Mot. at 7-12), Bitfinex has amply pleaded a "legal interest" in the stolen Bitcoin. To survive a motion to dismiss, a petitioner claiming forfeited assets need only plausibly allege: (1) a "legal interest" in the forfeited property (known as statutory standing), 21 U.S.C. § 853(n)(2), and (2) that the legal interest was "superior to any interest of the defendant . . .

11

'at the time of the commission of the acts which gave rise to the forfeiture,'" *Preston*, 123 F. Supp. 3d at 116 (quoting 21 U.S.C. § 853(n)(6)(A)).  XYZ disputes only whether Bitfinex has adequately pleaded statutory standing—that is, a "legal interest" in the forfeited Bitcoin.  Bitfinex has easily done so.

### A.    Petitioners Need Only Plead Facts Plausibly Giving Rise to a Legal Interest in the Stolen Bitcoin

Whether a petitioner has a "legal interest" in forfeited property under Section 853(n) turns on questions of local and federal law.  A petitioner first must allege facts sufficient to establish an interest in the forfeited property under "the law of the jurisdiction that created the property interest being asserted." *United States v. Furando*, 40 F.4th 567, 576 (7th Cir. 2022).  A petitioner cannot be "faulted [] for not specifically citing which jurisdiction[]—and which laws from [that] jurisdiction[]—created [its] property rights." *United States v. Sanchez*, 2023 WL 5844958, at *4 (11th Cir. Sept. 11, 2023), *cert. denied*, 145 S. Ct. 139 (2024).  Instead, a petitioner need only allege facts that give rise to a property interest under local law.  *See id.* ("Only factual allegations, and not legal conclusions, are relevant at the motion-to-dismiss stage.") (internal quotation marks and citation omitted).  In addition, the local-law property interest must qualify as a "legal interest" under Section 853(n)(2)—which is a question of federal law.  *Id.*; *see United States v. Lester*, 85 F.3d 1409, 1412 (9th Cir. 1996); *United States v. Kennedy*, 201 F.3d 1324, 1334 (11th Cir. 2000); *United States v. Peters*, 732 F.3d 93, 103 & n.4 (2d Cir. 2013).

Establishing that a property interest is a "legal interest" under federal law is not a high bar. Federal courts have uniformly held that "legal interest" encompasses "*all* legally protected rights, claims, titles, or shares in real or personal property."  *United States v. Reckmeyer*, 836 F.2d 200, 205 (4th Cir. 1987) (emphasis added).  Courts thus "generally do not deny standing to a claimant who is either the colorable owner of the res or who has any colorable possessory interest in it."

*United States v. $244,320.00 in U.S. Currency*, 295 F. Supp. 2d 1050, 1058 (S.D. Iowa 2003) (quoting *United States v. U.S. Currency, $81,000.00,* 189 F.3d 28, 35 (1st Cir. 1999); *see also, e.g.*, *United States v. Von NotHaus*, 2017 WL 1396043, at *6 (W.D.N.C. Apr. 18, 2017) (finding that the possessory interest of a bailee was sufficient for standing); *United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1275 (10th Cir. 2008) (collecting cases and holding that an alleged possessory interest can confer standing). To determine whether a petitioner has a legal interest sufficient for standing, courts "look to indicia of dominion and control such as possession, title, and financial stake." *United States v. All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81, 100 (D.D.C. 2013) (internal quotation marks omitted); *accord United States v. Under Seal*, 2023 WL 4146234, at *2 (4th Cir. June 23, 2023).

### B.    Bitfinex Pleads Ample Facts Showing a Legal Interest in the Stolen Bitcoin

Bitfinex's petition sufficiently alleges that Bitfinex has a legal interest in the stolen Bitcoin. First, Bitfinex has alleged facts that establish a local-law property interest. Bitfinex is incorporated under the laws of British Virgin Islands ("BVI"), Pet. ¶¶ 7-8, meaning BVI law most likely determines whether Bitfinex has a property interest in the Bitcoin. *See United States v. Speed Joyeros, S.A.*, 410 F. Supp. 2d 121, 125 (E.D.N.Y. 2006) (applying Panamanian law to assets held in Panamanian bank accounts). Under BVI law, for tangible property, the possessor of that property presumptively has an ownership interest in that property. *See* UK Jurisdiction Taskforce, LawTech Delivery Panel, *Legal Statement on Cryptoassets and Smart Contracts* ¶ 43 (Nov. 2019) ("Legal Statement on Cryptoassets"), https://tinyurl.com/5czxuv45 ("[A] person lawfully in possession of a tangible asset is presumed to be the owner.").[5] Likewise, with respect to an

---

[5] BVI law incorporates English law. *See, e.g.*, *MBC Fin. Servs. Ltd. v. Boston Merchant Fin., Ltd.*, 2016 WL 5946709, at *4 (S.D.N.Y. Oct. 4, 2016) ("BVI Law . . . relies on English Common Law."); *In re Kwok*, 663 B.R. 151, 172 (Bankr. D. Conn. 2024) ("English common law and equity applies in the BVI."), *aff'd*, 2025 WL 252855 (D. Conn. Jan. 21, 2025).

intangible cryptocurrency like Bitcoin, because the possessor of the private keys controls the Bitcoin, "a person who has acquired knowledge and control of a private key by some lawful means would generally be treated as the owner." *Id.*; *see also Crumpler v. Yoong*, Claim No. BVIHC (COM) 2023/0003, ¶ 148 (E. Caribbean Sup. Ct. V.I. Comm. Div. Dec. 12, 2023), https://tinyurl.com/26ac2uvc (same); UK Law Commission, *Digital Assets: Final Report* § 5.104 (June 27, 2023) ("UK Law Commission Final Report"), https://tinyurl.com/4fwejnpp ("We conclude that factual control (plus intention) can found a legal proprietary interest in a digital object."). Legal commentators have also recognized that under English (and therefore BVI) law, crypto-intermediaries such as a cryptocurrency exchange generally have property interests in Bitcoin on the exchange, which can take a variety of forms. *See generally* UK Law Commission Final Report at 148-160, § 7.26.[6]

BVI law is not an outlier. For example, federal courts, including in this district, have consistently recognized that "[o]wnership of bitcoin is [] based on a user's possession or knowledge of the private key associated with a public key and address." *Harmon*, 474 F. Supp. 3d at 82; *see also United States v. Patel*, 2024 WL 1932871, at *1 (D.D.C. May 1, 2024) (same).

Under BVI law (as under U.S. law), Bitfinex's petition sufficiently alleges a property interest in the approximately 115,000 Bitcoin traceable to the 119,754 Bitcoin stolen from Bitfinex. Bitfinex's petition alleges that since 2012, years before the Hack, Bitfinex has operated a cryptocurrency exchange through which it lawfully obtained the 119,754 stolen Bitcoin, including but not limited to when customers transferred Bitcoin to Bitfinex's cryptocurrency

---

[6] If Bitfinex's claim is disputed at the ancillary hearing, Bitfinex intends to present BVI legal expert testimony regarding its property interest in the stolen Bitcoin. That expert analysis, which will be fact-intensive, is premature at this stage of the proceeding. However, if it would assist the Court, Bitfinex can submit an expert analysis of BVI law at this stage upon the Court's request.

wallets. *See* Pet. ¶ 20. Before the Hack, Bitfinex "controlled the Bitfinex exchange wallet addresses, including the deposit wallet addresses for customer accounts," through control of the private keys to those wallet addresses. *Id.* ¶¶ 21, 23. By controlling the private keys and wallet addresses, "[o]nly Bitfinex was able to control the movement of Bitcoin into and out of wallets on the Bitfinex exchange," *id.*, and "[o]nly Bitfinex had the ability to transfer the Bitcoins in the Bitfinex wallets," *id.* ¶ 23. It was precisely because Defendant Lichtenstein "misappropriate[d] Bitfinex's private keys" that he was able to "execute[] the Hack" and steal the Bitcoin from the wallets that Bitfinex owned and controlled. *Id.* ¶ 61. "If Bitfinex had not owned and controlled the hacked wallets, Lichtenstein would not have been able to steal Bitcoins from them." *Id.*

This property interest under BVI law easily qualifies as a "legal interest" under Section 853(n)(2). The "indicia of dominion and control such as possession, title, and financial stake" all support Bitfinex's "legal interest" in the Bitcoin. *All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d at 100 (internal quotation marks omitted). Again, by controlling the private keys and wallet addresses, "[o]nly Bitfinex" asserted dominion and control over the Bitcoin at issue. Pet. ¶¶ 21, 23.

The Government (*i.e.*, the party seeking forfeiture) has repeatedly and correctly acknowledged that Bitfinex has a legal interest in at least the vast majority of the stolen Bitcoin and that its petition is likely to be meritorious. The Government has affirmed that at least 94,643 Bitcoin are the "specific property lost" by Bitfinex, and that "those assets should be returned to Bitfinex." ECF No. 202 at 3-5. The Government specifically requested that the Court order the return of 94,643 Bitcoin to Bitfinex to effectuate "the return of lost property to the owner of that property." ECF No. 146 at 25. And although the Government more recently recommended that the Court defer returning the Bitcoin to Bitfinex until the ancillary proceeding because of complex

issues relating to the handful of competing claims, it maintained that the Court had the authority to return the property to Bitfinex instead of subjecting it to forfeiture, and it has not moved to dismiss Bitfinex's petition.  *See* ECF No. 315.

Bitfinex therefore has amply pleaded a legal interest in the stolen Bitcoin and that its interest is superior to the Defendant's legal interest in the same.  No further showing is required at the motion-to-dismiss stage.  *See Preston*, 123 F. Supp. 3d at 114 (noting that courts do not weigh evidence at the motion-to-dismiss stage).  To the extent other claimants have also asserted competing legal interests in a tiny fraction of the Bitcoin that Bitfinex seeks, assessing those competing claims will require fact-intensive and claimant-specific inquiries that cannot be determined at this early stage of the proceeding.  *See United States v. Timley*, 507 F.3d 1125, 1130 n.2 (8th Cir. 2007) ("A more accurate read [of the statute] treats § 853(n)(2) as requiring an initial showing of a 'legal interest' to obtain an ancillary hearing and § 853(n)(6) as requiring a showing of a 'superior legal interest' to prevail at the hearing.").

## III.    XYZ'S ARGUMENTS FOR DISMISSAL ARE MERITLESS

XYZ asks the Court to dismiss Bitfinex's petition based on two frivolous and conflicting theories.  XYZ first argues that prior to the Hack, Bitfinex became a bailee of the stolen Bitcoin, and that as a bailee Bitfinex cannot assert a legal interest in the stolen Bitcoin.  XYZ next contends, in the alternative, that Bitfinex's interest in the stolen Bitcoin did not arise prior to the Hack but through a post-Hack assignment.  Neither of XYZ's arguments defeat Bitfinex's well-pled petition.

### A.    XYZ's Interpretation of One Version of Bitfinex's Terms of Service Is Premature and Incorrect

XYZ's argument that Bitfinex acted as a bailee of the Bitcoin on behalf of its customers is irrelevant at the motion-to-dismiss stage and, in any event, meritless.

*First*, even if Bitfinex were a bailee as XYZ alleges, Bitfinex would have statutory standing sufficient to survive a motion to dismiss.  Petitioners who held property "pursuant to a valid bailment . . . have standing to contest its forfeiture."  Stefan D. Cassella, Criminal Forfeiture in 2014: An Annual Survey of Developments in the Law, Crim. L. Bull. at 50 (Aug. 3, 2014) (collecting cases).  Neither of the cases cited by XYZ holds otherwise.  *See, e.g.*, *Mac'Avoy v. The Smithsonian Inst.*, 757 F. Supp. 60, 65 (D.D.C. 1991) (granting art museum defendant's motion for summary judgment on plaintiff's bailment claims under District of Columbia law); *United States v. Alcaraz-Garcia*, 79 F.3d 769, 775 (9th Cir. 1996) (discussing bailments under California law and finding a sufficient legal interest under § 853(n)).  Thus, whether Bitfinex was a bailee with respect to its customers is wholly inapposite to whether Bitfinex had an interest in the stolen Bitcoin based on Bitfinex's "indicia of dominion and control such as possession [and] title" over the stolen Bitcoin.  *All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d at 100 (internal quotation marks omitted).

*Second*, even if bailee status were not sufficient for statutory standing, the question of whether Bitfinex acted as a bailee with respect to XYZ would require this Court to consider extrinsic evidence and resolve disputed facts, which it cannot do at this stage.  Whether a bailment relationship exists "turns on the intent of the parties to the transaction, as manifested by their conduct and statements and any other relevant evidence."  *In re LGI Energy Sols, Inc.*, 460 B.R. 720, 729 (8th Cir. B.A.P. 2011).  That fact-intensive issue cannot be resolved on the pleadings, as one of XYZ's own cases shows.  *See Mac'Avoy*, 757 F. Supp. at 65, 72 (resolving bailment issue on a motion for summary judgment "after extensive discovery" because "[d]ocumentary evidence . . . present[s] a picture of [plaintiff's] intent").  Conducting the type of fact intensive inquiry that

would be required to determine whether Bitfinex was a bailee would be inappropriate at the motion-to-dismiss stage.

In seeking to establish a bailment relationship, XYZ relies entirely on the language of the terms of service it attached to its own ancillary petition. But the Court cannot consider such extrinsic evidence at this stage. *See Preston*, 123 F. Supp. 3d at 114 ("The Court does not weigh evidence at this stage and therefore does not consider the additional evidence put forth by the Government, however strong it may be."); *United States v. Dupree*, 919 F. Supp. 2d 254, 267 (E.D.N.Y. 2013) (finding statutory standing based on the "four corners of the pleadings" and refusing "to look beyond the pleadings and to weigh evidence extrinsic to the petition"), *aff'd in part, vacated in part on other grounds by United States v. Watts*, 786 F.3d 152 (2d Cir. 2015).

Even if the Court could consider the terms of service at this stage, there would remain factual disputes about their relevance. XYZ relies on two different terms of service dated June 9, 2016 and August 8, 2016, respectively. XYZ Pet. ¶ 10; *see also* XYZ Pet, Exs. A-B, ECF No. 289-5. But Bitfinex's terms of service were just one of the documents relevant to its relationship with customers, and as Bitfinex will demonstrate at the ancillary hearing, the terms were revised numerous times prior to the Hack. *See* Government's Second Supplemental Submission, ECF No. 262 at 11. As XYZ's own extrinsic evidence reveals, different terms of service were in place for different customers at different times. *Compare* XYZ Pet., Ex. A *with* XYZ Pet., Ex. B.[7] Moreover, the existence of a bailment relationship turns not only on documents but also on the parties' "conduct and statements and any other relevant evidence." *In re LGI Energy*, 460 B.R. at

---

[7] Indeed, there were different terms on Bitfinex's website when XYZ deposited Bitcoin into its account in 2013 and 2014. Mot. at 9.

729.  XYZ's attempt to rely on extrinsic evidence at the pleading stage is particularly inappropriate when that evidence is at most just one piece of the puzzle.

*Third*, as Bitfinex will prove at the ancillary hearing, Bitfinex was not merely a "bailee" of the stolen Bitcoin.  "A 'bailee' is a person who receives possession or custody of personal property under circumstances that constitute a bailment, and a 'bailor' is a person from whom the property is thus received."  8 C.J.S. Bailments § 2 (2024 ed.).  Generally, to establish a bailment relationship, either party must be able to terminate a bailment "at will."  8A Am. Jur. 2d Bailments § 200 (2025 ed.); *see also Maramont Corp. v. Barks & Sons, Inc.*, 1999 WL 55175, at *7 (E.D. Pa. Jan. 13, 1999) ("[I]t is the general consensus among our sister states that either the bailor or the bailee may terminate a bailment at will where the bailment is not for any particular time.").  But here, even the terms of service XYZ cites impose restrictions on customers' ability to withdraw Bitcoin from Bitfinex.  *See, e.g.*, XYZ Pet., Ex. A § 3.

Furthermore, the bailment cases cited by XYZ are inapposite.  XYZ cites only cases evaluating bailments of tangible property under the laws of California and the District of Columbia.  Mot. at 9 (citing *Mac'Avoy*, 757 F. Supp. at 65 (artwork); *Alcaraz-Garcia*, 79 F.3d at 775 (physical cash)).  But here, as discussed, BVI law likely governs whether a bailment between Bitfinex and XYZ existed.  *See Mac'Avoy*, 757 F. Supp. at 65.  And under BVI law, "it is not possible to create bailments of intangible assets (including crypto-tokens)."  UK Law Commission Final Report § 7.98; *see also* Legal Statement on Cryptoassets ¶ 17 ("[A]s a matter of law [cryptoassets] cannot be the object of a bailment.").

### B.    XYZ's Assignment Arguments Mischaracterize Bitfinex's Petition and in Fact Demonstrates Why XYZ's Petition Must Be Dismissed

XYZ also asserts that Bitfinex has failed to state a claim because it failed to allege facts supporting "a constructive or actual assignment."  Mot. at 11.  This argument seems to rest on the

belief that Bitfinex is asserting its legal interest based on post-Hack conduct. *See id.* at 9-11. That is plainly not Bitfinex's position. As Bitfinex's petition makes clear, Bitfinex lawfully obtained a legal interest in the stolen Bitcoin prior to the Hack. Pet. ¶¶ 19-23, 61-64. Bitfinex's interest in the forfeited property is not based on a post-Hack assignment. In fact, XYZ is the party that lacks any pre-Hack legal interest because it did not lose any Bitcoin in the Hack. *See* Bitfinex Mot. XYZ's argument only underscores why its claims should be dismissed for lack of standing.

*     *     *

XYZ's motion asks the Court to resolve at the pleading stage all of the complex legal issues that the Court cited in denying restitution, based on extrinsic evidence and inapplicable state law. The Court should deny XYZ's motion.

**<u>CONCLUSION</u>**

Bitfinex respectfully requests that the Court deny XYZ's motion to dismiss.

Dated:  New York, New York
       May 7, 2025

GIBSON, DUNN & CRUTCHER LLP

By:   */s/ Barry H. Berke*
      Barry H. Berke (admitted *pro hac vice*)
      Daniel M. Ketani (admitted *pro hac vice*)
      Trevor Gopnik (admitted *pro hac vice*)
      200 Park Avenue
      New York, New York 10166
      Tel: (212) 351-4000
      bberke@gibsondunn.com
      dketani@gibsondunn.com
      tgopnik@gibsondunn.com

      Stephanie L. Brooker (D.C. Bar No. 475321)
      Nick Harper (D.C. Bar No. 144707)
      1700 M Street N.W.
      Washington, D.C. 20036
      Tel: (202) 955-8500
      sbrooker@gibsondunn.com
      nharper@gibsondunn.com

20

KIRKLAND & ELLIS LLP

Mark C. Holscher (admitted *pro hac vice*)
555 S. Flower Street
Los Angeles, California 90071
Tel: (213) 680-8190
mark.holscher@kirkland.com

Laura Vartain (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Tel: (415) 439-1400
Laura.vartain@kirkland.com

*Attorneys for Third-Party Petitioners iFinex Inc. and
BFXNA Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 7, 2025, I filed and therefore caused the foregoing document to be served via the CM/ECF system in the United States District Court for the District of Columbia on all parties registered for CM/ECF in the above-captioned matter.  I further certify that I caused a service copy of the foregoing to be sent via email and/or mail to the persons listed below who may not be included on the CM/ECF service list.  *Pro se* petitioner "A.B." was not served by email or mail because neither his email address nor physical address has been provided.

Louis Zuijderwijk

Jonas Paasch

Rafal Bielenia

Pablo Garcia Illescas

Francisco Cavazos

*/s/ Barry H. Berke*
Barry H. Berke