UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 23-cr-239 (CKK) |
| ILYA LICHTENSTEIN, et al., | |
| *Defendants*. | **REDACTED** |

**XYZ'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS
BITFINEX'S ANCILLARY PETITION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ................................................................................................................................ 2

    I.    XYZ Suffered A Loss.  Bitfinex Did Not. ........................................................................ 3

    II.   Bitfinex's Possession Of Private Keys Does Not Create A Redressable Injury. ................. 6

   III.  Bitfinex Misconstrues The Government's Position. .......................................................... 9

   IV.  Bitfinex Hides Behind Missing Facts It Possesses. ..........................................................11

CONCLUSION ........................................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Byrd v. EPA*,
   174 F.3d 239 (D.C. Cir. 1999) .................................................................................................. 5

*Chafin v. Chafin*,
   568 U.S. 165 (2013) .................................................................................................................. 5

*Crumpler v. Yoong,*
   Claim No. BVIHC(COM) 2023/0003 ....................................................................................... 7

*In re BFXNA Inc. d/b/a Bitfinex*,
   CFTC Docket No. 16-19 (June 2, 2016) .............................................................................. 6, 11

*In re LGI Energy Sols., Inc.,*
   460 B.R. 720 (B.A.P. 8th Cir. 2011) ....................................................................................... 12

*In re Voyager Digital Holdings, Inc.*,
   649 B.R. 111 (Bankr. S.D.N.Y. 2023) ....................................................................................... 9

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................................................................. 4

*Marino v. Nat'l Oceanic & Atmospheric Admin.*,
   33 F.4th 593 (D.C. Cir. 2022) ................................................................................................... 6

*New York Stock Exch. LLC v. Sec. & Exch. Comm'n*,
   962 F.3d 541 (D.C. Cir. 2020) .................................................................................................. 6

*Union Naval Stores Co. v. United States*,
   240 U.S. 284 (1916) .................................................................................................................. 4

*United States v. 7725 Unity Ave. N.*,
   294 F.3d 954 (8th Cir. 2002) ..................................................................................................... 3

*United States v. All Assets Held at Bank Julius Baer & Co.*,
   959 F. Supp. 2d 81 (D.D.C. 2013) ............................................................................................. 8

*United States v. All Assets Held in Acct. No. XXXXXXX*,
   471 F. Supp. 3d 192 (D.D.C. 2020) .......................................................................................... 4

*United States v. Emor*,
   785 F.3d 671 (D.C. Cir. 2015) .................................................................................................. 3

*United States v. Harmon*,
   474 F. Supp. 3d 76 (D.D.C. 2020) ............................................................................................. 8

*United States v. Patel*,
  2024 WL 1932871 (D.D.C. May 1, 2024) ................................................................. 8

**Statutes**

21 U.S.C. § 853(n)(6)(A) ............................................................................................... 1

**Other Authorities**

Bitfinex, *Initial Exchange Offering of LEO Tokens* (May 8, 2019) ................................ 5

UK Jurisdiction Taskforce, LawTech Delivery Panel,
  *Legal Statement on Cryptoassets and Smart Contracts* ......................................... 4, 7

UK Law Commission, *Digital Assets: Final Report*, §§ 5.45, 5.72-75 (June 27, 2023) ............ 7, 8

**Rules**

Fed. R. Crim. P. 32.2(c)(1)(A) ................................................................................... 3, 4

U.S. Const. amend. V ..................................................................................................... 4

**Treatises**

Shawn S. Amuial, et al., *The Blockchain: A Guide for Legal and Business Professionals* § 1.3
  (Oct. 2016) ................................................................................................................ 8

Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1548 (3d ed.) ...................................... 6

XYZ Inc. (proceeding by pseudonym, "XYZ") respectfully submits this Reply in Support of Its Motion to Dismiss the Petition filed by iFinex Inc. and BFXNA Inc. (together, "Bitfinex"). (*See* Bitfinex Petition, ECF No. 219; Motion to Dismiss, ECF No. 309; Opposition, ECF No. 327).

## INTRODUCTION

Seventeen petitioners are seeking to recover bitcoins in this case. Bitfinex is the only such petitioner that asserts neither that it owned bitcoins at the time of the hack nor that it lost bitcoins because of the hack. XYZ – not Bitfinex – rightfully owns thousands of the stolen bitcoins at issue.

Bitfinex's Opposition abandons any argument that it is seeking to recover bitcoins based on the actions it took months after the hack. It offers no meaningful response to dismissing its request for title, even though its own terms stated that the bitcoins at issue belonged to its customers. Bitfinex tries, once again, to equate its control of the private keys to customer wallets with ownership of the bitcoins that those wallets once contained. It does so by gesturing at inapposite cases, unidentified terms of service, and a CFTC consent decree that sanctioned Bitfinex for engaging in illegal transactions. Even the CFTC consent decree—which concerned customer bitcoins held in an omnibus wallet (rather than customer-specific wallets) that Bitfinex failed to timely deliver to its customers—recognized that "Bitfinex considered bitcoins held in the omnibus wallet to belong to" its customers. In essence, Bitfinex recognized that *even bitcoins it comingled in non-customer-specific wallets* were *owned by its customers*. Its Petition does not assert otherwise.

Even if Bitfinex states enough facts to support some colorable *inferior* interest in possession as a trustee, its Opposition leaves little doubt that XYZ and other customers held and hold the *"superior"* interest. *See* 21 U.S.C. § 853(n)(6)(A). Bitfinex concedes that customers'

claims "require fact-intensive and claimant-specific inquiries that cannot be determined at this early stage of the proceeding," yet it is so desperate to avoid meaningful discovery requests from XYZ on the "tiny fraction" of the bitcoins that XYZ rightfully owns that it resorts to cherry-picking out-of-court statements made years ago by XYZ's ███████████. (Opp'n 8-9, 16).[1] Bitfinex cannot escape the fact that XYZ – unlike Bitfinex – suffered a substantial loss of bitcoins it owned, and XYZ's Petition states an actual ownership interest in the stolen bitcoins. Conversely, Bitfinex asks this Court to award it an $11 billion windfall in assets that do not belong to it.

## ARGUMENT

*First*, XYZ – unlike Bitfinex – has standing because it suffered an actual loss of bitcoins and other assets that XYZ rightfully owned before Defendants' crimes. XYZ's specific interest is in 2,770 of the stolen bitcoins, but the standing requirement for Bitfinex's Petition depends on Bitfinex's loss (which does not exist), not XYZ's loss (which does exist). *Second*, Bitfinex does not assert that it had title to any relevant bitcoins, and it fails to explain its interest in the bitcoins at issue beyond its control of private keys, which are not property under the appliable law. *Third*, Bitfinex misportrays the government's position, which has changed and was clearly based on an incomplete understanding of the facts. *Fourth*, despite its exclusive access to the relevant information, Bitfinex hides behind missing facts.

---

[1] Specifically, Bitfinex identifies two out-of-context statements that XYZ ████████████████████████████████████████████████████████████████████████. Those statements are not part of any petition and should not be considered. ████████████ could not have known at that time that Bitfinex would so vehemently refuse to honor the legality of XYZ's property interest in the stolen bitcoins, ████ █ no understanding of the ancillary petition process—something that many lawyers (likely most) would be unable to explain without researching the subject. Discovery and appropriate context will clarify the meaning of these statements.

2

### I.  XYZ Suffered A Loss.  Bitfinex Did Not.

Bitfinex attempts to flip the script by questioning XYZ's standing, when the issue is Bitfinex's standing to obtain a windfall of title to 115,000 bitcoins (worth more than $11 billion) that it did not and does not own.  The parties agree that "any colorable claim on the property suffices" to show standing, if "the claim of injury is 'redressable, at least in part, by a return of the property.'"  *United States v. Emor*, 785 F.3d 671, 676 (D.C. Cir. 2015) (quoting *United States v. 7725 Unity Ave. N.*, 294 F.3d 954, 957 (8th Cir. 2002)).  The parties further agree that "[e]stablishing that a property interest is a 'legal interest' under federal law is not a high bar."  (Opp'n 12 (citation omitted)).

XYZ easily establishes standing through its sworn statements that it has a "legal interest in the seized BTC" comprised of its ownership of a "pre-hack balance of 2,705.40228000 BTC" plus bitcoins that were purchased with pre-hack assets it owned that provided coin-for-coin replacements to hack victims immediately after the hack.  (XYZ Petition ¶ 25); *see also* Fed. R. Crim. P. 32.2(c)(1)(A).  The loss for every bitcoin XYZ seeks to recover was assigned to XYZ in the immediate aftermath of the hack.  (*See* Bitfinex Petition Ex. B ("The Losses have been allocated ratably among the Bitfinex Group *customers* with Bitfinex custody accounts . . . ." (emphasis added))).  Even without any assignment, XYZ received vested rights pursuant to the principles of subrogation under the likely applicable law.  (*See* Burkitt Declaration, ECF No. 325-1).  XYZ never conveyed to "Defendants, Bitfinex, or any anyone else any right to or ownership interest in the subject property."  (XYZ Petition ¶ 26).

Unlike XYZ, Bitfinex fails to assert a *property* interest. Its petition contains no factual allegations establishing an ownership interest in the forfeited assets.  Bitfinex relies instead on the "dominion and control" that it says it once had over bitcoins that belonged to its customers.  (Opp'n 2).  But Bitfinex cannot show that *its* "injury" will be "redressed by" the relief it seeks, because

3

the relief it demands is ownership, whereas the injury it plausibly asserts is a possessory interest of private keys. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The UK Jurisdiction Taskforce's *Legal Statement on Cryptoassets and Smart Contracts*, which Bitfinex cites (Opp'n 13-14), concludes that a "private key viewed in isolation . . . is no more than an item of pure information and, like a password or a telephone number, it *cannot in itself be treated as property*." ¶ 65 (Nov. 2019), https://perma.cc/QYE8-GDMZ (emphasis added). Granting Bitfinex "title" in 115,000 bitcoins, worth $11 billion, that it did not own (and does not assert that it owned) on the basis that it merely possessed the password to access those assets would be absurd. It would provide a multibillion-dollar windfall of property that rightfully belongs to Bitfinex customers, including XYZ. That windfall would work a violation of bedrock principles of property law that span common law legal systems. *See, e.g.*, *Union Naval Stores Co. v. United States*, 240 U.S. 284, 290 (1916) (recognizing that one who knowingly takes the property of another cannot, by commingling it with other property, acquire title). And it would entangle this Court in an unjust taking of property that rightfully belongs to Bitfinex's customers. *See* U.S. Const. amend. V.

Rather than grapple with these weighty issues, Bitfinex asserts a curious rule: a party can move to dismiss a claim to forfeited property only to the extent of its share of the relief sought, and motions beyond that specific interest are moot. (Opp'n 11). Rule 32.2 does not impose this requirement. It provides simply that "the court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason." *See* Fed. R. Crim. P. 32.2(c)(1)(A). It is well established that "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *United States v. All Assets Held in Acct. No. XXXXXXXX*, 471 F. Supp. 3d 192, 204 (D.D.C. 2020) (quoting *Chafin v. Chafin*, 568

4

U.S. 165, 172 (2013)). "[E]ven the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'" *Id.* (quoting *Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999)).

In any event, XYZ's interest is not strictly limited to the bitcoins it rightfully owns. XYZ certainly has a vested and superior interest in 2,770 specific bitcoins, but it also has a general interest in how the *res* of fungible bitcoins and other crypto assets held in the same wallets as the bitcoins XYZ owns are handled. XYZ may be injured if those assets are improperly gifted to Bitfinex, because if owners' claims are not prioritized and Bitfinex is granted some or all of the remarkable windfall it seeks, XYZ could be left to fight other customers for its rightful slice of an insufficient pie. This legitimate concern is heightened by the fact that Bitfinex has promised to use the vast majority of any recovery it obtains to enrich its shareholders and the owners of UNUS SED LEO tokens (who are effectively shareholders with benefits).[2] (*See* Bitfinex Petition ¶ 69). Moreover, its claim to this Court that "[c]ustomers who elected [to accept RRT tokens] will benefit if and when Bitfinex recovers the stolen Bitcoin" (Opp'n 5), is, at best, misleading. In fact, if the Court awards Bitfinex what it seeks, Bitfinex will use at most $30 million of these assets to compensate these former customers. (*See* Bitfinex Petition ¶ 69, Ex. D). Thus, former customers will get less than 0.3% of Bitfinex's windfall, while the insiders who purchased LEO tokens will get the lion's share of Bitfinex's undeserved bonanza.

It is Bitfinex, not XYZ, that has moved to dismiss claims superior to any interest it asserts. While Bitfinex is wrong that XYZ lacks standing, it is correct that a petitioner must assert "its own alleged injuries," as XYZ has, and "not those of a third party who is not a [petitioner] in the case,"

---

[2] The UNUS SED LEO whitepaper guarantees token holders a guarantee of 27% of iFinex's gross revenue every month (through token buy backs), reduced fees on the Bitfinex exchange, and use of at least 80 percent of any stolen bitcoins it receives to "repurchase and burn outstanding LEO tokens within 18 months from the date of recovery." *See* Bitfinex, *Initial Exchange Offering of LEO Tokens* (May 8, 2019), https://perma.cc/QH6X-X48J.

5

as Bitfinex has. *New York Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 552 (D.C. Cir. 2020) (Opp'n 11). Courts have long been wary of trustees who seek ownership of assets they held only in trust, which is why a trustee must generally state that it has more than a possessory interest, and that "some property right in or title to the subject matter of the suit has been transferred to the trustee." Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1548 (3d ed.). Bitfinex's effort to obtain title to assets that it did not own runs afoul of these rules. Indeed, Bitfinex's rule that a petitioner should be limited in moving to dismiss a claim to the extent of its own interest, together with its inability to plead ownership, implicitly limits its own motion to dismiss to the contours of its status as a mere trustee and non-owner. Thus, by its own logic, Bitfinex should not be permitted to challenge the claims of actual bitcoin owners like XYZ, because Bitfinex's claim for subordinate possessory rights do not "'plausibly [] plead that a favorable decision would' redress" the greater harm suffered by the actual owners, at least beyond the amount of $30 million. (Opp'n 11 (quoting *Marino v. Nat'l Oceanic & Atmospheric Admin.*, 33 F.4th 593, 599 (D.C. Cir. 2022))).

## II. Bitfinex's Possession Of Private Keys Does Not Create A Redressable Injury.

Bitfinex's Petition does not assert that it owned any bitcoins at the time of the hack, or that it replaced any stolen bitcoins coin-for-coin thereafter. That was no error. Bitfinex has long told its customers that the bitcoins in their wallets "belong to and are owned by you." (XYZ Petition ¶ 11, Exs. A & B). Bitfinex's Opposition even cites the CFTC Consent Order that sanctioned it, and which asserts that "Bitfinex considered bitcoins held in the omnibus wallet to belong to" its customers, even when those bitcoins were subject to financing liens. *In re BFXNA Inc. d/b/a Bitfinex*, CFTC Docket No. 16-19, at 3 (June 2, 2016), https://perma.cc/G46Z-JUUS.

Bitfinex tries to escape the fact that it has not alleged ownership by pointing to a variety of authorities for the proposition that control of private keys associated with wallets indicates ownership of the bitcoins in those wallets. (Opp'n 13-14). But Bitfinex's authorities demonstrate

6

that users of an intermediary services (like the Bitfinex exchange) own crypto assets where, as here, the terms of the relationship provide as much.  Bitfinex first cites the UK Jurisdiction Task Force's *Legal Statement on Cryptoassets and Smart Contracts* for the proposition that "a person lawfully in possession of a tangible asset is presumed to be the owner." (Opp'n 13-14). But Bitfinex omits the next two sentences:

> However, ownership also depends on the circumstances and on the rules of the relevant system. For example: [] a person may hold the key on behalf of another, e.g. an employer or client, or as a custodian or intermediary, in which case ownership would be determined by established rules of agency or trust[.]

¶ 43 (Nov. 2019), https://perma.cc/QYE8-GDMZ.  That is, crypto assets are governed by the same common law principles that apply to a car handed off to a valet, valuables placed in a safe deposit box, or company property entrusted to an employee.  Possession and control may be indicative of ownership, but they are not dispositive.  Indeed, the report Bitfinex cites goes on to recognize that "cryptoassets possess all the characteristics of property" and may "be the subject of a trust." *Id.* ¶¶ 57-58.[3]  Bitfinex also cites *Crumpler v. Yoong,* Claim No. BVIHC(COM) 2023/0003, which likewise suggests that a trust may arise over crypto assets under BVI law.  ¶¶ 166-67.

Bitfinex also points to the UK Law Commission's June 27, 2023, *Digital Assets: Final Report*, https://tinyurl.com/4fwejnpp, which recognizes that "superior legal title (sometimes referred to as 'ownership') to a digital object can be separated from (factual) control over that digital object," including "intermediated holding arrangements and agency relationships." §§ 5.45, 5.72-75 (recognizing that a "proprietary interest" associated with control may be a "lesser interest

---

[3] Bitfinex quotes an unpublished Southern District of New York opinion and a District of Connecticut bankruptcy case for the proposition that English Common Law applies in the British Virgin Islands.  (Opp'n 13 n.5).  As explained by the Declaration of Daniel Burkitt, opinions of English courts are persuasive but not binding authority in the British Virgin Islands.  (ECF No. 325-1).

7

than a superior legal title"). While the report notes that holding intermediaries may operate based on "contract-based full title transfer/title acquisition arrangement," *id.* §§ 7.32-34, those arrangements are distinct from the circumstances present here, where the intermediary made clear that the bitcoins "belong[ed] to and are owned by" users and would be held in user-specific wallets, (*see* XYZ Petition Exs. A & B).[4] This distinction explains why Bitfinex's Petition did not assert that it owned the bitcoins it is asking this Court to award at the time of Mr. Lichtenstein's hack.[5]

Bitfinex also cites two cases from this District, which recognized that control of a private key is indicative of ownership. Neither *United States v. Harmon*, 474 F. Supp. 3d 76, 82 (D.D.C. 2020) (Opp. at 14), nor *United States v. Patel*, 2024 WL 1932871, at *1 (D.D.C. May 1, 2024) (Opp'n 14), directly addresses ownership in the context of assets held in a crypto wallet at an exchange.[6] Both decisions are consistent with the concept that bitcoins may be held on an exchange without conveying ownership. *Harmon* concerned the defendant's operation of a "tumbler" or "mixer" service that helped customers "obfuscate the source or owner of the bitcoins"

---

[4] Even in the context of "contract-based full title transfer/title acquisition arrangements," the report states, "The intention of the parties will be determined by construing the terms of the contract that governs the operation and provision of the arrangement. The rights and obligations of the parties to contract-based full title transfer/title acquisition arrangement will be determined fundamentally by the terms (express or implied) of the agreement(s) on which the arrangement is based." UK Law Commission, *Digital Assets: Final Report*, § 7.33 (June 27, 2023).

[5] Bitfinex also cites *United States v. All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81, 100 (D.D.C. 2013) (Opp'n 15), a case concerning the United States' effort to forfeit certain bank deposits that had nothing to do with custom crypto held pursuant to detailed terms of service.

[6] The quoted language from *Harmon* and *Patel* is based on a citation to § 1.3 of *The Blockchain: A Guide for Legal and Business Professionals*. In that introductory section, the author notes that he owns 0.1 bitcoin in a specific public address, and he says (technically incorrectly) that his ownership of that 0.1 bitcoin is "based solely on [his] knowledge of the private key that corresponds to the public address," just like a password-protected "e-mail or text." Shawn S. Amuial, et al., *The Blockchain: A Guide for Legal and Business Professionals* § 1.3 (Oct. 2016). Basic principles of property law would disregard the author's ownership claim if, for example, he had obtained the bitcoin by theft. And the section says nothing about ownership of bitcoins stored on an exchange, nor does it address ownership of e-mails or texts housed on cloud-based servers.

to "mask drug, gun, or other illegal 'transactions.'" 474 F. Supp. at 80. The indictment charged *Harmon* with providing that service and effecting transactions; it did not contend that he owned every bitcoin he touched. *Id.* at 82. *Patel* concerned a motion to suppress evidence of 450 bitcoins that the defendant had attempted to stash in "a Blockchain.com account even though the funds were subject to forfeiture." 2024 WL 1932871, at *1. Judge Friedrich recognized that the defendant could "move . . . as 'the owner of property the government has seized in a search to seek its return'" and assumed, without deciding, that the defendant indeed had a property interest in the 450 bitcoins seized from Blockchain.com. *Id.* at *5 n.4. None of the cases that Bitfinex cites holds that an exchange necessarily owns bitcoins in its customers' accounts. Bitfinex is, however, correct that "BVI law is not an outlier" (Opp'n 14), as U.S. courts also recognize that possession of a private key does not necessarily demonstrate ownership.[7]

### III.  Bitfinex Misconstrues The Government's Position.

The first substantive sentence of Bitfinex's Opposition states that "[b]oth the Government and Defendants acknowledge that most if not all of the recovered Bitcoin should be returned to Bitfinex." First, it is not clear why the Court should care about Defendants' opinion as to who owns the assets that they stole. Second, Bitfinex willfully misrepresents the government's position, repeatedly arguing that the government believes that the Court should award Bitfinex, and not the account holders, the forfeited assets. (*See* Opp'n 6 ("The Government, which is the party seeking forfeiture of the stolen Bitcoin, has agreed that Bitfinex is entitled to the vast majority of the seized Bitcoin."), 6-7 ("The Government has repeatedly recognized that Bitfinex may assert meritorious claims in the ancillary proceeding, and it has declined to move to dismiss its ancillary

---

[7] *See, e.g., In re Voyager Digital Holdings, Inc.*, 649 B.R. 111, 127 (Bankr. S.D.N.Y. 2023) (assets would be "held by Binance.US strictly in trust for (and in custody for) either the Debtors or the account holders, respectively").

9

petition."), 15 ("The Government (i.e., the party seeking forfeiture) has repeatedly and correctly acknowledged that Bitfinex has a legal interest in at least a vast majority of the stolen Bitcoin and that its petition is likely to be meritorious."), 16 (noting, again, that the government "has not moved to dismiss Bitfinex's petition."). But while Bitfinex quotes the government for the proposition that most of bitcoins at issue are "'specific property lost' by Bitfinex" (Opp'n 15 (quoting ECF No. 202 at 3-5)), it somehow omits the rest of that sentence, as the referenced government submission stated that the property was "'lost' by Bitfinex *and/or its accountholders*." (ECF No. 202 at 4 (emphasis added)). Far from endorsing Bitfinex's claim, the government stated evenhandedly, "Bitfinex *and/or other claimants may well have meritorious claims* to remaining seized assets during the third-party ancillary forfeiture proceeding." (*Id.* at 2, n.1).

Moreover, while Bitfinex repeatedly cites the Government's Notice Regarding the Court's April 4, 2025 Order, ECF No. 315, the government's most recent filing, for the uncontroversial fact that the government has not moved to dismiss Bitfinex's petition, in that pleading, the government makes clear that it is not moving to dismiss any claims filed by any petitioner. *Id.* In contrast to Bitfinex's portrayal of the government's position, the government has made clear that it is wholly agnostic in the dispute between Bitfinex and its former customers. *Id.* at 1 ("[T]he third-party petitioners have raised complex issues of facts and law. . . . [T]he government is not in a position to file any motions to dismiss and does not take a position regarding any motions to dismiss filed by petitioners in response to the April 4th Order.").

Bitfinex's mischaracterization of the government's position is part of a troubling pattern. It also misconstrues the caselaw it cites, none of which stands for the proposition that for crypto assets, control equals ownership. And its citation to the 2016 CFTC enforcement action against the company for the proposition that that agency found that the Bitcoin in its customer accounts

10

belonged to the company is similarly misleading. *In re BFXNA Inc. d/b/a Bitfinex*, CFTC Docket No. 16-19, at 3.[8] That case involved Bitfinex's violations of Sections 4(a) and 4(d) of the Commodity Exchange Act because of its failure to "actually deliver" financed commodities (in that case, bitcoins) within 28 days as required by the Dodd-Frank Act. The consent order in that case noted that Bitfinex considered even the Bitcoins held in its omnibus settlement account to "belong to" its customers and not Bitfinex itself. *Id.* And that was under Bitfinex's *old* system; the order further notes that "[i]n response to the Division of Enforcement's investigation, Bitfinex represents that it has made a number of changes to its business practices in order to attempt to come into compliance with the Act and Regulations." *Id.* at 4. One of those changes was to move to a system where each customer's assets were held in a segregated wallet instead of a common, omnibus wallet; in fact, the consent order notes that, during the CFTC's investigation, Bitfinex first "changed its model so that bitcoins purchased using the Exchange Trading feature were held in multi-signature wallets . . . that were individually enumerated for each trader." *Id.* at 3. Subsequently, but still during the CFTC's investigation, "Bitfinex changed its model again so that bitcoins purchased using both the Exchange Trading and Margin Trading features were held in individually enumerated, multi-signature wallets." *Id.* In sum, the CFTC Order is simply more evidence that the assets held on Bitfinex belonged to its customers and not Bitfinex itself.

### IV. Bitfinex Hides Behind Missing Facts It Possesses.

Bitfinex contends that the Court cannot adjudicate the relationship between Bitfinex and XYZ "at this stage" because "whether a bailment relationship exists 'turns on the intent of the parties to the transaction, as manifested by their conduct and statements and any other relevant

---

[8] In the interests of full disclosure, undersigned counsel notifies the Court that he was the Director of the CFTC's Division of Enforcement during the investigation and resolution of that Bitfinex matter, the first (but not last) case that the Commission brought against Bitfinex.

11

evidence." (Opp'n 17 (quoting *In re LGI Energy Sols., Inc.,* 460 B.R. 720, 729 (B.A.P. 8th Cir. 2011))). That is a sound reason for not dismissing XYZ's petition, which asserts that XYZ is the rightful owner of 2,770 stolen bitcoins. And XYZ wholeheartedly agrees that discovery into a variety of representations made by Bitfinex is appropriate.[9]

As emphatically as XYZ agrees that discovery on customers' claims may be needed, the issue raised by its Motion was Bitfinex's basis for claiming title to all 115,000 bitcoins. XYZ noted that "[a]s far as the Bitfinex's Petition alleges, the Bitcoin at issue all belonged to Bitfinex's customers." (Mot. at 9). Bitfinex's Petition contained no facts establishing what, if any, ownership interest it was asserting in the stolen bitcoin and when that interest arose. Its Opposition declines to answer those straightforward questions. Instead, Bitfinex emphasizes the supposed importance of unidentified "different terms" that were "on Bitfinex's website" at "different time[s]," including two or three years before the hack. (Opp'n 18 n.7). If Bitfinex believes that some relevant contract makes Bitfinex the *bona fide* owner of the bitcoins it claims title to, it should amend its Petition and say which bitcoins it owns and under what contract it owns them. Its Petition makes no such assertion, and its assertions that its these terms changed before or during the relevant period of time is just another attempt to distract the Court from the fact that Bitfinex is simply attempting to convert a possessory and non-ownership relationship into clear title.

One other point merits brief note. Bitfinex abandons any argument that it is asserting a "legal interest based on post-Hack conduct" and asserts plainly that its "interest in the forfeited property is not based on a post-Hack assignment." (Opp'n 20). This concession makes sense, as Bitfinex assigned the losses associated with the hack to its customers. (Bitfinex Petition Ex. B).

---

[9] Bitfinex is mistaken in construing XYZ's position as considering Bitfinex an ordinary bailee. XYZ argued that Bitfinex had a "contractual interest *akin to that of a bailee*." (Mot. at 9 (emphasis added)).

12

Bitfinex's attempts to construe that as temporary (Bitfinex Petition ¶ 33), but XYZ and other customers suffered a real loss in bitcoins that they – not Bitfinex – owned, and they have not been made whole. Bitfinex does not dispute that fact, and the Court should at least require Bitfinex to amend its Petition to state clearly which bitcoins, if any, it rightfully owns, and which bitcoins it seeks simply to award non-owners a multibillion-dollar windfall.

## CONCLUSION

For those reasons, the Court should, at a minimum, dismiss Bitfinex's Petition and direct Bitfinex to file an amended petition that states which, if any, of the stolen Bitcoin's it rightfully owns, and when any purported ownership interest arose.

Date: May 16, 2025                                   Respectfully submitted,

/s/ Aitan D. Goelman
Aitan D. Goelman (DC Bar 446636)
Christopher R. MacColl (DC Bar 1049153)
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
AGoelman@zuckerman.com
CMacColl@zuckerman.com

*Attorneys for Intervenor, Claimant, and Third-Party Petitioner XYZ*

**SERVICE OF AN UNREDACTED VERSION OF THIS FILING HAS BEEN EFFECTED**